Volume 2

Pages 257 - 475

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE Susan Illston

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
   vs.                             )  NO. CR 06-0711 SI
                                   )
CODY DOBBS,                        )
                                   )  San Francisco, California
              Defendant.           )  Wednesday
                                   )  November 14, 2007
_____   )  8:30 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**         SCOTT N. SCHOOLS
                           United States Attorney
                           450 Golden Gate Ave.
                           San Francisco, California  94102
                 **BY:  SUSAN JERICH, AUSA**
                        **KIRSTIN AULT, AUSA**


**For Defendant:**         Law Office of J. David Nick
                           99 Osgood Place, #1
                           San Francisco, California 94133
                 **BY:  J. DAVID NICK, ESQ.**

                           **E. MICHAEL LINSCHEID, ESQ.**
                           Law Chambers Building
                           345 Franklin Street
                           San Francisco, California 94102


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

1                    **P R O C E E D I N G S**

2   **NOVEMBER 14, 2007**                            **9:06 a.m.**

3

4           (Proceedings held in open court, outside

5             the presence and hearing of the jury.)

6           **THE COURT:**  Good morning.  Are we ready?

7           **MS. AULT:**  Yes, your Honor.

8           **MR. NICK:**  Your Honor, one quick issue.  With me is

9    Chris Reynolds.  He is my investigator.  I'm asking that the

10   Court allow him to stay here throughout the government's

11   opening statements and testimony as he is providing assistance

12   to the defense and listening to the testimony, being able to

13   observe --

14           **THE COURT:**  Will he be a witness?

15           **MR. NICK:**  Unlikely, your Honor.  That's the best way

16   that I can put it.  I don't have a plan to call him right now

17   for any reason, but he has interviewed people in this case that

18   perhaps if they don't, you know, go along with the statement

19   they provided before, there might be a chance that he might be

20   called to impeach.

21           **THE COURT:**  Do you have an issue with that?

22           **MS. AULT:**  No, your Honor, but we would ask that all

23   other witnesses be excluded.

24           **MR. NICK:**  No objection to that.

25           **THE COURT:**  All right.  That will be the Court's

1  order then.

2          **MR. NICK:**  Thank you very much.

3          **THE COURT:**  What's your name, sir?

4          **MR. REYNOLDS:**  Chris Reynolds.

5          **THE COURT:**  All right.  So mr. Reynolds may stay.

6          **MS. AULT:**  And, your Honor, Beau Bilek, our case

7  agent, will be present throughout the trial and we do

8  anticipate calling him as a witness.

9          **MR. NICK:**  Yeah, I have no objection to that.

10          **THE COURT:**  I wanted to tell you that I will give

11  preliminary instructions before you begin your opening

12  statements, and I will just do the standard instructions from

13  the Ninth Circuit.

14          Did you provide me any special opening instructions

15  that you wanted?

16          **MS. AULT:**  No, your Honor.

17          **THE COURT:**  Okay.  Good.  Then I will just do the

18  regular ones.

19          **MR. NICK:**  Your Honor, just for sake of my clarity,

20  there was some special instructions that the government had

21  requested.  I think that goes at the end, is what I believe.

22          **THE COURT:**  Right, those go at the end.  And you had

23  filed objections.

24          **MR. NICK:**  Thank you.

25          **THE COURT:**  We will have an instruction conference

1  before we finalize that.

2          **MR. NICK:**  Thank you.

3          **THE COURT:**  I just give them the preliminary ones at

4  this point.

5          **MR. NICK:**  Thanks.

6          (Jury in at 9:12 a.m.)

7          **THE COURT:**  Welcome back, ladies and gentlemen.

8  Please be seated.

9          What will happen now ladies and gentlemen is I have

10 some preliminary instructions to read to you.  As I told you

11 yesterday, I'm the judge of the law, so I get to tell you what

12 the rules are, although these that I'm about to read to you

13 today are less substantive than the ones you will get at the

14 end.  You will get detailed instructions at the end.  These are

15 preliminary to help you approach your task.

16         After I finish reading these instructions, it will be

17 the opportunity of counsel to give opening statements if they

18 desire to.

19                  **PRELIMINARY JURY INSTRUCTIONS**

20         **THE COURT:**  Ladies and gentlemen, you are now the

21 jury in this case and I want to take a few minutes to tell you

22 something about your duties as jurors and to give you some

23 instructions.  These are preliminary instructions.  At the end

24 of the trial, I will give you more detailed instructions.

25 Those instruction will control your deliberations.

1          You should not take anything that I say or do during

2    the trial as indicating what I think of the evidence or what

3    your verdict should be.

4          This is a criminal case brought by the United States

5    government.  The indictment charges five counts against the

6    defendant.  The indictment is simply the description of the

7    charges made by the government.  It is not evidence of

8    anything.

9          The defendant is charged in Count 1 a violation of

10   21 USC 846, which is that Mr. Dobbs did knowingly and

11   intentionally conspire to manufacture and possess with intent

12   to distribute 1,000 or more marijuana plants in violation of

13   21 United States Code Section 846.

14         Mr. Dobbs is charged in Count 2 with a violation of

15   21 United States Code Section 841(a)(1), which is that he did

16   knowingly and intentionally manufacture and possess with intent

17   to distribute 1,000 or more marijuana plants.

18         He is charged in Count 3 with a violation of 21

19   United States Code Section 841(a)(1).

20         In each of these I guess I should have told you, in

21   Count 1 the charge relates to the time frame January 2004 to

22   May 2005.

23         In Count 2 the time charged is April 30, 2004.

24         In Count 3 Mr. Dobbs is charged with a violation of

25   21 United States Code Section 841(a)(1) in that on or about

1  May 12, 2005 he did knowingly and intentionally manufacture and

2  possess 1,000 or more marijuana plant.

3  He is charged in Count 4 with a violation of Title 21

4  United States Code Section 846, in that between August 26 and

5  September 13, 2006 he did knowingly and intentionally conspire

6  to manufacture and possess with the intent to distribute 100 or

7  more marijuana plants.

8  And in Count 5 he is charged with violation of

9  21 United States Code Section 841(a)(1) in that on

10  September 13th, 2006 he did knowingly and intentionally

11  manufacture and possess with the intent to distribute 100 or

12  more marijuana plants.

13  The defendant has pleaded not guilty to the charges

14  and he is presumed innocent unless and until proved guilty

15  beyond a reasonable doubt.

16  A defendant has the right to remain silent and never

17  has to prove innocence or present any evidence.

18  The evidence that you are to consider in deciding

19  what the facts are consists of:

20  The sworn testimony of any witness;

21  The exhibits which are received into evidence;

22  And any facts to which all the lawyers stipulate.

23  Following things are not evidence and you must not

24  consider them in deciding the facts of this case:

25  Statements and arguments of the lawyers are not

1  evidence;

2          Questions and objections by the lawyers are not

3  evidence;

4          Testimony that I instruct you to disregard is not

5  evidence;

6          And anything that you may see or hear when the Court

7  is not in session is not evidence, even if what you see or hear

8  is done or said by one of the parties or one of the witnesses.

9          Some evidence may be admitted for a limited purpose

10 only.  When I instruct that you an item of evidence has been

11 admitted for a limited purpose, you must consider it only for

12 that limited purpose and no other.

13         Evidence may be direct or circumstantial.  Direct

14 evidence is direct proof of a fact such as testimony by a

15 witness about what that witness -- let me start that sentence

16 again.

17         Direct evidence is direct proof of a fact, such as

18 testimony by a witness about what that witness personally saw

19 or heard or did.

20         Circumstantial evidence is indirect evidence.  That

21 is, it is proof of one or more facts from which one can find

22 another fact.

23         You are to consider both direct and circumstantial

24 evidence.  The law permits you to give equal weight to both,

25 but it is for you to decide how much weight to give any

1  evidence.

2          There are Rules of Evidence which control what can be

3  received into evidence.  When a lawyer asks a question or

4  offers an exhibit into evidence and a lawyer on the other side

5  thinks that it not permitted by the Rules of Evidence, then

6  that lawyer may object.  If I overrule the objection, the

7  question cannot be answered and the exhibit cannot be received.

8  Whenever I sustain an objection to a question, you must ignore

9  the question and must not guess what the answer would have

10 been.

11         Sometimes I may order that evidence be stricken from

12 the record and that you disregard or ignore the evidence.  That

13 means that when you are deciding the case, you must not

14 consider the evidence which I told you to disregard.

15         In deciding the facts of this case you may have to

16 decide which testimony to believe and which testimony not to

17 believe.  You may believe everything a witness says, or part of

18 it, or none of it.

19         In considering the testimony of any witness, you may

20 take into account:

21         The opportunity and ability of the witness to see or

22 hear or know the things testified to;

23         The witness's memory;

24         The witness's manner while testifying;

25         The witness's interest in the outcome of the case;

1              And any bias or prejudice;

2              Whether other evidence contradicted the witness's

3    testimony;

4              The reasonableness of the witness's testimony in

5    light of all the evidence;

6              And any other factors that bear on believability.

7              The weight of the evidence as to a fact does not

8    necessarily depend on the number of witnesses who testify.

9              I will now say a few word about your conduct as

10   jurors.

11             First, you are not to discuss this case with anyone,

12   including your fellow jurors, members of your family, people

13   involved in the trial or anyone else, nor are you allowed to

14   permit others to discuss the case with you.  If anyone

15   approaches you and tries to talk to you about this case, please

16   let me know immediately.

17             Second, do not read any news stories or articles or

18   listen to any radio or television reports about the case or

19   about anyone who has anything to do with it.

20             Third, do not do any research, such as consulting

21   dictionaries, searching the internet or using any other

22   reference materials, and do not make any investigation about

23   the case yourselves.

24             Fourth, if you need to communicate with me, simply

25   give a note to Tracy and she will give it to me.

1      And fifth, do not make up your mind about the

2   verdict -- about what the verdict should be until after you

3   have gone to the jury room to decide the case and you and your

4   fellow jurors have discussed the evidence.  Keep an open mind

5   until then.

6      And I will mention one other thing.  I have ordered

7   the parties and the lawyers not to talk with the jurors or have

8   any communication with the jurors.  So if you should see

9   somebody in an elevator or in the hallway and you recognize

10   them as being part of this trial, they will ignore you.  They

11   will just not talk to you and ignore you.  They are not being

12   rude.  They are just doing what I have told them, which is stay

13   away from the jury.

14      So it will make your lives and their lives a lot

15   easier if you just ignore one another and don't have any

16   communication with one another until the case is all over.

17      At the end of the trial you will have to make your

18   decision based on what you recall of the evidence.  You will

19   not have a written transcript of the trial, so I urge you to

20   pay close attention to the testimony as it is given.

21      If you wish, you may take notes to help you remember

22   what a witness said.  If you do take notes, please keep them to

23   yourself until you and your fellow jurors go to the jury room

24   to deliberate the case.  Do not let note-taking distract you so

25   that you do not hear other answers by the witness.  When you

1   leave, you should leave your notes in the jury room.

2           Whether or not you take notes, you should rely on

3   your own memory of what was said.  Notes are only to assist

4   your memory.  You should not be overly influenced by your

5   notes.

6           The trial will now begin.  First, each side may make

7   an opening statement.  An opening statement is not evidence.

8   It is simply an outline to help you understand what the party

9   expects the evidence will show.  A party is not required to

10  make an opening statement.

11          The government will then present evidence and counsel

12  for the defendant may cross examine.  Then the defendant may

13  present evidence and counsel for the government may cross

14  examine.

15          After all the evidence has been presented, the

16  attorneys will make their closing arguments and I will instruct

17  you on the law that applies to the case.  After that, you will

18  go to the jury room and deliberate on your evidence.

19          So at this point the trial will begin.  The

20  government has the burden of proof and, therefore, it gets to

21  go first.

22          So, counsel, you may begin.

23          **MS. AULT:**  Thank you, your Honor.

24                      **OPENING STATEMENT**

25          **MS. AULT:**  Good morning.  My name is Kirstin Ault.  I

1    and my colleague, Susan Jerich, along with Special Agent Beau

2    Bilek, represent the United States in this case.

3           As the judge has told you, at the beginning of the

4    trial I and defense counsel, if he chooses, we get to address

5    you.  We get to address you twice, now and at the end of the

6    case.

7           The first time we address you is just to give you an

8    outline, sort a brief explanation of what we think the evidence

9    in the case is going to show.  The end of the case is the time

10   when we explain to you what we think that means.  That's when

11   we make our arguments.

12          And as the judge has told you, nothing that I say,

13   nothing that defense counsel says is evidence.  The only

14   evidence in the case is going to be what the testimony is that

15   you hear from the witnesses, the physical items, and other

16   things that come into evidence, that the judge admits into

17   evidence, and any stipulations or agreements that I and the

18   defendant agree to, and those will be read to you.  That's the

19   only evidence in the case.

20          So my statements right now are just to kind of give

21   you a road map of what you are going to hear, what we expect

22   you will hear.

23          So yesterday you took an oath and you took an oath to

24   do two things.  One of those things was to fairly find the

25   facts in this case.  And the second thing was to apply the law

1  that Judge Illston will give you.

2          So I want to start first with that first part of that

3  oath, the finding of the facts, and you will do that based on

4  the evidence that's introduced at trial.

5          So you are going to hear that the defendant was

6  responsible for a number of marijuana cultivation operations,

7  and most of the testimony is going to be about three primary

8  cultivation operations.  These operations were all located in

9  northern California, in Mendocino and Humboldt Counties, and

10 they occurred during the years 2002 through 2006.

11          First, you are going to hear evidence that on

12 May 12th of 2005, California Fish and Game Warden Larry

13 Bruckenstein was called out to investigate a diesel spill into

14 a creek in Mendocino County near what's called Bear Pen Canyon

15 Road.  Warden Bruckenstein went out there and he and another

16 warden, Warden Baccolini, traced the diesel spill up the creek

17 and traced its source to a large diesel generator that was

18 located on a remote rural property just off of the creek, and

19 the address for that property is 750 Bear Pen Canyon Road.

20          When they walked up the hill, they found this

21 generator.  And you will hear -- Warden Bruckenstein will

22 testify that they heard pounding coming from up the hill.  They

23 could see a building through the trees.  And so to find out who

24 was responsible for this generator, they kept walking up the

25 hill.

1       And eventually they came to a building.  And the door

2  to this building was open.  And Warden Bruckenstein will tell

3  you that when he looked through the door, he could see

4  marijuana plants through the door growing in the building.  And

5  then he will tell you that the defendant came walking out the

6  door.

7       He will also testify that he went inside the building

8  and he found two more people.  He found Wade Trabue and Wade's

9  son, Trevor Trabue, who at the time was 17 years old.

10      And you will hear testimony from witnesses that

11 before Warden Bruckenstein and the other warden arrived, the

12 defendant, Wade Trabue and Trevor Trabue were planting the

13 plants in that marijuana grow building.

14      Officers from the Mendocino County Sheriff's Office

15 will then testify that they searched this building, three more

16 other grow buildings on the property and they found a total of

17 over 2,000 marijuana plants.  That was May of 2005 and that

18 grow site was at 750 Bear Pen Canyon Road, which is near

19 Piercy, California.

20      So you will hear some of the witnesses refer to this

21 as the Piercy grow or the Mendocino grow.  One thing that you

22 will learn through this trial is that all of these grows are on

23 very remote rural areas of land and so the actual street

24 addresses sometimes aren't known to the witnesses.  They just

25 know that it's this piece of property they have been to that's

1   near Piercy.  So that's the first cultivation operation.

2          You will also hear testimony that over a year later,

3   on September 13th of 2006, special agents of the Drug

4   Enforcement Administration went to 4589 Crooked Prairie Road,

5   which is in Humboldt County.  They were there to execute a

6   search warrant.  They were there early in the morning.  Again,

7   this is another remote rural area of property.  And when their

8   trucks came in -- they have these large diesel trucks that they

9   bring -- they make a lot of noise.

10         So some of the agents were up near the house that's

11  on this property and when the trucks started to come up to the

12  road, and you can hear that noise, you will hear testimony that

13  the defendant goes through the back door of the house and took

14  off running through the woods.  Witnesses will testify that

15  they searched for the defendant, but they couldn't find him.

16         The agents then went on to do what they came there

17  for, which was to search the property, and they found over 700

18  marijuana plants growing in separate areas scattered and hidden

19  all over this property.

20         You will also hear testimony that this piece of

21  property was in the name of Jennifer Sutherland.  Jennifer

22  Sutherland is the defendant's girlfriend.  She was also in the

23  house with him, in the house he ran away from that day.

24         You will hear testimony -- and you will also hear

25  testimony that when the officers searched that house and looked

1 through it, they found the defendant's driver's license, his

2 credit cards, bills in his name, other documents that had his

3 name on them.  And you will hear testimony that many of those

4 documents with his name on them were found in a room of that

5 house, a room that was covered with marijuana clippings.  It

6 was a room that was being used to process the marijuana.  You

7 will hear testimony about how this is done.  There is a way

8 that you have to trim and clip the marijuana and process it so

9 that it can be packaged and weighed and sold.

10          So that's the second cultivation site, September 13,

11 2006 on Crooked Prairie Road.

12          Now, you will also hear testimony that on April 30th

13 of 2004 -- so that's two years before the Crooked Prairie grow

14 and a year before the Piercy or the Mendocino County grow --

15 there was a third site that was found.  It was on 4199 Bear

16 Butte Road, which is near Miranda, California.  That's also in

17 Humboldt County.

18          And you will hear testimony that the defendant was

19 renting that property from a man named Mark Boring.  Humboldt

20 County sheriff's officers will testify when they searched that

21 property, they found over 2,000 marijuana plants growing in two

22 buildings located on that property.

23          So those are the three primary grow sites that you

24 will hear about:  The Miranda grow in 2004; the Piercy grow in

25 2005; and the Crooked Prairie grow in 2006.

1          Now, you will also hear some testimony about other

2     grow sites that the defendant was also involved in.  You will

3     hear about a grow site here Whitethorn, California that he was

4     doing with Wade Trabue, who is the person who was found at the

5     Piercy grow site, and you will hear testimony about another

6     grow site that the defendant had on Cummings Creek Road near

7     Carlotta, California.  On that site the defendant -- the

8     defendant was building a house.  He was building a house that

9     looked like just a regular residential house, but you will also

10    hear in the woods behind this house he was building two more

11    grow buildings that were used for growing marijuana.

12         Now, the kind of operations that we are talking about

13    here, it should be obvious from the pictures, this is not about

14    putting a plant in a pot and sticking in it your window.  These

15    are large, complex commercial operations.

16         And you are going to hear terms that you might not be

17    familiar with.  You are going to hear "clones" and "trimming".

18    You are going to hear about "lights" and "ballasts" and.

19    "Hoods."  And, rest assured, we are going to have people who

20    will tell you many times what those things mean and how an

21    operation like this is put together, because it is a

22    sophisticated operation, that it takes some know-how to know

23    how to do it.

24         Now, you are going to hear from two different kinds

25    of witnesses in this case.  You are going to hear from the law

1    enforcement witnesses who saw the defendant at the Piercy grow

2    in 2005 and at the Crooked Prairie grow in 2006.  And you are

3    going to hear from the law enforcement officers that searched

4    the grow sites, took the photographs and gathered the evidence.

5             You are also going to hear from some people who are

6    not law enforcements officers.  These are people who were the

7    defendant's partners.  They were the defendant's employees.

8    They were the people who worked with him and helped him to run

9    these large, complex operations.

10            In addition to the testimony from the witnesses, you

11   will also see physical evidence that was seized from the grow

12   site, photographs that were taken.  And the testimony that will

13   be presented will be that from these, the three primary grow

14   sites that I talked about, the Miranda, the Piercy and the

15   Crooked Prairie grows, there were over 5,000 marijuana plants

16   seized.  You will hear testimony that the street value of that

17   marijuana was hundreds of thousands of dollars.  And the

18   evidence will show that this was just a fraction of the

19   marijuana that the defendant was responsible for growing.

20            Finally, you will hear evidence that the defendant

21   was trying to hide his involvement.  You will hear evidence

22   that he put property in other people's names, that he used

23   other people's names to purchase the large generators that

24   power these indoor marijuana grows.

25            And you will hear testimony that he was trying to

1  hide the large amounts of cash that he was getting from selling

2  this marijuana.  One of the primary ways he did that was using

3  the cash to purchase money orders, which he then used to pay

4  bills, like his mortgage payments for some of the property, car

5  payments, even some of his property tax payments.  He had

6  checking accounts, but he would also use these money orders

7  because he could get the money orders using cash.

8          That's a very brief brought outline of what the

9  evidence in this case is going to show, the facts.

10          So now I want to turn to the law, the law that Judge

11  Illston is going to give you.  And as she has told you, there

12  are five counts in this indictment.  The first three counts

13  relate to the 2004 grow in Miranda and the 2005 grow in Piercy.

14          Count 1 is a conspiracy count.  A conspiracy is

15  essentially an agreement.  So Count 1 essentially charges that

16  the defendant agreed with one or more other persons to

17  manufacture -- which just means to grow, to cultivate --

18  marijuana between 2004 and 2005.

19          Count 2 means that not only did he agree with other

20  people to do this, but he actually did it.  And that charge is

21  essentially cultivation, growing, or possessing that marijuana

22  with the intent to distribute to it other people, to sell it.

23  And Count 2 charges that he did it on April 30th, 2004, which

24  is the day that the Humboldt County sheriff's officers

25  discovered the grow at Miranda.

1        Count 3 charges that he did those same things.  He

2   cultivated or he possessed with intent to distribute, to sell

3   marijuana on May 12th of 2005.  And that is the day that

4   Mendocino County sheriff's officers found -- or the Fish and

5   Game Wardens found the grow at Piercy, California.

6        Now, Counts 4 and 5 charge the same two crimes,

7   conspiracy and cultivating or possessing with intent to

8   distribute marijuana, but these relate to the Crooked Prairie

9   grow in 2006.

10       So the first count, again, charges that the defendant

11  agreed with one or more other persons to cultivate, to grow

12  marijuana, or to possess it with intent to distribute.  And the

13  reason why there are two different conspiracy counts is that

14  the evidence will show that the people he agreed with in 2004

15  and 2005 are different from the people he agreed with in 2006.

16       And then Count 5 charges the substantive count, the

17  actual growing and cultivating, possessing with intent to

18  distribute marijuana on September 13, 2006, which is the day

19  that the DEA agents found the grow site at Crooked Prairie.

20       So at the end of this case Judge Illston is going to

21  instruct you on the elements of those offenses.  She will tell

22  you what exactly you need to find beyond a reasonable doubt to

23  be convinced that the defendant is guilty of the crimes charged

24  in the indictment.

25       Now, we ask that you to listen carefully to what the

1  witnesses have to say and you pay very close attention to the

2  evidence.  The testimony and the evidence in this case is going

3  to come in kind of like a jigsaw puzzle.  You are going to get

4  a piece at a time.  And that's because when we put a witness on

5  the stand, that witness has to testify to everything that

6  person knows about.  And if that person knows about three or

7  four different things that happened at different times, they

8  have to testify about it all.  And then the next witness might

9  be testifying about things that happened before that, things

10  that happened after that.  So things are going to come in in

11  pieces, but at the end of the case you are going to be able to

12  put all of those pieces together and they are going to form a

13  complete picture of what happened.

14         So we ask that you pay close attention to how the

15  witnesses' testimony fits together and how that testimony fits

16  with the physical evidence that you are going to see and with

17  all of the other evidence that we will be presenting in the

18  case.

19         When we come back to you at the end of the trial, we

20  will give you some more guidance on how the evidence in the

21  case fits together to show beyond a reasonable doubt that the

22  defendant is guilty of the crimes with which he's charged.

23         Thank you.

24         **THE COURT:**  Thank you, Miss Ault.

25         Mr. Nick, did you wish to give a statement or not?

1          **MR. NICK:**  I do, your Honor.

2          **THE COURT:**  All right.

3          **MR. NICK:**  Thank you very much.

4                        **OPENING STATEMENT**

5          **MR. NICK:**  Your Honor, I was wondering if I could

6    roll the podium out?

7          **THE COURT:**  You may turn it, sure.

8          **MR. NICK:**  Good morning.  Thank you for sitting

9    through the selection process --

10         **THE CLERK:**  Could you just -- I'm sorry.  I want to

11   make sure everybody can hear you, angle it to you.

12         **MR. NICK:**  They will be able to hear me, don't worry

13   about that.

14         All right.  I thank you for sitting through the

15   selection process.  I know it's very personal in asking these

16   type of questions.  The principal reason really is what this

17   trial is about, is that this defendant receive a fair trial.

18   And if we are here, I think all intelligent people that are

19   sitting on this jury have to assume already that there must be

20   two sides to the story.  Otherwise, we probably wouldn't be

21   here.

22         So I'm here to tell you the other side of the coin,

23   the other side of the story.  And you all promised that you

24   were going to be fair to this defendant, and so I ask you to

25   pay close attention to how this case was built.

1           The evidence upon which it's built on is not the only

2    issue in this trial.  More questionable and the other aspect of

3    this trial that I want you to focus on is how the government

4    built this case and how we got here.

5           And so I start out by telling you that in essence

6    what we have in this case is two tracks.  We have the

7    government's war on marijuana and their complete craze over the

8    issue clouding their judgment and clouding their investigation

9    throughout this case.  I think you will be satisfied at the

10   conclusion of this case that the evidence has displayed that

11   that's one of the things that's going on.

12          You are going to find that as part of this war on

13   marijuana on California that Washington D.C. has launched that

14   they have built a complex web of agents, of local police

15   officials that all are part of a team with one goal in mind,

16   and that's to crush the will of the people of the state through

17   law enforcement activities.

18          You are going to find through this trial that part of

19   the tactics that the government uses in order to assist them in

20   developing that goal is to pressure people with cooperating or

21   walking the plank.

22          On the other side we have a real human being.  He's

23   sitting right there.  He breathes.  He's a man.  He's 30 years

24   old.  He's sitting there wearing a suit trying to have whatever

25   dignity he can in this trial.

1          And how he came to land in this courtroom, Cody Dobbs

2    from the age of 23 was an entrepreneur.  In Arizona you are

3    going to find out he started a buffet restaurant, a franchise

4    called the Golden Corral.

5          Cody, just like many other people in this country,

6    learned that there was a real estate rush in California and

7    throughout, really, the entire state.  He was from Humboldt

8    County.  He was born and raised there.  His entire youth was

9    spent in Humboldt County.  His mother lives in Humboldt County.

10   People who delivered him live in Humboldt County, at his birth.

11   His entire other family, whatever there may be of it, is also

12   there.

13         I think the government is going to try to paint a

14   picture that this man came out here to become a pot grower and

15   to join in the riches of the green oil.

16         Instead what you are going to find out is that this

17   is a highly intelligent human being that devised a method of

18   purchasing real estate with no money down and making a

19   substantial income from that.

20         You all probably have seen on TV before these

21   individuals that are like, "I will show you how to buy real

22   estate with no money down."  And, you know, you look at that

23   guy and you go, "Yeah, right."

24         Well, you are going to find out that Cody Dobbs

25   brought that to reality.  And through a method where depressed

1  properties, properties that were in rural areas and therefore

2  had little demand for purchase, properties that had been

3  abandoned and uncared for, presented a very unique situation

4  where you can buy the property on what's called owner

5  financing.

6          Cody would provide a very small down payment.  The

7  owner would finance the totality of the loan.  It's secured by

8  a deed of trust on the property.  In other words, it's as if

9  the owner is acting as the bank.  So if there is a default on

10 paying the seller, who was the owner prior to Cody buying the

11 property, then that person at the bank can go in, move in and

12 create a default.

13         What this allowed Cody to do is in the meantime to

14 acquire the property, improve it, and then sell it to others.

15 Sell it at a higher value.  Pay the note and then carry on with

16 his cash to the next deal.

17         Sometimes the property would be financed after it was

18 improved prior to the sale so that he can realize through a

19 regular bank or another financier the equity that had been

20 increased in the property due to the improvements that he had

21 done.

22         This made for an explosive situation where Cody lived

23 in Humboldt County, which is the center of this war that I told

24 you about.  Cody was young.  He was rich for a young kid.  He

25 had great automobiles that he bought with his hard-earned

1   money.  He had a nice house.  He had nice stuff.  And I know

2   that he made a lot more money than the law enforcement

3   officials that decided to turn their eye on him.

4           As a matter of fact, as I get to it sequentially, as

5   I go through my opening statement, you are going to find out

6   that in the year 2005 Cody Dobbs filed an IRS income tax return

7   claiming $250,000 in income after deductions.

8           This is a case you are going to find out is built on

9   deceit of paid informants, deceit of informants that are trying

10  to save their own hide from the federal prisons in their own

11  criminal cases.

12          You are going to find out that most repugnant is that

13  the case is not just built on informants that are being given a

14  pass on their prison sentence, but that it's based on

15  informants that are given a pass on prosecution.  Nevermind, we

16  are going to prosecute you and give you a break.  No, we are

17  just not going to prosecute you at all.

18          You are going to find out from the evidence that the

19  government's goal, given that being the situation, is get him

20  at all cost.

21          **MS. AULT:**  Your Honor, defense counsel is arguing.

22          **THE COURT:**  That's true.  So I sustain the objection

23  and please caution you to just state what facts you expect to

24  come out of the trial.

25          **MR. NICK:**  Yes, your Honor.

1          You are going to find out from the evidence in this

2    case that part of the purpose in targeting this defendant was

3    envy and jealousy over his success.

4          So how did Cody get here?  In the year 2005 a local

5    agent in Humboldt County, a state agent that you are going to

6    hear testify in this case, Mr. Prose, decided to target Cody.

7    At first you are going to think from the evidence for no

8    apparent reason, but I think that you are going to learn from

9    the evidence that it's also as a result of sour grapes, sour

10   grapes over his failure to successfully prosecute Cody's

11   brother.

12         As a result of that, here is a guy going around

13   making money selling properties, being an American independent

14   entrepreneur, and somehow or another he becomes the target of

15   this officer.  They haven't found him with any marijuana.  They

16   haven't seen him selling any marijuana.  They haven't found him

17   with any growing marijuana, and he becomes a target.

18         You are going to find out that with that only being

19   the state of the case, no marijuana, no evidence, no nothing,

20   just suspicions, Cody is followed.  His associates are

21   questioned.  And I think that you will be satisfied from the

22   evidence that before they even get to Piercy, which we will

23   talk about in a minute, they already have their mind made up.

24         So let's talk about Piercy.  I think Piercy is -- the

25   government, as they told you, there's going to three major

1  grows in this case.  I think I have an easier way of breaking

2  them down, and I will put it to you this way.

3          There are two grows in Humboldt County.  There is one

4  grow in Mendocino County.  The Mendocino County is called

5  Piercy.  That's the town.  But what makes this case confusing

6  is that it's also Bear Pen Road.  And you will hear that one of

7  the roads of one of the grows in Humboldt County is Bear Butte.

8  So that's going to kind of make it confusing.  It took me

9  awhile to get it, but I think the easier way is just to

10 remember there are two in Humboldt, one in Mendocino.

11         The one in Mendocino County occurs in 2005, and it's

12 literally the very first activity of marijuana which Cody is

13 connected to.  And let's talk about what happened in that case

14 and what the evidence is going to show on the other side of the

15 coin.

16         I think you are going to be satisfied through

17 probably the government agents themselves, many of the local

18 law enforcement people, that being there is not enough to say

19 you are guilty of the crime.  As a matter of fact, the judge is

20 going to instruct you at the end presence at the crime scene is

21 not enough.  That is not a crime for you to be there.

22         I think you are also going to find from the evidence

23 that the culture, I want to emphasize that, the culture and the

24 attitude towards marijuana in these communities is even more in

25 favor of it than here in the Bay area.

 1          You are going to find out that there is pervasive

 2    growing by individuals throughout these counties.  That these

 3    officers are involved in hundreds of these raids.  That it's a

 4    full-time assignment.  They have units dedicated just for this.

 5    That brothers of family members grow.  That the mother grows.

 6    That some -- everybody grows up there.  You are going to find

 7    nobody is going to contest that here.  It's substantial.

 8          And so that puts young people clearly connected to

 9    this.  And what happens with Piercy is that we have two

10    individuals that we are going to have to focus on.

11          One, and the most important, is Wade Trabue.  Wade

12    Trabue is the person who is responsible for this grow.  Wade

13    Trabue, you are going to find out in this case, is covering for

14    his partner, who has never been prosecuted, Don Freeman.  You

15    are going to find out through the evidence in this case the web

16    of deceit that Wade Trabue has spun in order to cover for his

17    partner, Don Freeman.

18          You are going to find out that these informants are

19    like a family.  They all know each other.  They work with each

20    other.  They hang out with each other.  And who is the

21    outsider?  Him (indicating).  He is the easy one to pick on,

22    the rich guy that made it legitimately, that supports

23    marijuana, because there is not going to be a question about

24    that.  And so on that fateful day -- and, actually, even

25    backing up before that, you are going to find out how did Cody

1 meet Wade.  How else?  Selling him real estate.  Doing his

2 work.

3          So Wade presents to Cody that this is a legitimate

4 medical marijuana grow.  No big deal to you.  Give me and my

5 son a ride up there.  Cody takes them up there.

6          You are going to find out that while the government

7 wants you to believe that one of the -- because of what they

8 said up here that one of their witnesses saw Cody planting

9 plants, actually you are going to find out that that's a

10 conclusion they want you to draw, because not one single

11 witness is going to come in here saying they saw him planting

12 plants.

13          What you are going to hear them say is that the guy

14 was acting like he had nothing to do with the place.  And they

15 may not say it like that, but, certainly, the circumstances

16 that are going to come out in the trial will show you that.

17          Why?  Number one, they see him coming out of the grow

18 room on his cell phone, talking on the cell phone.  Not

19 marijuana business, that's for sure.  You are not going to hear

20 that.  Who is in the grow room doing work?  Wade Trabue.  Who

21 has the keys to the compound?  Wade Trabue.  Who shows the

22 government how to turn off the diesel gin?  Wade Trabue.  Who

23 says its his grow?  Wade Trabue.  Who tells law enforcement

24 agents how many plants are there?  Wade Trabue.

25          Wade never mentions Cody Dobbs, ever, until when?

1  Until a year and a half later when the federal government

2  knocks on the door and says, We want to talk to you buddy and

3  if you don't talk to us, you know what's going to happen.

4          **MS. AULT:**  Objection, your Honor.  This is all

5  argumentative.

6          **THE COURT:**  Sustained.

7          **MR. NICK:**  I think you are going to find out that

8  Mr. Trabue is not prosecuted, despite the fact he's there and

9  he has admitted that this is his grow, unlike Cody.  You are

10  going to find out that he is actually given immunity.  Anything

11  you tell us we won't use against you as long as you tell us how

12  Cody was involved in this.

13          You are going to find out that many of the statements

14  he made were inconsistent.  And you are going to find out that

15  this is a desperate individual that is willing to do anything

16  in order to avoid being in that same chair that Mr. Dobbs is.

17          You are going to find that the circumstances that

18  developed after this grow was taken down in Piercy, that there

19  was an active immediate web of deceit to try to point the

20  finger at this defendant.

21          **MS. AULT:**  Objection, your Honor.

22          **THE COURT:**  Sustained.

23          **MS. AULT:**  Mr. Nick knows how to do this properly,

24  your Honor.

25          **THE COURT:**  Mr. Nick, please just keep yourself

1    direct.

2              **MR. NICK:**  Yes, your Honor.

3              You are going to find out there are many inconsistent

4    statements.  You are going to find out -- many statements you

5    are going to find untruthful, and that many activities which

6    were undertaken in order to, in essence, try to take the focus

7    away from Don Freeman and put the focus on Mr. Dobbs.

8              You are going to find out that Don Freeman is the one

9    who leased this property.  You are going to find out that Don

10   Freeman had an alias; that the alias is Fred Hover, and that

11   that alias was the person who rented the property.

12             You are going to find out the payments in cash, the

13   rent payments, were made by somebody who wrote the deposit slip

14   and it wasn't Cody Dobbs.

15             You are going to find out that magically, low and

16   behold, the same month that this property gets taken down, the

17   rent payments stop, and you are going to find out that that

18   same month Don Freeman is nowhere to be found.

19             Again, who is Don Freeman?  Another real estate

20   associate connected to Mr. Dobbs.  Another person that knows

21   that Mr. Dobbs makes his income legitimately, but who is a

22   supporter of the use of marijuana.  An easy target.

23             What happens after Piercy, which keeps developing in

24   this case?  Well, the law enforcement officials -- by the way,

25   there is one other thing I wanted to tell you about Piercy.

1   They did a complete roundup of anything they could find for

2   fingerprints.  You are not going to hear that any of them came

3   back to this defendant.  Why?  Because if you were there

4   laboring every day, I think you are going to find out from the

5   evidence it's likely your fingerprints would be there

6   somewhere.  He wasn't wearing gloves when he was supposedly

7   there to hide his fingerprints or anything like that.  So that

8   will be another issue in this trial that comes up.  That's a

9   side issue.

10          More importantly is what happens after Piercy?  How

11  does the federal government become involved in this case?  Is

12  Mister -- I'm sorry.  The local Mendocino County officials,

13  actually I think it's the warden, Bruckenstein, for whatever

14  reason picks up the phone and calls Humboldt County substation

15  and says, Anybody there know anything about Cody Dobbs?

16          Well, goes guest who is on the other end?  A buddy of

17  Mr. Prose.  Oh, yeah, I'm looking for that guy.  What did you

18  find?  You found him at a grow site with 2,000 plants?  Well,

19  guess what?  I'm executing a search warrant at Cody's house.

20          So Mr. Prose gets a search warrant, executes the

21  warrant at Mr. Dobbs' home on Osprey Terrace in Fortuna, I

22  believe it is.  Definitely Humboldt County.  One of the little

23  communities right next to Eureka.

24          At the home there are several pieces of information

25  that are going to be important for you to look at, but more

1  importantly, and I will get into this in a second, the most

2  critical thing that happens is Mr. Prose finds Cody's bank

3  statements and he swears out an affidavit to seize $250,000 out

4  of Cody's account.  And you are going to find out he did this

5  despite the fact that he swore to a judge that the money in the

6  account had an apparent legitimate purpose behind it -- or we

7  should say not purpose, but origin.

8          The money is taken.  You are going to find out that

9  the $250,000 are the product of two checks directly from escrow

10 companies from the sale of properties.

11         Mr. Prose understands this is above him, is what I

12 believe the evidence will show, because the next thing he does

13 is he contacts the federal government and he says, Guess what I

14 got?  I have $250,000 I seized from Mr. Dobbs and I would like

15 for the federal government to take over the asset forfeiture

16 and the seizure of this money.  And the federal government

17 adopts it.  They adopt it in the year 2005.

18         And now keep this in mind.  In 2005 they supposedly

19 know that Cody Dobbs was at Piercy, but it's not until

20 September of 2006, over a year later, that Cody Dobbs is

21 indicted by the federal government.  Over a year since the

22 federal government has had his $250,000 in their possession,

23 and over a year since Cody Dobbs and his attorney for that

24 purpose had been requesting that the money be returned.

25         You are going to find out that they want that money,

1   and that this trial is a huge motivation for what they are

2   doing.

3           As a result of the federal government finally

4   deciding, well, I guess we are going to have to go after him

5   criminally, they executed a search warrant -- now it's not

6   state agents, it's the Drug Enforcement Administration -- at

7   the Crooked Prairie location.  That is the Humboldt County grow

8   of the year 2006.

9           The property there is one of the properties which

10  Cody had purchased in the purchase and sales for the purpose of

11  acquiring income.

12          And what's interesting is is that when they arrived,

13  let's first talk about the running out, okay?  There is not

14  going to be any challenge to that.  Yes, he ran out.  That's

15  not even being questioned.  But what they haven't told you is

16  other side of the coin.

17          Remember, since 2005 the federal government was

18  involved with Cody.  Since 2005 the federal government had been

19  having meetings with Cody's attorney.  They knew where Cody

20  Dobbs was.  They had all sorts of ways of making contact with

21  Cody Dobbs.  And they never, ever, ever attempted to in any way

22  make contact through the casual ways that they know how to make

23  contact with him after this happened.

24          Why?  Because let's talk about the reality of what

25  happened.  He's living there with his girlfriend, Jenny

1   Sutherland.  This is a new girlfriend.  There is another

2   ex-boyfriend in the picture.  You are going to find out that

3   the guy was a complete maniac.  He had been out to kill Cody.

4   He had been out to harm him.  This is a rural property with a

5   lengthy approach before you get to the home.

6           When Cody sees the lights coming up at 6:00 a.m. in

7   the morning where it's almost dark, he thinks this guy is

8   coming to kill him.  He has already rammed his car one time.

9   Cody gets out, runs out.  End of the story.  Afterwards he

10  finds out no apparent attempt to in any way make any contact

11  with him.

12          This is not a person running away.  This is a

13  misunderstanding.  They know it.  That's why they never

14  approached him.

15          Now, what's critical is they are trying to use that

16  to say, oh, see, it shows consciousness of guilt is really --

17  let's just look about what really happened there.

18          There's three groups of people living on that land.

19  And this is very critical for the case.  In the main house,

20  it's going to be a blue colored home, it's Cody and his

21  girlfriend Jenny Sutherland.  They are living in that house.

22  Jenny is the lawful owner of that property.  You will find out

23  that she leased two different trailers on the property to an

24  individual named Zachary Diamond and Mr. Whitney.

25          In the agreement itself Jenny Sutherland, the lease

1  agreement, entered a clause which allowed them to grow

2  marijuana, but limited to medical marijuana only.  Marijuana

3  authorized under California's medical marijuana program.

4          The trailer is a substantial distance from where the

5  main house is.  And there is a second trailer where Mr. Whitney

6  is living.  And what you are going to find out is that the

7  majority, 95 percent of all these marijuana plants are found

8  where?  Right in front of Mr. Diamond's trailer.

9          Not only that, but you are going to find out that

10 Mr. Diamond had two firearms.  One of them was hidden in the

11 bushes somewhere.  Another one was hidden somewhere in the

12 trailer.  Why is this important?  This is a person who is

13 interviewed that same day by the Drug Enforcement

14 Administration and is asked about his involvement in growing

15 marijuana.  He admits that he's growing marijuana.  He admits

16 he's growing over 100 marijuana plants.  He admits the firearms

17 are his.  This is serious criminal conduct.  But what is

18 Mr. Diamond given?  A free pass.  He is not even arrested that

19 day.  They are like, Thanks for your statement, goodbye.  Who

20 do they arrest?  Jenny Sutherland, the girlfriend.

21         I will argue to you why they do that at the end of

22 the case, but you need to focus on these people that are being

23 arrested and the ones that are not.  Why?  It goes back to what

24 I said.  They are trying to buy testimony.

25         Mr. Diamond readily admits that all the marijuana

1  being grown in front of his trailer is his, but then he comes

2  up with this story -- which I don't even know if it's going to

3  be provided again here on the witness stand.  We have to wait

4  until these witnesses get here -- saying that, oh, well, but,

5  you know, Cody was going to get a percentage of the plants.

6  And that's all the evidence they have of that.

7          We have a -- you are going to see by the evidence,

8  you have an individual that has admitted they're his plants,

9  that is involved in serious criminal conduct, who is given a

10  free pass from prosecution, and who the only evidence in this

11  case to tie all those plants to is his own word under that

12  duressful situation, while an arrest is being -- I'm sorry,

13  while a search warrant is being executed with dozens of DEA

14  agents and local police armed and presenting themselves in that

15  environment.  That's the statement they want to rely on.

16          Next to the main home there was a little greenhouse

17  and that greenhouse had 20 something plants in it.  Those are

18  Cody's plants.  No question about it.  We don't doubt that.  We

19  don't question that.

20          And as a matter of fact when we go back to Osprey --

21  remember, after the Piercy take down, the one in Mendocino,

22  Mr. Prose gets a warrant and goes and searches Cody's home in

23  Osprey.

24          There was one other thing that I omitted to tell you.

25  In the Osprey residence they find a medical marijuana grow.

1    Cody has got his medical recommendation.  It's a very small

2    grow.  It's in a basement.  We will argue to you at the end,

3    why does a guy have to have 2,000 plans and 100 at the house?

4    It doesn't make any sense.

5              **MS. AULT:**  Objection, your Honor.  This is

6    argumentative again.

7              **THE COURT:**  Sustained.

8              Mr. Nick, you are distinguishing your argument at the

9    end from your statement at the beginning and you are right to

10   make that distinction.

11             Ladies and gentlemen, there are rules that govern the

12   way evidence and information gets presented to you.  The

13   opening statement is intended only to help you as sort of a

14   road map of the evidence you will hear.  It's not intended to

15   argue your conclusions or anything else.  That happens at the

16   end.

17             So what I'm asking Mr. Nick to do is simply present

18   the evidence that you expect will be brought forward at the

19   trial, but not to argue it.  You will have time for that later.

20             **MR. NICK:**  Sorry, your Honor.

21             Now, what else happens on that day?  It's, again,

22   more of these people getting free passes and others being

23   arrested.

24             So what does Mr. Prose do?  He finds the medical

25   marijuana grow there and then he realizes Cody owns another

1  home on the same road, on Osprey, and it's occupied by a guy

2  named Tom Golden.  And Tom Golden is a lessee of Cody.  He pays

3  Cody rent to live there at the home.

4          Well, they find Mr. Golden.  They find that he's

5  growing marijuana in his home.  He claims it's a medical

6  marijuana grow.  It's virtually the same size as Cody's

7  residence down the street, but there is a difference.

8  Mr. Golden claims that supposedly Cody is going to get a pound

9  of his medical marijuana grow.  So they get some sort of a

10  statement.  Well, lo and behold, you got your

11  free-get-out-of-jail card.  Mr. Golden is not arrested.

12          But then what happens?  They go back to the residence

13  up the street where Cody lives.  Why?  Because Amanda Buckland,

14  his girlfriend, at that period of time in '05 arrives.  And

15  Miss Buckland is arrested for the grow inside the house.

16          I think the evidence will show in this case that the

17  reason that woman is arrested and Mr. Golden is not is, again,

18  they are trying to pressure people and buy testimony.

19          Now, let's talk about some other important evidence

20  in this case that I want you to focus on.  If, in fact, this

21  defendant made what they are going to say is millions of

22  dollars off of marijuana, something that I can almost assure

23  you you are going to see no evidence of in this case, their

24  only evidence is $50,000 in money orders purchased over a

25  two-year period of time.  You are going to find a substantial

1  number of those money orders are being bought by other people

2  and being paid for Cody for the payments of a Ford truck.

3           At the Osprey residence in '05 when Prose searches it

4  where supposedly he's in the throws of all this and making

5  millions of dollars, what do they find?  They find $10,000 in

6  $100 bills with the bank strip on it.  That's all they find.

7  The bank strip.  In other words, directly from the bank.  The

8  bank strip around the hundred dollars -- the $10,000 bundle

9  just like a bank puts on it.

10          Where is all this money?  Where is all this cash?

11          **THE COURT:**  Mr. Nick, please.

12          **MR. NICK:**  I'm sorry.

13          You are going to find there is no cash in this case.

14  They didn't find any buried cash at Piercy.  They didn't find

15  any buried cash at Bear Butte.  They didn't find any buried

16  cash anywhere.  It just doesn't exist.  It's a fantasy.

17          Finally, the government is going to try to bolster

18  their case by pointing to other grows that they claim the

19  defendant was involved in.  Again, I think that the evidence

20  will show that they have nothing to prove this.  Zero.

21          The Whitethorn grow.  What is the evidence of that?

22  Wade Trabue telling you that he was a partner in the grow with

23  him.  That's it.  The mouth of a paid informant or the mouth of

24  somebody who has been given a pass.

25          Cummings Creek.  Well, Cummings Creek is, again, one

1  of these situations that have no evidence.  Not only does it

2  have no evidence, but you are going to find out that the police

3  actually linked that grow to somebody else; that that somebody

4  else's truck was seen in front of that grow; that the police

5  focused on somebody else.  And the only person who tries to tie

6  Mr. Dobbs in to that grow is, again, Mr. Prose because of the

7  things that I told you before, with nothing else.

8          Finally, as to the final charge that the government

9  has is the Bear Butte.  This is the grow that occurs in

10  Humboldt County, but it occurs in 2004.  So let's talk about

11  that.

12          In 2004 you are going to find out it's not Cody Dobbs

13  who was ever arrested at that location.  You are going to find

14  out that in 2004 nobody knew anything or was suspecting or was

15  claiming that Cody was involved in that grow.

16          But all of a sudden something critical happened in

17  the year 2005 where people started pointing the finger at Cody

18  for that particular grow.

19          Ron Prose now is trying to develop a case against

20  Cody.  Not a criminal case, but in order to be able to take the

21  $250,000.  So he develops informants.  He uses the assistance

22  of the federal government to develop the informants who are

23  facing criminal charges and who are basically told, Tell us

24  Cody Dobbs was involved and you get a free pass.

25          **MS. AULT:**  Objection, your Honor.

1          **THE COURT:**  Sustained.

2          Are you coming to a conclusion here, Mr. Nick?

3    Because it's just important that you tell us what facts you

4    expect to bring out and not argue them at this time.

5          **MR. NICK:**  The grow is processed at Bear Butte for

6    fingerprints, and it's not the fingerprint of Cody Dobbs that's

7    found there.  It's of their informant.

8          Secondly, you are going to find out that the person

9    who was arrested there had a vehicle that belonged to the other

10   informant for that grow; that all the fuel was being purchased

11   by that informant; that the only people at that grow were those

12   individuals.

13         A notebook was found inside that vehicle belonging to

14   one of the informants.  A person who claims his only

15   involvement was to watch over the property you will see has a

16   notebook that is filled with details about this grow.  You are

17   going to see that this is a person who at first when the police

18   arrive there denies any connection to the grow, and now all of

19   a sudden he's admitting a connection to the grow.  When?  Not

20   on that day.  Not three months later.  Not six months later.

21   But in 2005 after the Piercy grow is taken down and the federal

22   government gets involved.

23         The only connection, again, that Cody has to this

24   property is that he leased it.  He leased it on behalf of a

25   relative of his who you may or may not see as a witness in this

1  case.  I can't tell you yet because I don't know.  And that is

2  it.  Doing a favor for a family relative, leasing the property

3  for him.  You're going to find out that the lease payments were

4  never made by Cody.  They don't have any evidence that Cody

5  ever made any of the lease payments except one or two, two at

6  the most, and that those payments are made in July of 04, three

7  months after this grow is taken down by the Humboldt County

8  authorities.  And I think that that has a significance to his

9  involvement in this, or lack thereof I should say.

10        All of these cases arise out of all the issues that I

11  have told you, and I think that this case really just comes

12  down to the credibility of these individuals that the

13  government is going to present.

14        Thank you.

15        **THE COURT:**  Thank you, Mr. Nick.

16        I think what we will do is take a 10-minute recess at

17  this time and then we will begin with the evidence in this

18  case.

19        So I will let you go and I will tell you now, as I

20  will tell you a lot from now on, please don't speak with each

21  other or anyone else about this case.  Don't maybe make up your

22  minds, you have not heard all the evidence yet.  Indeed, you

23  have not heard any evidence.

24        If would you be ready to come back in 10 minutes,

25  then we will start with the evidence.

1              (Whereupon there was a recess in the proceedings

2              from 10:23 until 10:44 a.m.)

3          **THE COURT:**  Welcome back, ladies and gentlemen.  You

4    may all be seated.

5          Okay.  The plaintiff may call its first witness.

6          **MS. AULT:**  Thank you, your Honor.  The United States

7    calls Larry Bruckenstein.

8          **THE COURT:**  One thing I forgot to tell you, ladies

9    and gentlemen -- come up, sir -- we always take a little

10   photograph of each witness right before the person begins to

11   testify.  We do it with a Polaroid.  The quality is somewhere

12   between DMV quality or south in terms of the quality of the

13   picture, but the idea is it will help you remember when the

14   case is all over with who the witnesses were and what they

15   said.  It's just a memory prompt for you when you go back and

16   deliberate.

17         So the first thing we will do, sir, is take your

18   picture.  And that's the purpose of it.  And we will do it with

19   each of the witnesses who testifies.

20                        **LARRY BRUCKENSTEIN**,

21   called as a witness for the Plaintiff herein, having been first

22   duly sworn, was examined and testified as follows:

23         **THE WITNESS:**  I do.

24         **THE CLERK:**  Okay.  If you could state your full name

25   for the record, please?

1          **THE WITNESS:**  Larry Richard Bruckenstein.

2          **THE CLERK:**  Okay.  Spell your last name for the

3    record.

4          **THE WITNESS:**  B-R-U-C-K-E-N-S-T-E-I-N.

5          **THE CLERK:**  Thank you.

6          **THE COURT:**  You may proceed, Miss Ault.

7          **MS. AULT:**  Thank you, your Honor.

8          Your Honor, could you inquire whether the jury can

9    actually hear Mr. Bruckenstein?

10         **THE COURT:**  Can you hear him?

11         (Jury answers affirmatively.)

12         **MS. AULT:**  Thank you, your Honor.

13                        **DIRECT EXAMINATION**

14   BY MS. AULT:

15   **Q.**   Good morning, Warden Bruckenstein.  Where do you work?

16   **A.**   Garberville.

17   **Q.**   And who do you work for?

18   **A.**   California Department of Fish and Game.

19   **Q.**   How long have you worked for the Department of Fish and

20   Game?

21   **A.**   I'm working my 29th year.

22   **Q.**   And how long have you been in Garberville?

23   **A.**   23 years, almost 23 years.

24   **Q.**   Where were you before that?

25   **A.**   Merced.

1  Q.   So what are your responsibilities as a Fish and Game

2  warden?

3  A.   We are the enforcement branch, in part, of Fish and Game

4  and I enforce Fish and Game code; hunting, fishing laws.

5          THE CLERK:  Is it working now?  Yeah, okay.

6  A.   I enforce Fish and Game law and hunting and fishing

7  regulations, pollution statutes; anything that affects fish and

8  wildlife, the environment.  That's my area of responsibility.

9  BY MS. AULT:

10 Q.   Now, as part of your responsibilities, do you investigate

11 diesel spills into creeks and rivers?

12 A.   Yes, state waters.

13 Q.   Why do you do that?

14 A.   Its effect on fisheries.

15 Q.   And why does that impact on your job?

16         MR. NICK:  Objection.  Relevance.

17         THE COURT:  Overruled.  You may answer.

18 A.   There is a Fish and Game Code that specifically prohibits

19 discharging petroleum products into state waters or discharging

20 them where they may pass into state waters.

21 BY MS. AULT:

22 Q.   Now, over the course of your career, how many diesel spill

23 investigations have you been involved in?

24 A.   Probably, I'm guessing, 10 to 15; maybe a bit fewer than

25 15.

1  Q.   And how often do you find that the diesel spills into

2  creeks or rivers are caused by marijuana cultivation

3  operations?

4  A.   It's the majority of the case.

5  Q.   Again, can you pull the microphone towards you?

6  A.   I will scoot in a bit.

7  Q.   As part of your job, how many marijuana cultivation

8  operations have you wound up investigating?

9  A.   Probably 10 to 12 I have been involved in.

10 Q.   And other than diesel spills -- I mean, are there other

11 kinds of environmental damage that are caused by the

12 cultivation operations that leads you to get involved?

13          **MR. NICK:**  Objection.  Relevance.

14          **THE COURT:**  Will this tie up to facts in this case?

15          **MS. AULT:**  Yes, your Honor, I believe so.

16          **THE COURT:**  All right.  Overruled.  You may answer.

17 And you need to speak right into that mike.

18 A.   Okay.  Oftentimes some of the other grows, illegal road

19 building, diversions, that sort of thing, creek diversions.

20 **BY MS. AULT:**

21 Q.   Now, other than -- so let's turn your attention to

22 May 12th of 2005.

23          Had you been involved in investigating -- were you

24 involved on that day with investigating a marijuana cultivation

25 operation near Piercy, California?

1  **A.**    Yes.

2  **Q.**    Now, how did that investigation begin?

3  **A.**    Near the first of May I received third-hand information

4  about a diesel spill in the Piercy area of Mendocino.  It's

5  northern Mendocino County.  I patrol only Humboldt County.  I

6  do go into Mendocino County, but my primary area of

7  responsibility is Humboldt County.

8  **Q.**    Okay.  Now you say "third-hand information."  What do you

9  mean by that?

10  **A.**    Right.  The person who contacted me had heard from another

11  person, who had been questioned by a third person, who had

12  knowledge of the spill if they were to report the spill to me,

13  would they -- could they remain anonymous.  And I told the

14  person, yes, they could remain anonymous.

15          **MR. NICK:**  Your Honor, I just object on the basis of

16  hearsay unless it's being sought to indicate how the witness

17  found it.  In other words --

18          **THE COURT:**  I believe it is being sought for that

19  purpose, is it not?

20          **MS. AULT:**  Yes, your Honor.  It's simply to explain

21  the actions that he took.

22          **THE COURT:**  Ladies and gentlemen, we have arrived at

23  the hearsay rule.  That's a rule that lawyers and judges can

24  discuss at length and for hours.

25          For today's purposes, though, I will tell you the

1  general point of the hearsay rule is that the evidence that you

2  are to decide the case on is witness's testimony under oath, on

3  the witness stand, in your presence and in the presence of the

4  defendant.  That's generally the evidence that you will hear.

5          If something is a statement made by another person

6  who is not present in court when he's making the statement and

7  he's not under oath, that's generally lumped into the hearsay

8  category, and it's not permissible except under certain

9  circumstances.  And the exceptions are numerous.  One of them

10 is if it's not being used for a hearsay purpose.

11         So in this case the witness was allowed to testify to

12 what some other people said to him, not because it was true or

13 not true.  We don't know if it was true, but it doesn't matter.

14 It's to explain what he did next.

15         So for that limited purpose I will allow the evidence

16 to -- the testimony to stand and you are to use it for that

17 limited purpose, that it explains why the witness did what he

18 did next.  But we can't vouch for the reliability of those

19 statements because those persons aren't here and they are not

20 under oath.

21         And with that, you may proceed.

22         **MS. AULT:**  Thank you, your Honor.

23 **Q.**   So, Warden Bruckenstein, you received a phone call with

24 some third-hand information about a diesel spill near Piercy?

25 **A.**   Yes.

1    Q.    Did you do anything in response to that?

2    A.    I did not.

3    Q.    And why not?

4    A.    It was just a general report.  No specific location,

5    anything.

6    Q.    Now, where are you headquartered?

7    A.    I'm in Garberville.

8            MS. AULT:  Your Honor, I have what's been marked as

9    Exhibit 1.  It's just a general map of the area, and I would

10   like to introduce that.

11           I think the Court must take judicial notice that it's

12   a map of the Humboldt and Mendocino County areas.

13           THE COURT:  Any objection, Mr. Nick?

14           MR. NICK:  No objection.

15           THE COURT:  Thank you.  It will be received.

16           THE CLERK:  What's the number?  I'm sorry.

17           THE COURT:  1.

18         (Trial Exhibit 1 received in evidence)

19           MS. AULT:  And if I can get it up here?

20           THE CLERK:  And are we publishing this?

21           MS. AULT:  May I publish Exhibit 1 to the jury?

22           THE COURT:  Well, you did, but I guess she's talking

23   about on the little screen.

24           THE CLERK:  Is it not on?  Is it on?

25           AGENT BILEK:  Do you want me to put it on?

1          **MS. AULT:**  May we publish it on the screen?

2          **THE COURT:**  On the little screens?  Yes, you may.

3          **MS. AULT:**  Thank you.

4          (Brief pause.)

5          **MS. AULT:**  It's a little slow process getting the

6   things to come up.

7          (Document displayed)

8          **THE COURT:**  You may proceed.

9          **MS. AULT:**  Thank you.

10          And, your Honor I would like to have the witness

11  testify to a few things that are on the map.  May he come down

12  off the witness stand to point to those things?

13          **THE COURT:**  Yes.

14          **MS. AULT:**  Thank you.

15          (Witness steps down.)

16  **BY MS. AULT:**

17  **Q.**   So, Warden Bruckenstein, if you could go over to the map

18  and show us where Garberville is?

19  **A.**   It's Garberville about right here (indicating).  Southern

20  Humboldt County.

21          (Court reporter interruption.)

22          **THE COURT:**  Speak up and face the court reporter.

23  **A.**   Garberville, it's in Humboldt County on Highway 101.

24          **THE CLERK:**  Is he going to be there for awhile

25  because he can use this?

1          MS. AULT:  He will be.

2          (Witness given microphone.)

3    BY MS. AULT:

4    Q.   Okay.  Warden Bruckenstein, again, can you just restate

5    what you -- your previous testimony?

6    A.   I'm located in Garberville.  That's along 101 in southern

7    Humboldt County (indicating).

8    Q.   And you are indicating that on Exhibit 1.

9          Now, where is Piercy, California?

10   A.   Piercy is south, in northern Mendocino County.  This being

11   the Humboldt-Mendocino County line right here (indicating).

12   Q.   About how far away from Garberville is Piercy?

13   A.   I would guess 15, 20 miles.

14         MS. AULT:  And, Agent Bilek, can you focus in on that

15   area of the map so maybe it's a little easier for the jury to

16   see?

17         (Document displayed)

18   A.   I can turn it if you want.

19   Q.   That's okay.  If you would take the witness stand.

20         (Witness resumes stand.)

21         THE COURT:  That's much better.

22   BY MS. AULT:

23   Q.   So after you received that phone call in early May, what's

24   the next thing that you remember happening that led you to

25   eventually end up going to this place near Piercy?

1   A.   The morning of May 12th near 8:00 in the morning I

2   received a phone call from a person who wished to remain

3   anonymous.  Told me there had been a diesel spill on Dane

4   Peterson's property in Piercy.

5   Q.   Okay.  That's Dane, D-A-N-E?

6   A.   Correct.

7   Q.   And what did you do then?

8   A.   The person gave me a phone number, directions to

9   Mr. Peterson's, rough directions.

10          I called Mr. Peterson and he said, in fact, he did

11  have diesel in his creek.  In fact, he had diesel in his

12  domestic water.  He was taking a shower, brushing his teeth and

13  it had a strange smell, strange taste to it.  He had gone to

14  his tank and found what he believed to be diesel in it.

15  Q.   Okay.  So what did you do then?

16  A.   I called Warden Steve White.  He's the warden for the

17  area.  It was his day off, a Thursday, and he wasn't available.

18  So I called Warden Baccoloni and set up a time to meet with

19  him.

20  Q.   Can you spell Baccolini for the court reporter?

21  A.   Baccolini.  I'm going to say B-O-C-C -- or

22  B-A-C-C-O-L-O-N-I.

23  Q.   So you called Warden Baccolini, and what did you do then?

24  A.   We met about 10:00 o'clock at the overpass on Highway 101

25  near Mr. Peterson's.

1  Q.    Now, what kind of area does Mr. Peterson live in?

2  A.    Remote.

3  Q.    How would you describe it?  What does it look like out

4  there?

5  A.    His house is an open area, a meadow area, but the

6  hillsides around there are quite steep, wooded, brush.  You

7  know, timber-type hills, mountains.

8  Q.    Now, I'm hoping that you can, again, come down very

9  briefly and just go over to Exhibit 1 and show us where on this

10  map, just kind of trace the route from Garberville to where you

11  ended up?  It was near Piercy, but it's not exactly at Piercy.

12        (Witness steps down.)

13  A.    Okay.  Traveled south on 101 down to -- I guess here just

14  below Red Mountain.  Actually, it's -- this is the exit right

15  here, 625.  There is an overpass right here (indicating), and

16  we met just across the overpass near Mr. Peterson's.

17          Mr. Peterson's house would be back up in here,

18  probably near the bottom of the six (indicating).

19  Q.    Okay.  Thank you.  You can take the stand again.

20        (Witness resumes stand.)

21  Q.    What did you do when you arrived at Mr. Peterson?

22  A.    Met with Mr. Peterson and his neighbor, the Farrels, and

23  he took us to his water tank first.

24  Q.    And when you got to the water tank, what did you see?

25  A.    I climbed up the water tank.  It was a huge concrete water

1  tank, a storage tank, and popped the inspection cover off and

2  immediately smelled diesel and you could see scum, looked like

3  diesel scum on the surface.

4  Q.   And was Mr. Peterson getting his water from the creek?

5  A.   Yes.

6  Q.   Now what did you do then after you saw the diesel spill in

7  his tank?

8  A.   Mr. Peterson, the Farrels and I walked to the creek near

9  where he -- it would be downstream from where his intake is in

10 the creek, and I could immediately smell diesel and, also, see

11 diesel sheen.  Diesel puts a rainbow-type sheen on the surface

12 of the water.

13 Q.   Okay.  I'm going to show you what's been marked as

14 Exhibit 84-a.

15        MS. AULT:  And I believe that the Court and defense

16 counsel have these in their exhibit binders.

17        (Whereupon, photograph was tendered

18         to the witness.)

19        THE CLERK:  Do you have 1?  Did you take 1 down?  Oh,

20 that's 1.

21        THE COURT:  Will you you be offering this?

22        MS. AULT:  Yes.

23        THE COURT:  Is there any objection, Mr. Nick?

24        MR. NICK:  No objection.

25        THE COURT:  All right.  It will be received.

1            (Trial Exhibit 84-a received in evidence)

2            **MS. AULT:**  Thank you, your Honor.

3  **BY MS. AULT:**

4  **Q.**    Now, just generally can you describe -- we are going to

5  talk about it in more detail, but what does 84-a depict?

6  **A.**    That's the site where the point of entry is.  It's the

7  waterfall that I mentioned in my report.  I'm actually standing

8  on the upper portion of the waterfall area.

9  **Q.**    Does that depict what a diesel -- what the sheen on the

10  water looks like when there is diesel in the water?

11  **A.**    Yes.

12            **MS. AULT:**  Your Honor, we would like to move 84-a

13  into evidence.

14            **THE COURT:**  It will be received.

15            **MS. AULT:**  Thank you, your Honor.  May we publish

16  84-a to the jury?

17            **THE COURT:**  You may.

18            **MS. AULT:**  I think that should come up on everyone's

19  screens.

20            (Photograph displayed)

21  **BY MS. AULT:**

22  **Q.**    Now, this picture was not actually taken on May 12th, is

23  that correct?

24  **A.**    It was not.

25  **Q.**    Okay.  It was taken a few weeks later?

1  A.     Correct.

2  Q.     Does this accurately depict what the sheen on the water

3  looked like that day?

4  A.     Yes.

5  Q.     Okay.  Now, can you explain to the jury -- I think it's a

6  little hard to tell what exactly -- where is the diesel and

7  where is the fresh water.  Can you explain how that works?

8  A.     The reason I took this picture, I'm standing up on the

9  waterfall on the day of spill or the day I found the spill.  It

10 was actually spilling over that log right there that's covered

11 with moss where the black line is going across.  Water was

12 actually spilling across here.  This is later in the year, so

13 the water is running under the log.  The creek has dried up

14 somewhat.

15        But what this was showing was this was clear water

16 running into this pool which is contaminated with diesel, and

17 you can see a perfect little arch of where the fresh water is

18 pushing the plume away.  Perfect interface there between the

19 clean water and contaminated water.

20 Q.     The clean water is in the center and it's pushing the

21 contaminated water out?

22 A.     That's correct.

23 Q.     So those rings that are kind of shiny, that's the

24 contaminated diesel?

25 A.     Yes.

1    Q.    Okay.   I would also like to show you what's been marked as

2    84-d.

3              (Whereupon, photograph was tendered

4               to the witness.)

5    Q.   Can you tell me, just generally, what does that depict?

6    A.    That is the waterfall.

7              **MS. AULT:**   I offer 84-d into evidence.

8              **THE COURT:**   Any objection?

9              **MR. NICK:**   I object to relevance.

10             **THE COURT:**   Overruled.   It will be received.

11             (Trial Exhibit 84-d received in evidence)

12             **MS. AULT:**   Thank you, your Honor.   And may we publish

13   it to the jury?

14             **THE COURT:**   You may.

15             (Photograph published to the jury.)

16   **BY MS. AULT:**

17   Q.    So this is the waterfall that you were talking about?

18   A.    Yes.

19   Q.    All right.   So let's go back.   You went out to the creek

20   with Mr. Peterson and the Farrels.

21   A.    Right.

22   Q.    And you said you could see the diesel sheen on the creek.

23   And what did you do then?

24   A.    Smelled the diesel, also.   The Farrels and Peterson, we

25   walked upstream.   They said their water intake was a distance

1  upstream.  We walked up, I would guess, 200, 300 yards and came

2  to their intake system or their intake pipe.

3          At the intake pipe someone else had spliced into the

4  pipe and extended the -- their water intake upstream.

5  **Q.**   And where is this waterfall in relation to where that

6  splicing occurred?

7  **A.**   I would guess near 300 yards downstream.

8  **Q.**   So you found the splicing, so someone had taken their

9  intake and extended it farther upstream?

10 **A.**   That's correct.

11 **Q.**   What did you do then?

12 **A.**   Continued -- left the Petersons and Warden Baccoloni and

13 I started walking upstream following the pipe.

14          It made sense to me that whoever had extended -- made

15 the extension or continued the line upstream, they would have

16 inserted it back above where the spill had come in, which was

17 the case.

18          We got to the waterfall.  You could smell the strong

19 smell of diesel, see plume just upstream.  On the waterfall

20 here there was perfectly clean water; no smell, no sheen.

21 Fine.

22 **Q.**   So what did that indicate to you?

23 **A.**   I felt the person who was responsible for the spill had

24 tapped into their water to get around so they could continue to

25 get fresh water.

1          I think what happened is these people didn't realize

2   they had contaminated domestic water.  I think they thought

3   they were going to --

4          **MR. NICK:**  I'm going to object, your Honor.  Now it's

5   speculation testimony.

6          **THE COURT:**  Sustained.

7          **MS. AULT:**  Okay.

8   **BY MS. AULT:**

9   **Q.**   So you said you walked up the stream until you got to this

10  waterfall, is that correct?

11  **A.**   Yes.

12  **Q.**   There is a black line that appears to be running, I guess,

13  from the -- looking at the picture from the left-hand side?

14  **A.**   Yes.

15  **Q.**   What is that?

16  **A.**   That's the extension, the intake extension.

17  **Q.**   So that's the intake extension from the -- the intake to

18  Mr. Peterson's water spill?

19  **A.**   That's correct.

20  **Q.**   And where did that end up?

21  **A.**   Ended up just upstream of -- you don't have that in this

22  picture, but probably a yard upstream from the waterfall they

23  had put the intake back in, put the rocks over the top of it.

24  **Q.**   I'm going to show you Exhibit 84-e.

25

1              (Whereupon, photograph was tendered

2                to the witness.)

3   **Q.**   What does that depict?

4   **A.**   That is the intake mount.  You can see the pipe running

5   underneath and a series of rocks over the top of it.

6              **MS. AULT:**  Your Honor, we would like to admit 84-e

7   into evidence.

8              **THE COURT:**  Any objection?

9              **MR. NICK:**  No objection.

10             **THE COURT:**  Thank you.  It will be received and you

11  display it.

12             (Trial Exhibit 84-e received in evidence)

13             **MS. AULT:**  Thank you.

14             (Photograph displayed)

15  **BY MS. AULT:**

16  **Q.**   So is this the area on top of the waterfall?

17  **A.**   Yes.

18  **Q.**   And you said that that there was no more diesel sheen

19  farther up the creek?

20  **A.**   No.  It ended right here at the lower end, the downstream

21  part of the waterfall.

22  **Q.**   So what did you do then?

23  **A.**   Prior to getting to this point, I'm guessing 100,

24  200 yards, I begin to hear the sound of what I believe was a

25  generator.

1  Q.   Okay.  And did you suspect that might be the source of the

2  diesel spill?

3  A.   Yes.

4  Q.   So what did you do then?

5  A.   Getting closer to the waterfall, we got to the waterfall

6  you could definitely hear a generator running uphill.

7  Q.   Okay.  And so what did you do next?

8  A.   Continued uphill toward the sound of the generator.  About

9  probably about halfway uphill started smelling diesel again.

10 Once we left the creek, we couldn't smell diesel.

11       But once we got uphill a distance, started to smell

12 diesel again, strong smell of diesel, and continued until we

13 walked up to a large diesel generator.

14 Q.   Okay.  I'm going to show you what's marked as

15 Exhibit 84-c.

16       (Whereupon, photograph was tendered

17        to the witness.)

18 Q.   Does that sort generally depict the area that you were

19 walking through when you went up the hill?

20 A.   That is a big open that we were in where it's quite a bit

21 brushier, quite a bit more timber, but that's just, I would

22 say, west of where the generator was where we came out.  It's

23 probably 25, 30 yards west of where we came out.  Same general

24 area.

25       MS. AULT:  Your Honor, I would like to move 84-c into

1    evidence.

2              THE COURT:  Any objection?

3              MR. NICK:  No objection.

4              THE COURT:  Thank you.  It will be received and you

5    may display it.

6              (Trial Exhibit 84-c received in evidence)

7              (Photograph displayed)

8    BY MS. AULT:

9    Q.   So you said that you walked up the hill until you found a

10   diesel generator, is that correct?

11   A.   Yes.

12   Q.   I would like you to take a look at Exhibit 9-dd.  That's

13   double d as in dog.

14             (Whereupon, photograph was tendered

15              to the witness.)

16   Q.   What does that photo depict?

17   A.   That's the generator and the generator shed that it had

18   been in.

19             MS. AULT:  Your Honor, I would like to move 9-dd into

20   evidence.

21             THE COURT:  Any objection?

22             MR. NICK:  No.

23             THE COURT:  Thank you.  It will be received.

24             (Trial Exhibit 9-dd received in evidence)

25             THE COURT:  And you may display it.

1          **MS. AULT:**  Thank you.

2               (Photograph displayed)

3    **BY MS. AULT:**

4    **Q.**    Now, were the Petersons and their neighbors, were they

5    hooked up to the PG&E system?

6    **A.**    Yes.

7    **Q.**    So this generator didn't have anything to do with powering

8    their property?

9    **A.**    No.

10   **Q.**    So after you came up to this generator, what did you do

11   next?

12   **A.**    We basically looked.  You could see diesel on the grounds.

13   Very strong smell of diesel everywhere.

14               As we were standing there just above -- we kind of

15   came up to the left of that picture there, just above this --

16   up the hill I could see a structure, just a faint outline of a

17   building.  Then we heard some pounding farther up the hill; not

18   from the direction of this structure, but another structure.

19   It sounded from some other area uphill.

20   **Q.**    I'm going to show you what's been marked as Exhibit 9-c.

21               (Whereupon, photograph was tendered

22                to the witness.)

23   **Q.**    Tell me if you recognize that.

24   **A.**    Yes.

25   **Q.**    What is that?

1  A.   That's the second building that we located as we were

2  walking uphill.  We actually walked beneath this building.

3  Q.   Okay.  The first building that you saw, did you actually

4  walk up to that building?

5  A.   Later I did, yes, but not initially.  Initially we came to

6  this building.

7         There were a series of three buildings.  The first

8  building I saw was downhill from this building.  There was this

9  building and another building uphill, which was the building we

10 were hearing the pounding coming from.

11 Q.   You saw one building up in the trees you and then you

12 walked up and you came to a second building?

13 A.   Correct.

14 Q.   And is this the building you came to?

15 A.   Yes.

16      MS. AULT:  Your Honor, we would like to move 9-c into

17 evidence.

18      THE COURT:  Any objection?  Mr. Nick, any objection

19 to 9-c?

20      MR. NICK:  No objection.

21      THE COURT:  Thank you.  It will be received.

22      (Trial Exhibit 9-c received in evidence)

23      MS. AULT:  Thank you.  May we publish it to the jury?

24      THE COURT:  You may.  In fact, anything I let in you

25 may publish unless I tell you not to.

1    **MS. AULT:**  Thank you, your Honor.  Just trying to

2  follow rules.

3         **THE COURT:**  Appreciate that.

4         (Photograph displayed.)

5  **BY MS. AULT:**

6  **Q.**  So this building, the one that's up on stilts, is the

7  first one that you actually walked up to?

8  **A.**  Yes.

9  **Q.**  So after you got to this building -- now, when you got to

10  this building, did you notice -- did you hear anything or smell

11  anything?

12  **A.**  Heard fans running and could smell bud marijuana.

13  **Q.**  So what did you do then?

14  **A.**  Heard pounding again uphill and basically followed a trail

15  uphill to a third structure.

16  **Q.**  I'm going to show you what's been marked as 9-b.

17         (Whereupon, photograph was tendered

18          to the witness.)

19  **Q.**  And tell me if you recognize that?

20  **A.**  That is the third structure.

21         **MS. AULT:**  Your Honor, we would like to move 9-b into

22  evidence.

23         **THE COURT:**  Any objection?

24         **MR. NICK:**  No objection.

25         **THE COURT:**  Thank you.  It will be received.

1              (Trial Exhibit 9-b received in evidence)

2    BY MS. AULT:

3    Q.    Now, when you came up to that structure, was the door open

4    or closed?

5    A.    It was open.

6    Q.    And what did you see?

7    A.    Inside I could see the bright yellow-orange glow of lights

8    and raised beds and what I believed to be marijuana plants, a

9    number of marijuana plants.

10   Q.    Okay.   Could you hear anything at that point?

11   A.    There were people talking, yes, in the building.

12   Q.    And could you smell anything?

13   A.    Not at that point, no.

14   Q.    Okay.   So what did you do next?

15   A.    Started walking toward the building.   As I was stepping

16   out or just stepped into a batch of huckleberry, saw a person

17   walk to the -- walking from inside the building walking toward

18   the door.

19   Q.    Okay.   And what did you do then?

20   A.    At gunpoint as the person walks to the door, I told them

21   to get their hands up, walked them back into the building.

22   Q.    Now, do you see that person in the courtroom here today?

23   A.    I do.

24   Q.    And can you please point him out for the jury and tell us

25   something that he's wearing?

1  A.   It's Mr. Dobbs there, sitting rocking in the chair.

2          MS. AULT:  Your Honor, may the record reflect that

3  the witness has identified the defendant?

4          THE COURT:  What is his position at the table there?

5          THE WITNESS:  He's the third person with his -- I

6  guess both of them.  He has a tie on, blue shirt, like a

7  brownish-gray suit jacket.

8          THE COURT:  How about raising your hand, Mr. Dobbs?

9          MR. NICK:  Go ahead stand up, Mr. Dobbs.

10          (Mr. Dobbs stands.)

11          THE COURT:  Is that Mr. Dobbs?

12          THE WITNESS:  That is Mr. Dobbs.

13          THE COURT:  Thank you.  And the record may reflect

14  that.  Thank you, sir.

15          MS. AULT:  Thank you, your Honor.

16  BY MS. AULT:

17  Q.   Now, I'm going to ask you to take a look at what's been

18  marked as Exhibit 11, just so we can get a little oriented.

19          (Whereupon, document was tendered

20            to the witness.)

21  Q.   This is a diagram.  You did not draw this, but at some

22  point did you end up walking around the entire site that was

23  out there?

24  A.   Yes.

25  Q.   Does this roughly depict the layout of the buildings at

1  that structure?

2  A.    Yes.

3            MS. AULT:  Your Honor, we would like to move

4  Exhibit 11 into evidence.

5            THE COURT:  Any objection?

6            MR. NICK:  No objection.

7            THE COURT:  Thank you.  It will be received.

8            (Trial Exhibit 11 received in evidence)

9            MS. AULT:  Your Honor, I actually have a blow-up of

10  that, which we would like to introduce as 11-a.

11            THE COURT:  All right.  It will be received.

12            (Trial Exhibit 11-a received in evidence)

13            MS. AULT:  Your Honor, may the witness approach the

14  diagram so he indicate where he was?

15            THE COURT:  He may.

16            (Witness steps down.)

17  BY MS. AULT:

18  Q.    Warden Bruckenstein, can you just trace on this diagram,

19  where did you come from and where did you go?

20  A.    We came from the creek, basically --

21  Q.    Warden Bruckenstein, you are going have to use the mike.

22  A.    I'm sorry.  The creek is down here.  This would be down

23  slope, working that way.  We came up from the generator area

24  this way, and basically worked our way around the hill.  Came

25  underneath this building here around, and then followed the

1  trail up to this grow building -- I'm sorry, came around this

2  way.

3           This is the first building that we saw.  Came around

4  -- this is a bit out of size, but that's okay.  Walked

5  underneath this building around this way, and then walked up to

6  the -- this building right here, third upper building

7  (indicating).

8  Q.   So you are indicating that you came from sort of the upper

9  left of the diagram across the top of the diagram --

10 A.   Yes.

11 Q.   -- to --

12 A.   Came up here and then around (indicating).

13 Q.   Up to where it says "generator," over towards the right,

14 down to the second building from the left that says "grow

15 room," and then over to the building on the far right that also

16 says "grow room," is that correct?

17 A.   Yes.

18 Q.   Where did you see the defendant?

19 A.   In the door of this grow here (indicating).

20 Q.   Okay.  There is a grow room to the far right?

21 A.   Yes.

22 Q.   Thank you.  You can take the witness stand again, please.

23          (Witness resumes stand.)

24 Q.   So after you saw the defendant walk out of that grow

25 building, what did you do next?

1  A.    He did not walk out.  He just walked to the entry, to the

2  door, again, at gunpoint.  I had him put his hands up, walked

3  into the building with him.

4        There were two other persons in the building, also.

5  They were back at the back of the grow shed.

6  Q.    Now, did you order the defendant to get down on the

7  ground?

8  A.    I did not.

9  Q.    Okay.  And when he came out of the building, do you

10 remember what was his appearance like?  What did he look like?

11 A.    Had a shirt, a pair of pants on, you know, blue jean-type

12 pants.  I think boots.  I don't recall exactly what he was

13 wearing.

14 Q.    What condition was his clothing in?

15 A.    His pants had dirt on them.

16        MR. NICK:    I'm going to object to that.  That's a

17 conclusion, your Honor, without foundation.  I move to strike

18 it.

19        THE COURT:    Well, I will sustain the objection.  I

20 will ask you to ask the question again and ask the witness to

21 describe exactly what he saw.

22 BY MS. AULT:

23 Q.    Can you describe the condition of his pants?

24 A.    He had kind of, as I remember, dark-ish brown dirt on the

25 pants; not red-ish brown like would you see in the soil, like

 1  if I had put him on the ground, like he had fallen down or

 2  something like that.  It was I would say consistent with what

 3  was inside the beds.

 4          **MR. NICK:**  Your Honor, I move to strike that

 5  conclusion.  Speculation.

 6          **MS. AULT:**  The witness is simply describing what he

 7  saw.

 8          **THE COURT:**  Overruled.  He's just describing his

 9  observation.

10          **MR. NICK:**  Just to be specific, your Honor, the

11  portion that I move to strike is that what is on the pants is

12  consistent with what -- the dirt that's in the beds.

13          **THE COURT:**  Right.  And I think he's just observing

14  that.  So I will deny your request.

15  **BY MS. AULT:**

16  **Q.**   So you said you went inside of the grow building then?

17  **A.**   Yes.

18  **Q.**   Now, I'm going to show you what's been marked as

19  Exhibit 9-h.

20          (Whereupon, photograph was tendered

21           to the witness.)

22  **Q.**   Can you tell me generally what that?

23  **A.**   That looks like the building.

24  **Q.**   Is that the inside of the building?

25  **A.**   Inside, yes.

1    **MS. AULT:**  Your Honor, I would like to move 9-h into

2  evidence.

3          **THE COURT:**  Any objection?

4          **MR. NICK:**  No objection.

5          **THE COURT:**  I couldn't hear you.

6          **MR. NICK:**  No objection, your Honor.

7          **THE COURT:**  Thank you.  It will be received.

8          (Trial Exhibit 9-h received in evidence)

9  BY MS. AULT:

10 **Q.**  So you said you found two other people in the building, is

11 that right?

12 **A.**  Yes.

13 **Q.**  And who were those two other people?

14 **A.**  Mr. Trabue and his juvenile son.

15 **Q.**  And what did you do with Mr. Trabue and his son?

16 **A.**  We handcuffed Mr. Trabue, also.  And I don't remember, but

17 I don't believe we handcuffed his son.

18 **Q.**  Were Mr. Trabue and his son also -- were they also dirty?

19 **A.**  Yes.

20 **Q.**  All right.  So after you had Mr. Trabue and his son and

21 the defendant in custody, what did you do next?

22 **A.**  I read the three men their Miranda warning and I then took

23 Mr. Dobbs -- actually, prior to that I had said something to

24 these -- the three men, you know, "What do you guys think would

25 bring two game wardens up here?"  And they both acted like they

1  didn't know what I was talking about.

2          So I rephrased it by saying, "Why do you think two

3  game wardens would follow a creek and end up up here?"  And

4  Mr. Trabue in answer to the question said, "Diesel?"  And I

5  said, "Yeah.  That's why we came here."

6  Q.    He said that in a questioning tone of voice?

7  A.    Right.

8  Q.    So what did you do then?

9  A.    I then took Mr. Dobbs outside.  I believe I took Mr. Dobbs

10  out first.  Began to question him as to -- I was concerned

11  about the amount of the spill, how much diesel we were going to

12  have to deal with.  And he said he knew nothing about it.  Said

13  that, "I'm just up here for the day."  That was his statement

14  initially.

15  Q.    And so what did you do then?

16  A.    I tried questioning him more and finally he said to me,

17  "You know how it is.  You have been around here long enough."

18  And that was the last he said anything to me.

19  Q.    Okay.  So what did you do after that?

20  A.    After that, I left the three with Mister -- or Warden

21  Baccolini and I began to look around the rest of the area.

22          The first building that we had seen, when I came to

23  that I could hear what I thought were voices inside, but it

24  ended up being a transistor radio playing.  Secured that,

25  making sure there was no one in there.

1          Actually, went in the second building first, the one

2     that we had walked beneath, and then went to the third building

3     where the transistor radio was playing.

4          Walked downstream and came -- excuse me, downhill and

5     came to a building which looked like it has been house at one

6     time.  No one was in that.  There were some out buildings.  I

7     just briefly looked in them quickly and there was nothing in

8     there.  There was a green GMC pickup parked in the driveway

9     down near the house.

10          And I walked back up to Warden Baccolini after I made

11    sure there was no one else around.  Radioed my dispatch,

12    though, to tell them what we were up to.

13    **Q.**   I'm going to stop you for one second.

14    **A.**   Sure.

15    **Q.**   Can you take a look at Exhibit 10-a.

16          (Whereupon, photograph was tendered

17           to the witness.)

18    **Q.**   And tell me what that depicts?

19    **A.**   That's the GMC pickup that I saw parked down at the house.

20          **MS. AULT:**  Your Honor, we would like to move 10-a

21    into evidence.

22          **THE COURT:**  Any objection?

23          **MR. NICK:**  No objection.

24          **THE COURT:**  Any objection?

25          **MR. NICK:**  No objection, your Honor.

1          **THE COURT:**  It will be received.

2          (Trial Exhibit 10-a received in evidence)

3    **BY MS. AULT:**

4    **Q.**    Just to clarify.  I'm now looking at 11-a, which is the

5    diagram.  Is this the residence where you ended up?

6    **A.**    Yes.

7    **Q.**    And where was the truck parked?

8    **A.**    To your right.  Right up against the bank.  A little more

9    toward the bank there.

10   **Q.**    (Indicating)

11   **A.**    There you go.  Yeah, about there.

12   **Q.**    So was there a clearing out in front of the residence

13   here?

14   **A.**    Driveway type area, yes.

15   **Q.**    And the truck was parked over here towards the right where

16   there is this curved line?

17   **A.**    Yes.

18   **Q.**    So after you found the truck, what did you do next?

19   **A.**    Walked back up to where the three men were in the top grow

20   area.  I suspect at that time probably got ahold of my dispatch

21   and had told them to get ahold of Mendocino County.  I may have

22   done that before.  I don't know --

23   **Q.**    Okay.  And Mendocino County, the Sheriff's Office?

24   **A.**    Mendocino Sheriff's Office, yes.

25   **Q.**    Why did you want to get ahold of the Sheriff's Office?

1  **A.**    Marijuana is their area of expertise.  I am the Game

2  Warden, so whenever it -- you know, saying if they were to come

3  a Fish and Game violation, they would turn that over to me and

4  I, in turn, turn things over to them.

5  **Q.**    Okay.  So at some point you decided that you needed to

6  leave this property?

7  **A.**    Yes.  I would have to get back down to the road.  We had

8  walked in, so I wouldn't want to walk somebody in.  I knew they

9  had driven this in, so I decided to use Mr. Dobbs pickup to go

10  down to the -- where I parked my patrol vehicle and exchange

11  vehicles and lead the deputies and whoever else was going to

12  come back up to the grow area.

13  **Q.**    Warden Bruckenstein, you are starting to get ahead of me a

14  little bit, so I'm going to ask you just to listen to my

15  question, answer the question, and then I have to ask you

16  another question.  That's kind of how this has to work.

17  **A.**    Sure.

18  **Q.**    Okay.  So you decided that you needed to get back down to

19  lead the sheriff's deputies to where you were, is that right?

20  **A.**    Yes.

21  **Q.**    And you had walked in.  So how did you decide to get back

22  out?

23  **A.**    I decided to use Mr. Dobbs' pickup.

24  **Q.**    And how did you know it was Mr. Dobbs' pickup?

25  **A.**    I had run the license plate.

1  Q.   And it came back registered to him?

2  A.   Yes.

3  Q.   So what did you do then --

4  A.   I asked Mr. Dobbs if I could use his pickup and he said I

5  could.  Got the keys from him.  Prior to leaving I suspected

6  there may be some locked gates -- I don't want to get ahead of

7  you here.

8  Q.   Okay.  So you got the keys from the defendant --

9  A.   Yes.

10 Q.   (Continuing) -- to the truck.

11         And then what did you do next?

12 A.   I asked if I was going to encounter any locked gates on my

13 way out.  Mr. Trabue said I would encounter two locked gates.

14 Q.   So what happened then?

15 A.   I asked if he had keys to them, and he said he did.  He

16 had a large ring of keys in one of his pockets.  Removed the

17 keys from his pockets.  He showed me the two keys that would

18 unlock the gates, which they did, and I drove downhill in Mr.

19 Dobbs' pickup.

20 Q.   So when you got down the hill, did you eventually meet up

21 with the sheriff's deputies?

22 A.   I did.

23 Q.   And what did you do then?

24 A.   I didn't lead them back uphill.  They went uphill.  I was

25 in an area where I could make phone contact, so I wanted to

1  stay there in case anyone was going to call me for awhile?

2          But they ran uphill and were able to -- I told them,

3  gave rough directions how to get there and they drove right to

4  it.

5  **Q.**   Okay.  I'm going to show you what's been marked as

6  Exhibit 9-a.

7          (Whereupon, photograph was tendered

8            to the witness.)

9  **Q.**   Can you tell me what that looks like?

10  **A.**   That looks to be one of the roads heading up toward the

11  grow area.

12          **MS. AULT:**  Your Honor, we would like to move 9-a into

13  evidence.

14          **THE COURT:**  Any objection?

15          **MR. NICK:**  No.

16          **THE COURT:**  Thank you.  It will be received.

17          (Trial Exhibit 9-a received in evidence)

18          (Photograph displayed.)

19  **BY MS. AULT:**

20  **Q.**   At some point did you eventually go back up to the grow

21  site?

22  **A.**   I did.  A patrol officer also showed up and I led him back

23  up to the grow scene.

24  **Q.**   Did you help to process that scene?

25  **A.**   I did.

1  Q.   What did you do as part of processing the grow scene?

2  A.   Firstly, I secured the generator.  We got the generator

3  shut down.  I secured the fuel lines on it so there wouldn't be

4  any more diesel spill and, also, secured the lines to the fuel

5  tanks so there wouldn't be any spill there.

6          And then I helped cut marijuana, count, collect the

7  ballasts and the lights and different things.

8  Q.   You said you helped to cut the marijuana plants and count

9  them?

10  A.   Yes.

11  Q.   How do you do that?

12  A.   I cut in piles of 10.  I will cut 10 plants, depending on

13  the size.  Usually you can handle 10.  These were small.  Of

14  course, in some of the areas they were a little larger, but I

15  just cut 10 at a time and put them in a little pile of 10 and

16  then go back through.  Rather than keep a running count, I go

17  back through and do a recount.

18  Q.   What do you do with the number when you are done with it?

19  That day what did you do --

20  A.   There's a person who is tallying up everybody's number of

21  plants that they cut.  They will tally it up on a clipboard or

22  a sheet or whatever they were -- whoever was taking the tally.

23  Q.   Was that one of the Mendocino County sheriff's officers?

24  A.   Yes.

25  Q.   Did you give the number of your plant total to that

1 person?

2 A.    Yes.

3 Q.    And did you do that right at the scene?

4 A.    Yes.

5 Q.    Did the plants that you were counting, did those plants

6 have roots on them?

7 A.    They did.

8 Q.    And did you make sure of that as you were counting them?

9 A.    They were all set in growing soil, a little rock bowl, the

10 way it's done everywhere.

11 Q.    But you saw they had roots?

12 A.    They were rooted plants, yes.

13 Q.    Now, you said you went to go secure the generators.  So

14 did you walk all around that area where the generator was?

15 A.    Yes.

16 Q.    I'm going to show you what's been marked as Exhibit 84-f.

17          (Whereupon, photograph was tendered

18           to the witness.)

19 Q.    Can you tell me what that depicts?

20 A.    That is -- as you would face the generator shed, that is

21 the right front corner, and that is red diesel from the spill,

22 and those lines are electrical lines.  They are not fuel line

23 or anything.  They are electrical line.

24 Q.    Again, this picture was taken a few days after May 12,

25 2005, but does it depict what the area around the generator

1    looked like on that day?

2    A.    Yes.

3             MS. AULT:  Your Honor, we would like to move 84-f

4    into evidence.

5             THE COURT:  Any objection?

6             MR. NICK:  No objection.

7             THE COURT:  Thank you.  It will be received.

8             (Trial Exhibit 84-f received in evidence)

9    BY MS. AULT:

10   Q.    So that red mark that's in the middle of the picture, what

11   is that?

12   A.    That is diesel.

13   Q.    So was diesel like that, was that covering the area around

14   the generator?

15   A.    Yes.  There were several pools.  Sheen everywhere.  Very,

16   very strong smell of diesel.

17   Q.    I'm going to show you what have been marked as Exhibits

18   9-ff, that's double f, through 9-ii, that's double i.

19            (Whereupon, photographs were tendered

20             to the witness.)

21   Q.    Can you just glance at those really quickly and tell me

22   whether they depict the area just around the generator?

23   A.    Yes.

24            MS. AULT:  We would like to move 9-ff through 9-ii

25   into evidence.

1          THE COURT:  Any objection?

2          MR. NICK:  No objection.

3          THE COURT:  Thank you.  They will be received.

4          (Trial Exhibits 9-ff through 9-ii received in

5          evidence)

6          MS. AULT:  Let's start with double f.

7          (Photograph displayed)

8   BY MS. AULT:

9   Q.   Can you tell us that this photograph depicts?

10  A.   That's containers full of waste oil.

11  Q.   Were those found near the generator?

12  A.   Yes.

13  Q.   Is that type of oil used in the generator?

14  A.   That's -- this type of oil, yes.  It's -- what it is they

15  are running these generators usually 24 hours a day, so they

16  don't -- so they have to change oil with frequency.  They

17  generate a lot of waste oil.

18  Q.   And that's what this is?

19  A.   Yes.

20  Q.   Can you look at 9-gg?

21          (Photograph displayed.)

22  Q.   And can you tell me what this depicts?

23  A.   Those are the supply tanks that you were uphill from the

24  generator room.

25  Q.   And the lines from those tanks, did those lead to the

1  generator?

2  **A.**    They do.  They did.

3  **Q.**    And 9-hh.

4          (Photograph displayed.)

5  **Q.**    And can you tell me what that depicts?

6  **A.**    That's the floor of the generator room.

7  **Q.**    What's the black stuff that's in all of those pans?

8  **A.**    Used motor oil.

9  **Q.**    Again, is that from the generator?

10 **A.**    Yes.

11 **Q.**    And 9-ii?

12         (Photograph displayed.)

13 **Q.**    Can you tell me what this depicts?

14 **A.**    Those are the two main supply tanks in the generator room.

15 **Q.**    Okay.  And it looks like there is some discoloration on

16 the top tank.  What was that?

17 **A.**    That's over fill.  Spill over.  I suspect that's the

18 source of the spill or point where it started.

19 **Q.**    Now, did you do any further investigation with regard to

20 this site after May 12th?

21 **A.**    Yes.

22 **Q.**    What did you do?

23 **A.**    We took water samples, soil samples.  That's pretty -- the

24 Fish and Game-type, you know, for the pollution incident, that

25 was pretty much what we did.

1   Q.   Did you find out who owned the property?

2   A.   I did.

3   Q.   Who was that?

4   A.   Mrs. Geri Stanton.

5   Q.   And was Miss Stanton local?  Did she live in the area?

6   A.   No.

7   Q.   Where did she live?

8   A.   She's from Oregon.

9   Q.   And eventually were you able to get the site cleaned up?

10          MR. NICK:  Objection.  Relevance.

11          THE COURT:  Sustained.

12          MS. AULT:  If I could just have one moment, your

13  Honor?

14          THE COURT:  Sure.

15       (Discussion held off the record between

16        government counsel.)

17  BY MS. AULT:

18  Q.   Those are all the questions I have for you right now,

19  Warden Bruckenstein.  Defense counsel, Mr. Nick, is going to

20  ask you a few questions now, I assume.

21          THE COURT:  Mr. Nick?

22                    CROSS EXAMINATION

23  BY MR. NICK:

24  Q.   Good morning, sir.

25  A.   Good morning.

1  Q.   I wanted to start by asking you, you said that you had

2  previously investigated, it sounded like about a dozen grows

3  you were estimating?

4  A.   Yes.

5  Q.   And would all those have been in the Humboldt -- in your

6  area of Garberville?

7  A.   Yes.

8  Q.   And over what period of time have you encountered those

9  dozen grows?

10 A.   Oh, I'd say the indoor grow thing is probably relatively a

11 new phenomenon.  Maybe seven, ten years.  Probably more like

12 seven, last seven years especially.

13 Q.   You have been running into more indoor grows, is that

14 correct?

15 A.   Yes.

16 Q.   And would the outdoor grows extend back beyond the seven

17 years?

18 A.   Oh, yes.  Ever since I have been there.

19 Q.   Now, I would assume, and correct me if I'm wrong, that

20 based upon your official position, you are not out there

21 looking for these things.  You just encounter them as you are

22 investigating Fish and Game violations, correct?

23 A.   That's correct.

24 Q.   And would you agree that you encounter these type of grows

25 very commonly?

1  A.    I could probably do it every day if I wanted, yes.

2  Q.    And tell me again your area?  I know you said you are out

3  of the Garberville office, but the geographical area that you

4  take care of is?

5  A.    I have southern Humboldt and southern Trinity County.

6  Q.    How did you get over to the Piercy area on this one?

7  A.    Warden White was on a day off.  I received the call.

8  Q.    You filled in for another warden that had that little

9  area?

10 A.    Yes.

11 Q.    So your prior experience had been finding the marijuana

12 grows in the Humboldt County area, would that be true?

13 A.    Yes.

14 Q.    Now, in the process of conducting your work in this case,

15 you wrote a report, correct?

16 A.    Yes.

17 Q.    And let me just show you this report just to confirm that

18 this is the only one you have ever written.

19        MR. NICK:  May I approach the witness?

20        THE COURT:  Yes.

21 BY MR. NICK:

22 Q.    Warden Bruckenstein, I have a report with your name with a

23 date of May 16th.  It's also one of six pages.

24        I wonder if could you take a look at it real quick

25 and just tell me if that's the one that you prepared and if

1   it's the only one that you recall preparing?

2                   (Whereupon, document was tendered

3                   to the witness.)

4   A.    It looks like my report, yes.

5   Q.    Is there any other report that you wrote in this case?

6   A.    No, I had some rough drafts, but...

7   Q.    Thank you very much.

8           Now, I want to ask you, the purpose of writing a

9   report -- and, you know, you can augment on what I say or

10  correct me if I'm wrong -- is because you investigate many

11  different situations and you need to be able to recall

12  important events when called upon to recall them.  Would that

13  be correct?

14  A.    Yes.

15  Q.    Now, do you have a copy of your report with you, sir?

16  A.    I do.

17  Q.    And anywhere in your report did you ever indicate that the

18  soil that you saw on the defendant's pants, or what you claim

19  is soil, matched the color of the soil in the beds?

20  A.    No.

21  Q.    Now, was there anything unique about the color of the soil

22  in the bed that would distinguish it from soil in any other

23  garden in America?

24  A.    No.

25           MR. NICK:  Your Honor, I would like to -- I believe

1  the government has the defendant's pants and I would like to

2  have them marked and show them to the witness right now.

3           THE COURT:  Do you have them?

4           MS. AULT:  We do, your Honor.  They have already been

5  marked as an exhibit.

6           MR. NICK:  And if it's okay with the Court, I can use

7  the government's own exhibit number.

8           THE COURT:  Of course, sure.

9           THE CLERK:  Do you know what number?

10          MS. AULT:  I believe that they are 36-a.  They are

11  36-a.

12          And for the record 36-a, I believe, contains both the

13  defendant's pants and his socks.

14          THE COURT:  Do you wish those admitted into evidence?

15          MR. NICK:  Yes, your Honor.

16          THE COURT:  Is that all right with you?

17          MS. AULT:  Certainly, your Honor.  As long as counsel

18  is agreeing those are defendant's.

19          MR. NICK:  Yes, we have no problem.  We stipulate to

20  it.

21          THE COURT:  They will be admitted.

22          (Trial Exhibit 36-a received in evidence)

23          MR. NICK:  What was the number again it was marked?

24          THE COURT:  36-a.

25          (Exhibit 36-a displayed)

1  **BY MR. NICK:**

2  **Q.**   Do you have a recollection, just an independent

3  recollection that these are the pants he was wearing?

4  **A.**   I couldn't tell you if they were the exact pants, but

5  that's what I remember seeing him wearing, yes.

6  **Q.**   You didn't take the pants from him that day?

7  **A.**   I did not.

8  **Q.**   And when Mr. Dobbs was taken away, arrested that day, he

9  was -- he left wearing these pants, right?

10 **A.**   The pants that he was wearing when I contacted him, yes.

11 **Q.**   And do you recall what appears to be brown stains, maybe

12 soil, whether they were just like as they appear on the pants

13 right now as a whole?

14 **A.**   Yes.  I mentioned in my -- earlier that I had asked him

15 about, you know, what his involvement was or how much diesel

16 was spilled.

17       And the reason I continued to question him is I saw

18 the dirt on his pants and it didn't make sense to me that he

19 was just up there for the day.

20 **Q.**   All right.  Now let me ask you this:  You can get a lot of

21 soil stains by doing construction work, correct?

22 **A.**   Yes.

23 **Q.**   You can get them by working on the garden at your

24 residence, not a marijuana grow site, correct?

25 **A.**   Yes.

1  Q.   Did you happen to learn on that day by any part of your

2  investigation what Mr. Dobbs' profession was, what he did for a

3  living?

4  A.   On that day?

5  Q.   Yes.

6  A.   I did not.

7  Q.   Incidentally, you know, what I saw from the pants -- and

8  I will hold them up again.   Correct me if I'm wrong.

9           (Exhibit 36-a displayed.)

10 Q.   The stains on the pants did -- let me see if I can ask the

11 question in a manner you can understand.

12           I see stains, and what I want to know is if you

13 actually saw soil debris on the pants?

14 A.   I don't remember seeing soil debris.

15 Q.   You have no way of knowing when those stains got on the

16 pants, correct?

17 A.   No.

18 Q.   Now, when you walked up the embankment and you ran into

19 the generator and then you encountered Mr. Dobbs coming out of

20 the brown shed that had the grow in it, was Mr. Dobbs on the

21 cell phone?

22 A.   Yes.

23 Q.   Was he having a conversation that you could hear?

24 A.   I heard him talking.   When I -- when he walked out and I

25 saw him, he had the phone to his ear.   I don't know that he was

1  making conversation.  He may have just been placing a call.

2  I'm not sure.

3  Q.  Understood.  Now, you mentioned in your report that --

4  Actually, let me ask you this.  Did you advise Mr. Dobbs

5  that -- at that time that he was not under arrest, but that you

6  were simply handcuffing him for your own safety?

7  A.  I don't know why I would say that.  It's a felony in my

8  possession.  I would certainly arrest somebody.

9  Q.  Okay.  Let me show you a report that was written by a

10  Scott Poma and ask you if it refreshes your recollection of

11  making that statement.  Okay.

12       MS. AULT:  Your Honor, if he's merely showing it to

13  the witness to see if it refreshes his recollection, then he

14  can show the report to the witness.  However, this would not be

15  proper impeachment.

16       THE COURT:  I believe it was just to refresh his

17  recollection, correct?

18       MR. NICK:  That's correct, your Honor.

19       THE COURT:  All right.  You may.

20  BY MR. NICK:

21  Q.  I will represent to you it's a Mendocino County sheriff's

22  report regarding this incident.  And this page here, which is

23  page seven, is the report of Scott Poma.

24       And I was wondering if could you read the underlined

25  highlighted portion and see if it refreshes your memory on that

1    issue?

2    A.    "Larry stated" --

3          THE COURT:  Don't read it out loud --

4    BY MR. NICK:

5    Q.    Sorry.  You can read to it yourself.

6          (Witness complied.)

7    A.    I don't recall making that statement.  I may have.

8    Q.    Okay.  Thank you, sir.

9          Now, when -- did Mr. Dobbs have to walk backwards up

10   the little stairway that he came down?

11   A.    He never stepped out.

12   Q.    He never made it onto the stoop?

13   A.    He walked basically right into the doorway, as I remember.

14   Q.    Okay.  And did you get to enter into the building with him

15   at some place in front of you, where you got to observe who was

16   inside the building?

17   A.    Yes.

18   Q.    And you mentioned that Wade Trabue and Trevor Trabue were,

19   I believe you said, in the back of that shed?

20   A.    Yes.

21   Q.    And what were they doing?

22   A.    They had their hands up at the time.

23   Q.    Okay.  And remember you said you had heard some banging?

24   A.    Yes.

25   Q.    Did they have a hammer with them anywhere near them?

1  A.    I didn't check.

2  Q.    And was there anything going in the immediate presence of

3  the Trabues that would indicate to you that was the origin of

4  the hammering, or of the banging I should say?

5  A.    Not that I determined, no.

6  Q.    Now, who showed you how turn off that generator?

7  A.    I don't believe I did it.  I believe one of the deputies

8  may have done it.

9  Q.    Okay.

10  A.    I don't recall.  I don't deal with generators.

11  Q.    Do you recall Wade Trabue showing you how the generators

12  turned off?

13  A.    Could be.  He may have told us how to turn the generator

14  off.  I don't believe that, unless one of the deputies took him

15  down there.  They -- as I remember, we kept them at the

16  generator shed until the Sheriff's Office showed up, and the

17  generator continued to run.

18  Q.    And you don't have a recollection right now of whether

19  Mr. Trabue showed you how to turn off the generator, is that

20  correct?

21  A.    I don't.

22  Q.    Let's see if we can find something that maybe helps you

23  remember.  I'm looking for it right now.

24  A.    Sure.

25  Q.    Now, when you elected to go down to, I guess, it would be

1   the principal road to meet the sheriff and CHP that you had

2   summonsed, you requested of Mr. Dobbs the use of his vehicle,

3   correct?

4   A.    Yes.

5   Q.    And he voluntarily granted it to you?

6   A.    Yes.

7   Q.    And he gave you a set of keys, correct?

8   A.    Yes.

9   Q.    Is it correct that none of the keys for any of the locks

10  that you encountered that day were on that key ring?

11  A.    I don't know.  The keys that I got for that, the locks

12  that I encountered, Mr. Trabue gave me.

13  Q.    Okay.  He --

14  A.    I didn't try Mr. Dobbs' keys.

15  Q.    And Mr. Trabue had a -- basically upon you requesting

16  whether you were going to encounter any gates, Mr. Trabue

17  affirmed by giving you a set of keys that allowed you to open

18  those gates?

19  A.    Yes.

20  Q.    Did they come out of his pocket?

21  A.    Yes.

22  Q.    Now, was there also what appeared to be a residential

23  structure on this property?

24  A.    Yes.

25  Q.    And did you ever get an opportunity to go inside of it?

1  A.   I did not.

2  Q.   And was there any observation that you made that would

3  allow you to conclude whether that residence was occupied or

4  unoccupied?

5  A.   It looked like maybe somebody would spend a little bit of

6  time in there once in a great while, but it didn't look like a

7  continuous occupation.

8  Q.   Now, also, I wanted to go back to the question that you

9  had posed to all three, Wade, Trevor and Mr. Dobbs, which is,

10 in essence, whether they knew why you had come there.   And

11 eventually when you reframed the question, it was Mr. Trabue

12 who admitted to you that the reason he felt you had come was

13 because of the diesel spill, correct?

14 A.   Yes.

15 Q.   And Mr. Dobbs told you he knew nothing about it, correct?

16 A.   Yes.

17 Q.   After Mr. Dobbs had told you that he had just come up for

18 the day and you questioned him some more, his reply to you was,

19 "You have been around here long enough, you know how it is."

20 A.   Yes.

21 Q.   And did you ask him what he meant by that?

22 A.   No.   He just no longer spoke me.   That was kind of the end

23 of the speaking.

24 Q.   Now, you also questioned Wade Trabue and at first when you

25 asked who is responsible for the plants, or how many plants

1  there were actually, Mr. Trabue responded that he -- he

2  basically didn't give you any answers to your questions, in

3  essence, at first, correct?

4  A.   During probably the initial questioning, yes.  I remember

5  at one point he said something about a thousand plants.

6  Q.   And that was actually after you told him that you kind of

7  needed to know how much marijuana there was there so that the

8  Sheriff's Department, who is going to arrive, knows whether to

9  bring ten guys or two guys, in essence?

10 A.   Yes.

11 Q.   And Mr. Trabue then responded that there were over a

12 thousand plants?

13 A.   Yes.

14 Q.   And not Mr. Dobbs, correct?

15 A.   Yes.

16 Q.   And actually it was Mr. Trabue who also told you that

17 there would be two locked gates, not Mr. Dobbs, as you went

18 down to the main road to meet law enforcement?

19 A.   Yes.

20 Q.   Do you remember ever interacting with -- while they were

21 on the scene with Mendocino County sheriff Deputy Kendall?

22 A.   I don't know the Mendocino deputy.  I'm sure I did.  His

23 name is familiar from having been there.

24 Q.   I guess what you are saying, they are not a crew that you

25 routinely deal with and so you didn't really know them on a

1  first-name basis?

2  **A.**    That's correct.

3  **Q.**    All right.  Were you together with your partner,

4  Baccolini, throughout this whole process or were there times

5  that he split up from you?

6  **A.**    Oh, we were definitely split up.  When I drove down, we

7  were obviously split up.  He stayed out at the grow with the

8  three and I went down.

9  **Q.**    Now, after you had been -- after you had placed Mr. Dobbs

10  under arrest, you placed a call in to, I guess, it was a

11  Sheriff's substation in Humboldt County, is that correct?

12  **A.**    Yes.

13  **Q.**    And you were told that there is a certain drug enforcement

14  unit out of Humboldt County that was very interested in Cody

15  Dobbs, correct?

16  **A.**    Yes.

17  **Q.**    And one of the people that you spoke about that interest

18  was Sergeant Wayne Hansen, correct?

19  **A.**    Yes.

20  **Q.**    I believe it's a drug enforcement unit that he's part of,

21  is that correct?

22  **A.**    There's a marijuana eradication team, yes.

23          **MR. NICK:**  I don't have any further questions of this

24  witness right now, your Honor.

25          **THE COURT:**  Thank you.

1          Any further redirect, Miss Ault?

2              **MS. AULT:**  Just a couple questions, your Honor.

3                  **REDIRECT EXAMINATION**

4   BY MS. AULT:

5   **Q.**   Warden Bruckenstein, you wrote a report, correct?

6   **A.**   Yes.

7   **Q.**   Do you have an independent recollection of the day?

8   **A.**   I do.

9   **Q.**   And you're testifying from your memory?

10  **A.**   Yes.

11  **Q.**   The pants that we saw, when was the defendant wearing

12  those?

13  **A.**   That day.

14  **Q.**   Okay.  And that day is May 12th of 2005?

15  **A.**   Correct.

16  **Q.**   So two years ago?

17  **A.**   Yes.

18  **Q.**   Were there any other vehicles on the property other than

19  the defendant's truck that day?

20  **A.**   No.

21  **Q.**   I think when Wade Trabue answered your question about why

22  two game wardens would follow a creek up there, could you tell

23  us again what was the tone that he answered that question in?

24  **A.**   Questioning.

25  **Q.**   Okay.  So like he was guessing?

1   A.   Hmm, very possibly or maybe -- yeah, I'm not sure.

2   Q.   And you testified earlier, I think, that before you spoke

3   to the defendant and Mr. Trabue, you Mirandized them, is that

4   right?

5   A.   I did.

6   Q.   Can you just tell us what that means?

7   A.   Basically tell them that I'm going to question them and

8   that any statements they use -- may be used against them in a

9   court of law.

10  Q.   Do you tell them they have the right to remain silent?

11  A.   I do.

12          MS. AULT:  Thank you.

13          THE COURT:  Thank you.

14          Anything further, Mr. Nick?

15          MR. NICK:  No further questions.  Thank you.

16          THE COURT:  All right.  Thank you very much, sir.

17  You may step down.

18          MS. AULT:  Your Honor, may the witness be excused?

19          THE COURT:  I don't know.  May the witness be

20  excused?

21          MS. AULT:  Your Honor, I'm just wondering.  He wants

22  to know if he can go back to Garberville.

23          MR. NICK:  I don't intend on recalling him right now,

24  your Honor.

25          THE COURT:  All right.  Yes, sir.  You are excused.

1    Thank you.

2              **MS. AULT:**  Thank you.

3              (Witness excused.)

4              **THE COURT:**  Miss Ault, I would propose we take our

5    lunch break now.

6              **MS. AULT:**  That would be fine.

7              **THE COURT:**  Ladies and gentlemen, we will take our

8    lunch break at this time.  If you would be ready to come back

9    at 12:30.

10             In the meantime, do not speak with each other or

11   anyone else about this case.  Do not make up your minds.

12   You've not heard all the evidence yet.  Have a good lunch.

13             (Jury out at 11:52 a.m.)

14             **THE COURT:**  Do you want to talk about Mr. Donald

15   Dobbs now?

16             **MS. JERICH:**  We can, your Honor.

17             **MR. NICK:**  Yes, your Honor.

18             **THE COURT:**  There are two issues as I see it.  One

19   has to do with the government's motion on the 404(b), and the

20   second has to do with discovery sanctions in general.

21             With respect to the -- well, let's talk about the

22   general issue.  Apparently, within the last couple of weeks the

23   government advised the defendant that Mr. Dobbs, Mr. Donald

24   Dobbs, has received certain benefits in exchange for his

25   cooperation with law enforcement in all matters, not

1  necessarily his cooperation regarding this case, and then it

2  mentions some things.

3          You propose to call Mr. Dobbs?

4          **MS. JERICH:**  We do, your Honor.

5          **THE COURT:**  And I take it that you would anticipate

6  that Mr. Nick would examine Mr. Dobbs about this information

7  that you have provided to him?

8          **MS. JERICH:**  I believe so, your Honor.

9          **THE COURT:**  Right.  Now, let's say that the defendant

10  said anything else to Mr. Dobbs.  What would you anticipate

11  Mr. Donald Dobbs would reply to that?

12          **MS. JERICH:**  I'm sorry.  I don't understand your

13  question.

14          **THE COURT:**  Well --

15          **MS. JERICH:**  Are you referring to the information

16  with respect to Mr. Dobbs' involvement with another federal

17  agency?

18          **THE COURT:**  Yes.

19          **MS. JERICH:**  We would anticipate, and we believe it's

20  fair game, for the defendant to cross examine Mr. Dobbs on his

21  involvement with, in general, another federal agency, the fact

22  that he has been compensated, the fact that he might receive

23  further consideration, compensation in the future from that

24  federal agency.

25          Our only request and consideration we are asking for

1  is we do not believe he's entitled to know the details of

2  Mr. Donald Dobbs' work, which is ongoing now with that separate

3  federal agency that has nothing to do whatsoever with this case

4  or with this defendant.

5          **THE COURT:**  So would you anticipate that Mr. Nick

6  could examine Mr. Donald Dobbs about work with that other

7  agency, but only in general or what?

8          Would Mr. Donald Dobbs answer truthfully questions

9  put to him by Mr. Nick about that other case?

10         **MS. JERICH:**  Yes, he would.

11         **THE COURT:**  Well, in that case why is this filed

12  ex parte?  Why can't you show this to Mr. Nick?

13         **THE CLERK:**  That hasn't even been filed yet.

14         **THE COURT:**  Well, it was provided to the Court and

15  the Court read it.

16         **MS. JERICH:**  I understand.  For the reasons stated in

17  that ex parte motion, your Honor, we believe that the details,

18  the details that would not be proper inquiry on

19  cross-examination which the defendant would be precluded from

20  inquiring into, the details of that, what the other federal

21  agency is, and what Mr. Dobbs is doing in his capacity as an

22  undercover operative  are off limits.

23         And that's why -- we have submitted it to the Court,

24  frankly, because we obviously want to disclose what is our

25  obligation to disclose.  However, we do not want to put Mr.

 1  Dobbs in jeopardy, nor do we want to jeopardize an ongoing

 2  federal investigation.  And both of those are very real issues

 3  that we believe were the specifics of that investigation and

 4  Mr. Dobbs' involvement to be provided to counsel.  And we also

 5  don't believe it's legally required.

 6          We believe our legal obligation is to advise him,

 7  yes, he's working for the federal government, another federal

 8  agency.  And, yes, he has been paid.  And, yes, he might

 9  receive further compensation.  And that's it.

10          **THE COURT:**  Well, and then isn't he entitled to ask

11  Mr. Dobbs, "What are you up to?  What's going on?"

12          **MS. JERICH:**  I don't believe he is, your Honor.

13          **THE COURT:**  Why not?  What is the reason for that?

14          **MS. JERICH:**  It's not relevant to his bias or

15  credibility.

16          **THE COURT:**  How do we know that?  How does Mr. Nick

17  know that?  How does the jury know that?

18          **MS. JERICH:**  Your Honor, I'm representing as an

19  officer of the court, and based upon what I have submitted in

20  that ex parte motion, that it's wholly irrelevant.

21          **THE COURT:**  Well, it is not related to this

22  prosecution.  I think that's --

23          **MS. JERICH:**  It is not.

24          **THE COURT:**  Assuming this were under oath -- which it

25  is not, but assuming it were, then that's correct.

1          MS. JERICH:  Correct.

2          THE COURT:  But the whole issue here is credibility.

3    The issue is informants.  The issue is who is telling the truth

4    about what.

5          So how can we say that it's irrelevant to those

6    issues even though it is not mechanically related to this

7    investigation?  That's my concern.

8          MS. JERICH:  We have inquired of that other federal

9    agency if they have had any concern about Mr. Dobbs not

10   providing them with accurate or truthful information.  I think

11   that would be a relevant question.  However, the answer is

12   negative.

13         THE COURT:  Well, I will tell you my view.  My view

14   is if you want to call this witness, then I'm going to order

15   that you provide Mr. Nick a copy of this document that you gave

16   to the Court ex parte.  I will order, if you do so, that it be

17   held under protective order and Mr. Nick may only use it for

18   purposes of this case.  And then I will entertain further

19   discussion about the ambit of Mr. Nick's allowable

20   cross-examination of this witness.

21         But I won't allow you to call him and put him on the

22   stand without having that conversation with all three of us,

23   Mr. Nick and you and me, after Mr. Nick has had an opportunity

24   to review these materials.

25         So you can do what you choose to do, but if you want

1  to go forward, you will have to show him this.

2          MS. JERICH:  Would the Court entertain further

3  briefing on the issue?

4          THE COURT:  I will, but not ex parte.

5          MS. JERICH:  I understand that.  Yes, ma'am.

6          THE COURT:  You understand?

7          MS. JERICH:  We do understand that, yes.

8          THE COURT:  So until we resolve that, I don't want

9  you to call this witness.

10          MS. JERICH:  I understand.

11          THE COURT:  Okay.  Thank you.

12          (Whereupon at 12:00 p.m.proceedings

13            were adjourned for noon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2  **NOVEMBER 14, 2008**                              **12:44 p.m.**

3

4          (Whereupon, the following proceedings were

5           held in open court, in the presence and

6           hearing of the jury.)

7          **THE COURT:**  Welcome back, ladies and gentlemen.  You

8  may all be seated.

9          The government may call its next witness.

10         **MS. AULT:**  Thank you, your Honor.  The United States

11  called Gregory Van Patten.

12                    **GREGORY VAN PATTEN**,

13  called as a witness for the Plaintiff herein, having been first

14  duly sworn, was examined and testified as follows:

15         **THE WITNESS:**  Yes.

16         **THE CLERK:**  State your full name for the record?

17         **THE WITNESS:**  My full name is Gregory Van Patten.

18         **THE CLERK:**  And spell your last name?

19         **THE WITNESS:**  Last is spelled capital V-A-N, space,

20  capital P-A-T-T-E-N.

21         **THE CLERK:**  Thank you.

22         **THE COURT:**  Miss Ault, you may proceed.

23         **MS. AULT:**  Thank you, your Honor.

24

25

1                    **<u>DIRECT EXAMINATION</u>**

2   **BY MS. AULT:**

3   **Q.**   Good morning, or good afternoon.  Where do you work?

4   **A.**   I work for the Mendocino County Sheriff's Office located

5   in Mendocino County, California.

6   **Q.**   And what's your position there?

7   **A.**   I'm currently employed as a detective sergeant with the

8   Sheriff's Office.

9   **Q.**   And what does a detective Sergeant do?

10  **A.**   I am responsible for the supervision of the detective unit

11  within the Sheriff's Office, which is responsible for major

12  crimes -- investigating major crimes such as homicides,

13  robberies, sexual assaults, high dollar thefts.

14  **Q.**   How long have you had that position?

15  **A.**   Just about nine months now.

16  **Q.**   What did you do before that?

17  **A.**   Before that I spent approximately a year and a half in the

18  patrol division as a patrol sergeant.

19  **Q.**   And before that what did you do?

20  **A.**   Prior to that I was assigned as a deputy sheriff, assigned

21  to the detective unit for two and a half years.

22  **Q.**   So as part of the detective unit, you also investigated

23  major crimes?

24  **A.**   Yes, that is correct.

25  **Q.**   So those are assaults, robberies, homicides, things like

1  that?

2  **A.**   That is correct.

3  **Q.**   Did you also help out the marijuana unit sometimes?

4  **A.**   Yes.

5  **Q.**   But that wasn't your primary duty?

6  **A.**   No.  Being that we are a small agency, we depend on

7  different units from time to time.  We have different

8  responsibilities.  Like the detective unit, there is a

9  narcotics task force that primarily deals with, like,

10 methamphetamine and cocaine and that.  And then there is also a

11 marijuana eradication unit.

12          And, again, from time to time all three of the units

13 cross over and help whatever unit needs any kind of assistance.

14 **Q.**   Okay.  So in May of 2005 were you a detective?

15 **A.**   Yes, I was.

16 **Q.**   And did you assist with processing Cody Dobbs after his

17 arrest in Mendocino County on May 12th of 2005?

18 **A.**   Yes, I did.

19 **Q.**   And do you see Mr. Dobbs in the courtroom here today?

20 **A.**   Yes, I do.

21 **Q.**   And can you point him out to the jury and tell us where he

22 is sitting and what he is wearing?

23 **A.**   Yes.  He's seated at the defense table.  He is wearing,

24 looks like a tan suit with a blue shirt and he has a goatee.

25 He is the only one at the table with a goatee.

1    **MS. AULT:**  Your Honor, may the record reflect that

2  the witness has identified the defendant?

3    **THE COURT:**  It may.

4  BY MS. AULT:

5  **Q.**  So when you processed the defendant on May 12th of 2005,

6  did you take his clothes?

7  **A.**  Yes, I did.

8  **Q.**  And did you book them into evidence?

9  **A.**  Yes, I did.

10  **Q.**  Can you describe how that process works?

11  **A.**  Yes.  I was first contacted by then Detective Sergeant

12  Scott Poma.  He was actually at a location, I believe, it was

13  in Leggett or Piercy, which is located at the northern portion

14  of our County.

15    He had indicated that there had been an arrest made

16  on an investigation dealing with the cultivation of marijuana;

17  that two subjects were being transported to the actual County

18  jail, which is located in Ukiah, California, which is the

19  County seat.

20    It just so happens that our headquarters for the

21  Sheriff's Office is located adjacent to the correctional

22  facility of the county jail where the detective office is

23  located.  I was at the detective office.  He requested that I

24  actually wait for the two individuals to arrive and to collect

25  each of their clothing.

1   Q.   And so did you do that?

2   A.   Yes, I did.

3   Q.   And when did you do with their clothing after you

4   collected it?

5   A.   I individually packaged it, separately, into bags, marked

6   them, pursuant to our standard policies and then it was placed

7   into a secured holding area within the detective unit, which is

8   maintained for evidence purposes until it can be transported to

9   our centralized evidence housing building.

10  Q.   I'm going to show you exhibit 36-a, which I believe is

11  already in evidence.

12           (Whereupon, exhibit was tendered

13             to the witness.)

14  Q.   Can you please take a look at that and tell me if you

15  recognize it?

16  A.   Yes, I do.

17  Q.   And what is that?

18  A.   It's a bag containing an article of clothing, which I had

19  collected from Cody Dobbs per Sergeant Poma's request.

20  Q.   So is that the clothing that Mr. Dobbs was wearing on

21  May 12th of 2005?

22  A.   A portion of that, yes.

23  Q.   And so can you take out what's inside of that bag?

24           (Witness complied.)

25  Q.   So the first thing in that bag is a pair of blue jeans, is

1  that correct?

2  **A.**    That is correct.

3  **Q.**    And those are the blue jeans that the defendant was

4  wearing on that day?

5  **A.**    That is correct.

6  **Q.**    And can you tell us are there stains, like dirt stains on

7  those blue jeans?

8  **A.**    Yes, there is.

9  **Q.**    Okay.  And where are the stains?

10  **A.**    Looks like primarily on both legs in the front, all the

11  way from, like, the area of the pocket down to the actual cuff

12  of the pant.  On the back more towards the upper portion of the

13  right leg, down towards the bottom of the cuff, also.  And it

14  looks like on the left rear pant leg down towards the cuff

15  there appears to be more stains.

16  **Q.**    Thank you.  And is there something else in that bag as

17  well?

18  **A.**    Yes, there is.

19  **Q.**    What else is in the bag?

20  **A.**    A pair of white athletic socks.

21  **Q.**    Can you take those out, please?

22         (Witness complied.)

23  **Q.**    Was the defendant also wearing those on that day?

24  **A.**    Yes, he was.

25  **Q.**    Do those have dirt stains on them as well?

1  A.    Yes.   It appears that they have dirt stains on the

2  bottoms.

3  Q.    Thank you.   You can put those back in the bag, please.

4        (Witness complied.)

5  Q.    I will trade you.   I'm going to show you what's been

6  marked as 36-b.

7             (Whereupon, exhibit was tendered

8              to the witness.)

9  Q.    Do you recognize that?

10 A.    Yes, I do.

11 Q.    What is that?

12 A.    It's another piece of clothing that I had collected from

13 Cody Dobbs.   It's a T-shirt.

14        MS. AULT:   Okay.   And, your Honor, we would like to

15 admit 36-b into evidence.

16        THE COURT:   Is there any objection?

17        MR. NICK:   No objection, your Honor.

18        THE COURT:   Thank you.   It will be received.

19        (Trial Exhibit 36-b received in evidence)

20 BY MS. AULT:

21 Q.    Now, can you take 36-b out of the bag, please?

22        (Witness complied.)

23 Q.    And are there dirt stains on that T-shirt?

24        MR. NICK:   Well, that's a conclusion, your Honor.   No

25 foundation.

1          THE COURT:  You know I can't hear you, Mr. Nick.

2          MR. NICK:  I'm sorry.  Your Honor, that's a

3   conclusion without foundation.  I object on that basis.

4          THE COURT:  Sustained.

5          MS. AULT:  Your Honor, he can look at the T-shirt and

6   tell whether it's sustained.

7          THE COURT:  Well, he can look at the T-shirt and

8   describe what he sees.

9   BY MS. AULT:

10  Q.   Can you please look at the T-shirt and describe what

11  condition it's in?

12  A.   It appears to be worn.  It's not brand new.  There's some

13  -- the collar, there is actually some -- the material is worn.

14  It's not intact kind of at the rim of it.

15          Where the Pittsburgh Steelers logo is on the -- which

16  would be left breast, there is some discoloring there, appears

17  to be that of dirt.

18          MR. NICK:  I'm going to object to that statement,

19  your Honor, and move to strike it as a conclusion without

20  foundation.

21          THE COURT:  Sustained.  You can just describe the

22  coloring that you see.

23  A.   It's like a brown discoloring.  And kind of more towards

24  the arm pit there is some brown discoloring that's more linear.

25          Looking down towards the bottom of the front of the

1   shirt there is also some more brown discolored spots.

2          There is a hole in the left sleeve in the back of

3   it.

4          And at the bottom of the rear of the shirt there is

5   also some more brown discolored spots.

6   Q.   Thank you.  And now I would like to show you Exhibit 36-c.

7          (Whereupon, exhibit was tendered

8           to the witness.)

9   Q.   Tell me if you recognize that?

10  A.   Yes.  Again, some more clothing items that I had recovered

11  from Cody Dobbs.  This being a pair of size 11 Adidas shoes,

12  tennis shoes.

13         MS. AULT:  Your Honor, we would like to move 36-c

14  into evidence.

15         THE COURT:  Any objection?

16         MR. NICK:  No objection.

17         THE COURT:  Thank you.  They will be received.

18         (Trial Exhibit 36-c received in evidence)

19  BY MS. AULT:

20  Q.   Can you please take the shoes out of the bag?

21         (Witness complied.)

22  Q.   Can you describe their condition?

23  A.   Yes.  They appear to be sworn.  They are not brand new.

24  There is some discoloration all throughout, as far as kind of

25  brown colored discoloration.  It looks like that it's probably

1  an off-colored white down by the sole of the shoe and it's

2  obviously discolored some brown sort of material.  That's

3  consistent with both shoes it appears.

4          And looking at the soles, there appear to be like

5  dirt, matter, kind of small pebbles, gravel kind of a

6  substance.

7          **MS. AULT:**  Your Honor, I have no more questions for

8  this witness.

9          **THE COURT:**  Thank you.

10          Any cross-examination, Mr. Nick?

11          **MR. NICK:**  Yes.  Thank you.

12                      **CROSS EXAMINATION**

13  BY MR. NICK:

14  Q.   Good afternoon, Deputy Van Patten.

15  A.   Good afternoon.

16  Q.   Let's see.  I wanted to ask you about your position.

17  Mendocino County has some sort of marijuana eradication team

18  that's called COMET by its acronym?

19  A.   That is correct.

20  Q.   You are not a member of the COMET team?

21  A.   Correct, I'm not, no.

22  Q.   You just assist them, correct?

23  A.   That is correct.

24  Q.   Would I be correct to say that you assist them when they

25  have overflow work?

1  A.    Basically, if they are faced with a situation that's

2  overwhelming that they cannot deal with it with the personnel

3  that they have at their availability, they will call for

4  resources.

5  Q.    The COMET team, I believe, has approximately, like, a half

6  dozen deputies assigned to it?

7  A.    Actually, the COMET team in Mendocino County consists of a

8  sergeant and a deputy, and there are some reserve personnel

9  from time to time that will volunteer their time; but full time

10 actually dedicated personnel is only two.

11 Q.    Would I be correct to state that the reason why there is a

12 specific unit to deal with marijuana is because of the

13 abundancy of it in Mendocino County?

14 A.    That is correct.

15 Q.    I wasn't clear if you had actually been on the site in

16 Piercy where the marijuana was located.

17 A.    No, I was not.

18 Q.    You met Mr. Dobbs over at the jail, correct?

19 A.    Actually, at the head office, the Ukiah patrol division

20 squad room.  Just adjacent to it.  It's within walking

21 distance.

22 Q.    And you had received a request from another deputy to

23 seize the clothing?

24 A.    From my supervisor at the time, Sergeant Scott Poma.

25 Q.    And he's the one that requested that you do it?

1   A.    That is correct.

2   Q.    Now, when you took the clothing from Mr. Dobbs, obviously,

3   it had already been transported from the Piercy scene to some

4   sheriff location, correct?

5   A.    That is correct.  He was transported to the location by a

6   patrol deputy that was either at the scene or responded to the

7   scene for transportation purposes.

8   Q.    And he was wearing his shoes when you took them?

9   A.    That is correct.

10  Q.    In other words, he wasn't, like, holding them in his hands

11  or something like that?

12  A.    No, he was not.

13  Q.    Now, I just want to ask you whether -- I want to be sure

14  whether -- this is the bag -- I'm holding the bag that's got

15  Trial Exhibit 36-a marked on it.  I just want to know if this

16  was the bag that you actually put the clothing in?

17  A.    That's correct.

18  Q.    And you know that from your initials placed on here?

19  A.    Yes.

20  Q.    And you recognize your handwriting and everything,

21  correct?

22  A.    Yes, I do.

23  Q.    Okay.  Deputy Van Patten, I have removed the clothing from

24  the bag.  And I just want to ask you, sir, do you see any soil

25  inside the bag?

1           (Whereupon, exhibit was tendered

2             to the witness.)

3    **A.**   No obvious signs of soil, no.

4    **Q.**   Was there any soil falling off the clothing, any of the

5    items that you can recall when you seized it?

6    **A.**   I don't remember.

7    **Q.**   What you remember are -- what you do remember are stains,

8    correct?

9    **A.**   From the appearance of the clothing, yes.

10   **Q.**   I will show you the socks.

11          (Whereupon, exhibit was tendered

12            to the witness.)

13   **Q.**   Just based on your experience if somebody walked on soil,

14   don't you think they would be a little bit dirtier than that?

15   **A.**   Depending on what soil you are talking about, if you can

16   clarify that.  As far as what kind --

17   **Q.**   Sure.  Let me --

18          **MS. AULT:**  Objection.  He's asking the witness to

19   speculate.

20   **BY MR. NICK:**

21   **Q.**   Let me --

22          **THE COURT:**  Wait.  Let me just check.

23          (Brief pause.)

24          **THE COURT:**  Sustained.

25

1  BY MR. NICK:

2  Q.   Let me show you what's been marked as Government's Exhibit

3  9-bb.

4           (Whereupon, photograph was tendered

5            to the witness.)

6           **THE COURT:**  B like boy?

7           **MR. NICK:**  Yes, b like boy, your Honor.  Sorry about

8  that.

9  BY MR. NICK:

10 Q.   I will just represent to you that that's the exterior

11 ground at Piercy grow.

12          And what I wanted to ask you is, number one, what

13 color is the soil that you see on that photograph?

14 A.   If you are talking about the actual ground cover, it looks

15 like, obviously, there is either some kind of grass or moss or

16 something like that and there is some brown, which I would say

17 is the soil.  More, I guess, the dirt.  A brownish, light brown

18 and kind of dark brown color.

19 Q.   It has a red-ish tint to it, right?

20 A.   It looks more brown to me.  Kind of down in the corner

21 there is a little bit more red, but the majority of the photo

22 that you are showing to me looks like it's more of a dark brown

23 and a lighter kind of brown color.

24 Q.   Are you able to tell me whether these socks stepped on

25 that soil?

1  A.   No, I cannot.

2  Q.   I'm going to ask you just based on your police experience

3  if in any case previous to this one you had ever been asked to

4  collect soil samples for some sort of forensic comparison?

5         MS. AULT:   Objection, your Honor.   This is beyond the

6  scope of direct.

7         THE COURT:   Overruled.   You may answer.

8  A.   I'm sorry.   Can you restate your question?

9  BY MR. NICK:

10 Q.   Certainly.   In any other investigation that you have

11 conducted, have you ever been requested to collect soil samples

12 in order to make some sort of forensic comparison?

13 A.   No, not that I can, you know, really specifically

14 remember.

15         Usually my role in investigating anything would have

16 to do -- with that kind of a nature, would be to collect and

17 then we would -- normally, typically, if there was that kind of

18 analysis that would be needed, that item would be forwarded to

19 the Department of Justice.   Eureka lab, they do trace evidence

20 and they would be responsible from collecting anything from

21 that.

22         We would just pretty much primarily retain as much of

23 whatever item it is without jeopardizing the integrity of the

24 evidence so that a criminalist that's specifically trained to

25 deal with that would be able to perform that sort of analysis.

1  Q.   Understood.  So you would keep the evidence for the

2  criminalist to be able to do that kind of analysis, is that

3  correct?

4  A.   That is correct.

5  Q.   Your department doesn't do it itself, is what you are

6  saying?

7  A.   No.  We actually do have an evidence technician that under

8  some circumstances will do tape lifts or something like that,

9  but that would be sent off.

10        Typically we do not make a practice of doing that

11  because usually the cases that we are dealing are of grave

12  concern.  So, again, we want to always protect the integrity of

13  the evidence and let trained criminalists within a controlled

14  lab conduct that kind of analysis.

15  Q.   There was also some money inside Mr. Dobbs' pants, is that

16  correct?

17  A.   Yes, that's correct.

18  Q.   How much was there?

19  A.   $720.36.

20  Q.   Correct, according to the report.  And you took that and

21  booked it into evidence or something like that, correct?

22  A.   Yes, that is correct.

23  Q.   Thank you very much, sir.  Nothing further.

24        **THE COURT:**  Anything further, Miss Ault?

25

1                        **REDIRECT EXAMINATION**

2    **BY MS. AULT:**

3    **Q.**    I just want to clarify.  Sergeant Van Patten, you were not

4    at the Piercy grow scene that day?

5    **A.**    That is correct.

6    **Q.**    Thank you.

7               **THE COURT:**  May the witness be excused?

8               **MR. NICK:**  Yes.  I have no further questions, your

9    Honor.

10              **MS. AULT:**  Yes, your Honor.

11              **THE COURT:**  All right.  Thank you very much, sir.

12   You are excused.

13              **THE WITNESS:**  Thank you.

14          (Witness excused.)

15              **THE COURT:**  All right.  The government may call its

16   next witness.

17              **MS. AULT:**  Your Honor, the United States calls Andy

18   Alvarado.

19                        **ANDREW ALVARADO**,

20   called as a witness for the Plaintiff herein, having been first

21   duly sworn, was examined and testified as follows:

22              **THE WITNESS:**  I do.

23              **THE CLERK:**  Thank you.  Please state your full name

24   for the record.

25              **THE WITNESS:**  Andrew Alvarado.

1    **THE CLERK:**  Spell your last name for the record.

2    **THE WITNESS:**  A-L-A-V-A-R-D-O.

3    **MS. AULT:**  Thank you, your Honor.

4                    **DIRECT EXAMINATION**

5    BY MS. AULT:

6    Q.   Where do you work?

7    A.   I'm currently employed with the Mendocino County District

8    Attorney's Office.

9    Q.   What do you do for them?

10   A.   I'm a criminal investigator.

11   Q.   How long have you been with the District Attorney's

12   Office?

13   A.   Since April of this year.

14   Q.   What did you do before that?

15   A.   I was a deputy sheriff with the Mendocino County Sheriff's

16   Office.

17   Q.   How long did you work with the Sheriff's Office?

18   A.   Since September of 1997.

19   Q.   So for about ten years?

20   A.   Yes.

21   Q.   To what unit were you assigned while you were with the

22   Sheriff's Office?

23   A.   My most recent assignment was as a detective with the

24   major crimes area of our department.

25   Q.   What does the major crimes unit do?

1  A.    We are responsible for investigating all serious crimes,

2  such as homicides, sexual assaults, major frauds, et cetera.

3  Q.    How long were you a detective?

4  A.    From January of 2004 until April of 2007.

5  Q.    And as part of the major crimes unit, did you occasionally

6  help out with marijuana cultivation sites?

7  A.    Yes.  If they needed -- if the unit needed assistance, we

8  would help them and fill in in their absence.

9  Q.    So over the course of your career in the Sheriff's Office,

10  about how many investigations have you been involved in that

11  involve illegal drugs?

12  A.    I would say conservatively 30 to 40.

13  Q.    And how many of those involved marijuana investigations?

14  A.    I would say all but just a few.  A majority of them.

15  Q.    And how many search warrants have you assisted in

16  executing in drug cases?

17  A.    I would say at least 20.

18  Q.    And how many of those involve marijuana growing

19  operations?

20  A.    Again, a majority of them.

21  Q.    So about how many marijuana cultivation sites have you

22  examined over the course of your career?

23  A.    I have been to several just throughout the different

24  assignments that I have worked with within the Sheriff's

25  Office, but, again, at least 20 or 30 conservatively.

1  Q.   And that's a conservative estimate?

2  A.   Yes.

3  Q.   Now, did you participate in the search of a grow site

4  found at 750 Bear Pen Canyon Road on May 12th of 2005?

5  A.   Yes, I did.

6  Q.   What's the first thing you remember that -- happening that

7  day of the search?

8  A.   I was notified by our sergeant, we were at our Ukiah

9  office, that a larger marijuana grow had been located in the

10 northern region of our county and that we were going to respond

11 to deal with part of the investigation.

12 Q.   Okay.  And why were you, part of the major crimes unit,

13 why were you responding to that scene?

14 A.   On this date our marijuana investigators that were

15 assigned to this, primarily this type of investigation were out

16 of the state and on training.

17 Q.   And where were you located?

18 A.   I was at our Ukiah office.

19 Q.   Okay.  And where was the grow site to which you were

20 responding?

21 A.   It was located near the Piercy area, the northern region

22 of our County.

23 Q.   And so there is a map that's displayed up here.  It's

24 exhibit 1.

25        MS. AULT:  Your Honor, may the witness approach the

1    map?

2                    **THE COURT:**  He may.

3                    **THE WITNESS:**  Thank you.

4                    (Witness steps down.)

5    **BY MS. AULT:**

6    **Q.**   If could you grab that microphone.  And this is an on

7    switch there somewhere.  I think you might have to really push.

8                    So if could you come over to this map and show us

9    where -- it might not be on there, but where is Ukiah?

10   **A.**   Ukiah is located south on Highway 101 of this area by

11   approximately 30 to 40 miles south of this area right here

12   (indicating).

13   **Q.**   So that's the lower right-hand corner of the map?

14   **A.**   Yes.

15   **Q.**   And the grow site that you traveled to -- well, where is

16   Piercy?

17   **A.**   Piercy is going to be right here (indicating).

18   **Q.**   Okay.  And where is -- approximately, where is the grow

19   site that you traveled to that day?

20   **A.**   It was off of Highway 271.  Right here is 271 that comes

21   back along and parallels Highway 101, and then you cut back

22   underneath Highway 101 and it's right in this area here

23   (indicating).

24   **Q.**   All right.  Can you go back to the stand, please?

25                   (Witness complied.)

1   Q.   About how long -- sorry.  I will wait for you to get
2   there.
3           So about how long did it take you to travel from
4   Ukiah to the grow site?
5   A.   Once we collected the items that we needed to do our
6   investigation, it's about an hour and a half to two hour drive.
7   Q.   When you arrived at the grow site, what sort of area was
8   it in?
9   A.   It's a very remote area of our county that's basically up
10  in the hills, is the easiest way to put it, surrounded by
11  basically a heavy timber area, heavy forest area, kind of out
12  in the middle of nowhere.
13  Q.   When you arrived at the grow scene, were there any
14  suspects there?
15  A.   No.
16  Q.   And had you ever heard of Cody Dobbs before that day?
17  A.   No, I had not.
18  Q.   So what's the first thing that you remember happening
19  after you arrived at the scene?
20  A.   We were basically given a brief summary of what had
21  happened to that point.  At the time we arrived, we were still
22  awaiting for a search warrant.  So at that point we just kind
23  of stood by and waited for a search warrant to be prepared and
24  kind of talked about what our plan would be once the search
25  warrant was obtained.

1  Q.   Okay.  And was a search warrant eventually obtained?

2  A.   Yes.

3  Q.   And what was your assignment that day?  What were you

4  supposed to do?

5  A.   My first assignment was to go into each of the buildings

6  that contained the marijuana and take photographs of the

7  insides and outsides of the area.

8        From there I assisted in pulling of the marijuana

9  plants, collection of evidence at the scene, and then just

10 general collecting and packing of the evidence into our

11 vehicles.

12 Q.   I'm going to show you what have been marked as Exhibits

13 9-b through 9-w.  Can you just flip through those very quickly

14 and tell me if those photographs all fairly and accurately

15 depict the scene as you saw it that day?

16        (Whereupon, photographs were tendered

17         to the witness.)

18 A.   Yes, they do.

19        MS. AULT:  We would like to move 9-b through 9-w into

20 evidence.

21        THE COURT:  Any objection?

22        MR. NICK:  No objection.

23        THE COURT:  Thank you.  They will be received.

24        (Trial Exhibits 9-b through 9-w received in evidence)

25

1    **BY MS. AULT:**

2    **Q.**   So where -- when you first started to go around the scene

3    to take pictures and carry out your responsibilities, where is

4    the first place that you went?

5    **A.**   We went up the hillside kind of in an easterly direction,

6    and you came to a small structure that we eventually labeled as

7    Building 1.

8    **Q.**   Let me actually go back.  Where exactly did you start?

9         I put up what we have marked as -- or what's

10   Exhibit 11-a, a diagram of the area.  So can you tell me

11   where -- where did you start you at?

12   **A.**   We were just to the right of the residence, in that area

13   where your pen is at right now.  It's a dirt driveway and dirt

14   parking area, and that's where we started.

15   **Q.**   So you were over here to the right of where it says

16   "Residence"?

17   **A.**   Yes.

18   **Q.**   Okay.  And where did you go from there?

19   **A.**   We continued to the right up the hill, where you come to

20   the first square there that says "Grow Room."

21   **Q.**   Okay.  Now, I would like for you to take a look -- just

22   bear with me for one moment.

23        (Brief pause.)

24   **Q.**   Can you take a look at Exhibit 9-d, please?

25   **A.**   Okay.

1  Q.   Can you tell me what that depicts?

2  A.   It's the front of Building 1.  Basically it's a doorway

3  that's looking in to the structure.

4            MS. AULT:  Can we display 9-d for the jury, please?

5            (Photograph displayed.)

6            MS. AULT:  It appears to be displayed --

7            THE CLERK:  Oh, wait.  I know why.  They were working

8  -- okay.

9  BY MS. AULT:

10  Q.   I'm sorry.  Exhibit 9-d is the outside of that first

11  building?

12  A.   Yes.  Looking through the doorway into the building.

13  Q.   Okay.  Now, where did you go after that first building?

14  A.   We continued to go along the pathway there to the right,

15  to the square, again, marked "Grow Room."  We went to that

16  building.

17  Q.   All right.  So the second building to the right.

18            And can you look at Exhibit -- I believe it's 9-e?

19            (Photograph displayed.)

20  A.   9-e is actually the back side of the first building.

21  Q.   How about 9-c?

22            (Photograph displayed.)

23  A.   Yes.  That's looking at the side Building 2.  And it's got

24  the structure underneath it to make it level with the terrain.

25  Q.   So it has those pilings underneath it that are kind of

1  lifting it up?

2  **A.**    Yes.

3  **Q.**    And then where did you go from there?

4  **A.**    We continued farther to the right up to the last grow

5  room, the one farthest to the right on that sketch.

6  **Q.**    So this large rectangle to the far right of 11-a?

7  **A.**    Yes.

8  **Q.**    And can you look at 9-b?

9  **A.**    That, again, is looking at the side of that building,

10 looking into the doorway, kind of into the very front of the

11 building.

12 **Q.**    Now, did you go into each of these buildings?

13 **A.**    Yes, I did.

14 **Q.**    All right.  Starting with the first building you came to,

15 the grow room nearest to the residence, can you look at

16 Exhibit 9-p?

17          (Photograph displayed.)

18 **A.**    Okay.

19 **Q.**    And what is that?

20 **A.**    That is the inside of that very first room just past the

21 entryway.  There was a small entryway and then in the rear of

22 the building, this is the inside of that building.

23 **Q.**    And the plants that we see growing in those beds there,

24 are those marijuana plants?

25 **A.**    Yes.

1   Q.   Now, over the course of your career, about how many

2   marijuana plants have you had the occasion to inspect?

3   A.   Through the various search warrants and the open field

4   investigations I have been involved in, I would say that

5   conservatively again I have been around 15,000 plants.

6   Q.   Was there any doubt in your mind this was marijuana?

7   A.   Not to me, no.

8   Q.   Now, moving right along to the second building.  Can you

9   look at Exhibit 9-l?

10           (Photograph displayed.)

11  A.   Okay.

12  Q.   And tell me what that depicts?

13  A.   Again, it's the inside of the second building, again, just

14  past entryway that you come into and you will peel off to your

15  left and then this is the inside and main area of Building 2.

16  Q.   And, again, the plants growing in those beds, were those

17  marijuana plants?

18  A.   Yes.

19  Q.   And was there any doubt in your mind when you were there

20  that that's what that was?

21  A.   No.

22  Q.   Now, would you please take a look at Exhibit g?

23           THE CLERK:  Is it 9-g?

24           MS. AULT:  9-g.

25           THE CLERK:  Okay.

1              (Photograph displayed.)

2  **A.**    Okay.

3  **BY MS. AULT:**

4  **Q.**    Can you tell us what that depicts?

5  **A.**    This is the inside of the third building.

6  **Q.**    And, again, the plants that are in those beds, were those

7  marijuana plants?

8  **A.**    Yes.

9  **Q.**    Okay.  Can you take a look at Exhibit 9-f?

10             (Photograph displayed.)

11  **A.**    Okay.

12  **Q.**    Can you tell me what that depicts?

13  **A.**    It's one of the electrical boxes inside of the rooms that

14  we encountered.  I don't know specifically which room this is

15  in from the picture, but it's one of the electrical boxes in

16  one of the rooms.

17  **Q.**    And can you take a look at Exhibit 9-i?

18             (Photograph displayed.)

19  **A.**    Okay.

20  **Q.**    Can you tell me what that depicts?

21  **A.**    It's the very front of the third building, Building 3, and

22  it's pictured the various chemicals, hoses and other equipment

23  that were being used to water and feed the plants.

24  **Q.**    Okay.  Now, as part of your responsibilities that day, did

25  you also count the marijuana plants?

1    **A.**    I assisted in counting some of the marijuana, yes.

2    **Q.**    And how do you do that?

3    **A.**    In each building we were assigned to a certain area within

4    that building, and then we individually in that area pull the

5    plants up one by one and count.  I usually count up to no more

6    than 40 so I don't lose count.

7          Once I get to that certain number, I report it to the

8    person that's documenting the plant count for that building.

9    **Q.**    Okay.  And who was documenting the plant count that day?

10   **A.**    At the time it was Deputy Mike Davis.  He is now Sergeant

11   Mike Davis.

12   **Q.**    Okay.  And did he document the plant count for all of the

13   buildings?

14   **A.**    Yes.  He was responsible for taking the numbers that the

15   various people pulling the plants and calculating them.

16   **Q.**    And when you pull out the plants, why do you actually pull

17   them up out of the soil?

18   **A.**    We wanted to make sure -- in this instance that we pulled

19   each plant out to visualize a root system, was informed ahead

20   of time that because of --

21   **Q.**    That's, that's --

22   **A.**    Okay.

23   **Q.**    Now, so each plant that you counted, did it have a root

24   system?

25   **A.**    Yes.

1  Q.   Okay.  Now can you look at Exhibit 9-j?

2          (Photograph displayed.)

3  A.   Okay.

4  Q.   And what does this Exhibit depict?

5  A.   Some of the plants that were pulled out of Building 3 that

6  were pulled out of the soil.

7  Q.   And can you see the roots coming out of the bottom of the

8  plant?

9  A.   Yes.  It's the small hair-like structures at the bottom of

10  each plant.

11  Q.   Okay.  Now, can you take look at Exhibit 9-m and tell me

12  what that depicts?

13          (Photograph displayed.)

14  A.   Again, it's the -- an electrical box inside of one of the

15  rooms.

16  Q.   And please take a look at Exhibit 9-o.

17          (Photograph displayed.)

18  Q.   Can you tell me what that depicts?

19  A.   It's a small tray of marijuana plants that I believe to be

20  clones.

21  Q.   Can you explain to us what a clone is?

22  A.   As far as I know, a clone is basically a trimming from a

23  marijuana plant that is then put into a material to make it

24  grow into to root.

25  Q.   Is that an alternative to seeds, to try to reproduce

1  marijuana plants?

2  **A.**    Yes.

3  **Q.**    And what is depicted in Exhibit 9-o, those are marijuana

4  clones, is that correct?

5  **A.**    Yes, as far as I know.

6  **Q.**    And they were found in one of the buildings?

7  **A.**    They were found in Building 1.

8  **Q.**    Now, I would like you to turn to Exhibit 9-r.

9           (Photograph displayed.)

10  **A.**    Okay.

11  **Q.**    In addition to counting plants and photographing the

12  buildings, did you also collect evidence that day?

13  **A.**    Yes.  We looked for items that might be conducive to

14  fingerprints.

15  **Q.**    And does Exhibit 9-r depict one of the items that you

16  collected that day?

17  **A.**    Yes, it does.

18  **Q.**    And what is that?

19  **A.**    It's one of the lamps that would go into the grow light

20  that would be used to hang above the marijuana.

21  **Q.**    So did you actually collect the light that day?

22  **A.**    Yes.

23  **Q.**    I'm going to show you what's been marked as Exhibit 40.

24           (Whereupon, exhibit was tendered

25            to the witness.)

1   Q.   And can you tell me what that is?

2   A.   It's the same light depictured -- or pictured in

3   Exhibit 9-r.

4   Q.   And can you just --

5          MS. AULT:   Your Honor, we would like to admit

6   Exhibit 40 into evidence.

7          THE COURT:   Any objection?

8          MR. NICK:   No objection.

9          THE COURT:   Thank you.  It will be received.

10         (Trial Exhibit 40 received in evidence)

11  BY MS. AULT:

12  Q.   Can you take that out and show it to the jury?

13         (Witness complied.)

14  Q.   So that's not like the normal kind of light bulb that you

15  would find in your home?

16  A.   It's a little larger.

17  Q.   All right.  You can put that back.

18         (Witness complied.)

19  Q.   Now, were there any fingerprints found at the Piercy grow

20  site?

21  A.   We did not actually process the scene for fingerprints.

22  Q.   And in your experience is it common to find prints at grow

23  scenes?

24         MR. NICK:   Objection.  That calls for speculation.

25  Lack of foundation, your Honor.  It's an expert opinion.

1          **MS. AULT:**  I'm asking him based on his --

2          **THE COURT:**  Why don't you lay a foundation?

3          **MS. AULT:**  Okay.

4    BY MS. AULT:

5    **Q.**    Well, how many grow sites have you been involved in

6    investigating?

7    **A.**    Again, probably conservatively 20 or so.

8    **Q.**    Okay.  And at some of those grow sites -- or at how many

9    of those grow sites are -- is evidence examined for

10   fingerprints?

11   **A.**    Occasionally.

12   **Q.**    Okay.  And why is it only done occasionally?

13   **A.**    It depends.  Sometimes people are found inside the grows.

14   Sometimes there is other information to lead to suspects and

15   other -- I don't know.  I don't know why it's not always done.

16   **Q.**    But if suspects are found inside the grows, then commonly

17   fingerprints would not be taken, is that...

18   **A.**    It can be one reason why they wouldn't be.

19   **Q.**    So at the end of the day when you were done executing the

20   search warrant, what types of things did you take away from the

21   scene?

22   **A.**    We collected a few items of miscellaneous evidence, such

23   as this light.  We took the marijuana.  We took the lamps that

24   are used to hang above the marijuana to assist it in its

25   growing, and an electrical item that supplies power to these

1  lights that's called a ballast.

2  **Q.**    Can we look at 9-g perhaps?  Yeah, can we look at 9-g?

3         (Photograph displayed.)

4  **A.**    Okay.

5  **Q.**    Can you show us in the picture what is a ballast?

6  **A.**    They are kind of difficult to see, but I guess the easiest

7  thing would be --

8  **Q.**    Maybe 9-h is a better example.

9         (Photograph displayed.)

10  **A.**    They would be just down the center of the picture at the

11  very top of the screen.  They are the white boxes.

12  **Q.**    So you collected some of those as well?

13  **A.**    Yes.

14  **Q.**    And what did you leave behind?

15  **A.**    The grow beds were left in place.  All of the hoses and

16  watering materials were left behind.  A majority of the soil

17  and the tools that they were using to water and to take care of

18  the plants, that was all left behind.

19  **Q.**    And why is that?

20  **A.**    Part of the reason is we do not have the resources, the

21  vehicles to transport all of this away.  We don't feel that

22  it's necessary to take all of that with us and so it's left

23  behind.

24  **Q.**    So is that -- this is a large amount of equipment,

25  correct?

1   **A.**    Yes.

2   **Q.**    And was there a generator at this grow scene?

3   **A.**    Yes.

4   **Q.**    And was that removed?

5   **A.**    Yes, it was.

6   **Q.**    Now, after you finished processing and searching the three

7   grow rooms, what did you do after that?

8   **A.**    After processing the grow rooms, I was assigned to process

9   the main residence, just as you come up the driveway and off to

10  the left.

11  **Q.**    On Exhibit 11-a is that this rectangle in the middle of

12  the exhibit that's marked "Residence"?

13  **A.**    Yes.

14  **Q.**    Now, did the residence appear to you to have someone

15  living in it?

16  **A.**    It didn't -- it appeared that someone was staying there,

17  but living there on a permanent basis, no.

18  **Q.**    Okay.  And what led you to reach that conclusion?

19  **A.**    In searching through the residence, in the bedrooms there

20  were no beds, no sleeping materials, nothing to indicate that

21  someone would be staying overnight there or sleeping there on a

22  permanent basis.  There was a couch in the living room, but

23  there did not appear to be anyone living there permanently.

24  **Q.**    Now can you take a look at Exhibit 9-u and tell me what

25  that depicts?

1          (Photograph displayed.)

2   **A.**    That's the living room area of the residence.  Just to the

3   right when you come in through the doorway picks up the couch,

4   and the television and some other miscellaneous items.

5   **Q.**    Can you look at Exhibit 9-s.

6          (Photograph displayed.)

7   **Q.**    And can you tell me what that depicts?

8   **A.**    That's looking in through the front door of the residence

9   into the kitchen area.  And what's depicted here in those large

10  garbage bags is marijuana leaves and stems.  Basically, the

11  byproduct after a plant is trimmed.

12  **Q.**    Okay.  And is there a particular name that you give to

13  this byproduct?

14  **A.**    I commonly refer to it and it's been -- and I have known

15  it's been referred to as shake.

16  **Q.**    Shake, okay.  Now, you said after the marijuana plant has

17  been trimmed, what does that mean?

18  **A.**    Basically, from my experience, the bud is the primary

19  product that is wanted out of the marijuana.  Out of these buds

20  a lot of times you will have stems and leaves growing.  They

21  use small shears or scissors and cut away that -- the leaves

22  and stems so they can concentrate just on the bud.  This

23  byproduct then is not as valuable.

24  **Q.**    And that's what's contained in these bags?

25  **A.**    Yes.

1  Q.   The byproduct, the shake?

2  A.   Yes.

3  Q.   And Exhibit 9-t, is that a close-up of that shake?

4          (Photograph displayed.)

5  A.   Yes.  9-t is a close-up of that substance found in all

6  those bags.

7  Q.   Now, other than the shake that was found in the bags, what

8  else did you find in the house that day?

9  A.   There were some other items.  There were some -- there was

10  a scale, a small weighing scale, some rolling papers for either

11  cigarettes or marijuana cigarettes.  There was some oven bags

12  or basting bags.

13  Q.   Okay.

14  A.   That was the main thing.

15  Q.   Okay.  Can you take a look at Exhibit 9-w, please?

16          (Photograph displayed.)

17  A.   Okay.

18  Q.   Does that depict some of the items that you seized that

19  day as they were found in the residence?

20  A.   Yes.  That's on the kitchen counter and that's depicting

21  the scale that I obtained, the rolling papers under that small

22  black dish, and then the oven bags are in the bottom right-hand

23  corner of that picture.

24  Q.   Okay.  I'm going to show you what's been marked as

25  Exhibit 38.

1              (Whereupon, exhibit was tendered

2               to the witness.)

3  **Q.**   Can you tell me what this is?

4  **A.**   This would be the scale pictured in that photo.

5          **MS. AULT:**  Your Honor, we would like to move 38 into

6  evidence.

7          **THE COURT:**  Any objection?

8          **MR. NICK:**  No objection.

9          **THE COURT:**  Thank you.  It will be received.

10         (Trial Exhibit 38 received in evidence)

11         **MS. AULT:**  Please pull that up.

12         **MR. NICK:**  Your Honor, I would ask that the stainless

13 steel part not be touched.

14         **THE COURT:**  Okay.

15         **MR. NICK:**  That is the top portion.  Thank you.

16         **THE COURT:**  Okay.

17         **MS. AULT:**  Okay.

18 **BY MS. AULT:**

19 **Q.**   All right.  And can you tell me how many -- is that a gram

20 scale or ounce scale?

21 **A.**   Yes.  It's a measurement in grams.  It looks like it can

22 go up to 610 grams, if I'm correct.  It's a gram scale.

23 **Q.**   And that's what you found in the kitchen of the residence

24 at the Piercy grow site, correct?

25 **A.**   Yes.

1    Q.   Next I would like to show you Exhibit 39.

2              (Whereupon, exhibit was tendered

3               to the witness.)

4    Q.   And can you tell me what's in that bag?

5    A.   These are the rolling papers that are also pictured in

6    that photo.

7              MS. AULT:  And, your Honor, we would like to move 39

8    into evidence.

9              MR. NICK:  No objection.

10             THE COURT:  Thank you.  It will be received.

11             (Trial Exhibit 39 received in evidence)

12   BY MS. AULT:

13   Q.   Can you pull those out and show them to the jury.

14             (Witness complied.)

15   Q.   Okay.  Thank you.

16             Now, I'm going to show you Exhibit 37.

17             (Whereupon, exhibit was tendered

18              to the witness.)

19   Q.   And can you tell me what that is?

20   A.   They are boxes of Reynolds oven bags that are turkey size.

21   Q.   Okay.  Are those also items that you seized from the

22   kitchen that day?

23   A.   Yes.  They are the boxes that are pictured in the bottom

24   right-hand corner.

25             MS. AULT:  Your Honor, we would like to move 37 into

1    evidence.

2            **THE COURT:**  Any objection?

3            **MR. NICK:**  No objection.

4            **THE COURT:**  Thank you.  It will be received.

5            (Trial Exhibit 37 received in evidence)

6    **BY MS. AULT:**

7    **Q.**    Can you please pull them out and show them to the jury?

8    And can you also explain, are they empty or are they full?

9    **A.**    That box is empty.  This box is empty.  This box is open,

10   but does still have some of the bags left in it.

11   **Q.**    Now, why did you collect turkey sized oven bags?

12   **A.**    I felt they were an item of evidence as far as relating to

13   the marijuana.

14   **Q.**    Why is that?

15   **A.**    In my experience and training, I have often seen marijuana

16   packaged in oven bags.  And it's packaged in these oven bags to

17   conceal the smell.  They are very good at concealing the smell

18   of marijuana, which kind of has a pungent odor.  And it

19   prevents detection in the event that it's being transported or

20   someone is in possession of it, it prevents it from being

21   smelled by other people.

22           **MS. AULT:**  If I could have one moment, your Honor.

23           (Discussion held off the record

24            between government counsel.)

25           **MS. AULT:**  Your Honor, I don't have any more

1  questions for this witness at this time.  Thank you.

2          **THE COURT:**  Mr. Nick, would you like to question the

3  witness?

4          **MR. NICK:**  Sure, your Honor.  Would it be possible to

5  take about a two-minute break now?

6          **THE COURT:**  Sure.  Ladies and gentlemen, we will take

7  a 10-minute break now and then go straight to 3:00 o'clock.

8          Please don't make up your minds.  You haven't heard

9  all the evidence yet.

10          (Whereupon there was a recess in the proceedings

11          from 1:39until 1:52 p.m.)

12          **THE COURT:**  Welcome back, ladies and gentlemen.  You

13  may be seated.

14          All right.  Mr. Nick, you may proceed.

15          **MR. NICK:**  Thank you, your Honor.

16          If you would mark them as one exhibit.  Defense A,

17  collection of Bear Butte photographs.

18          **THE CLERK:**  So we will mark this as Defense A.

19          (Defendant's Exhibit A marked for identification)

20                        <u>**CROSS EXAMINATION**</u>

21  BY MR. NICK:

22  **Q.**   Good afternoon, Deputy Alvarado.

23  **A.**   God afternoon.

24  **Q.**   Sir, I wanted to ask you, on this particular day that you

25  responded to this location in Piercy, you were not a member of

1  what's known as the Mendocino County Sheriff's Office Comet

2  team.  You were just assisting them, correct?

3  **A.**    Yes.  Actually, they weren't there for the most part and

4  so we kind of took over as the investigators, but...

5  **Q.**    I think you said they were away on training or something

6  like that?

7  **A.**    Yes.

8  **Q.**    And you would agree that -- let me ask you this.  The

9  Comet unit is principally in charge of finding and eradicating

10  marijuana grows?

11  **A.**    Correct.

12  **Q.**    And would you agree that they have a substantial workload

13  in Mendocino County?

14  **A.**    Yes.

15  **Q.**    And sometimes work over flows and you have to help them?

16  **A.**    Umm, we usually assist.  We -- in any way that they need

17  us to.  So, yes.

18  **Q.**    And it's correct with your experience in all the other

19  prior grows that you participated in investigating or finding

20  in an open field or whatnot, that just finding somebody there

21  does not mean that you arrest them and you prosecute them.

22  There are other circumstances that you have to investigate,

23  correct?

24  **A.**    Yes.

25  **Q.**    Now, let's talk about the hoods that the light bulbs go

1  into.

2  **A.**    Okay.

3  **Q.**    And just for purposes of reference so we can get an

4  example of what one looks like, first of all, why don't you

5  describe what a hood looks like, if you don't mind?

6  **A.**    It's kind of a white thin tin or metal that's -- I don't

7  know how would you describe its shape, but it's basically

8  hollow kind of in the center with the metal around it and the

9  lamp or a bulb would go inside of it.  It kind of acts as a

10  reflectant, the hood does.

11  **Q.**    And approximately how many of those do you recall finding

12  at this location?

13  **A.**    I'm uncertain of the number.  I wasn't counting the number

14  of hoods.  I believe someone else there was.

15  **Q.**    I don't know if you have all the exhibits up there with

16  you, the photographs --

17          **THE CLERK:**  I have them.

18  **BY MR. NICK:**

19  **Q.**    9-g, I believe, was one of the government's prior

20  exhibits.  Let me just show it to you.  I have an copy of it

21  right here.

22          **MR. NICK:**  Your Honor, I'm going to approach the

23  witness and hand him a photograph.  Thank you.

24          (Whereupon, photograph was tendered

25            to the witness.)

1  BY MR. NICK:

2  Q.   I just wanted to ask you, the white objects that are

3  hanging from the ceiling are what are known as the hoods?

4  A.   Yes.  In this picture they are -- also, the small ballasts

5  there are, but the primary thing that you see in this picture

6  hanging is the hoods.

7  Q.   And they have sort of like a hard line umbrella shape to

8  them.  In other words, the umbrella more natural, but these are

9  harder lines.

10 A.   It also likes like they are labeled.  It says Sun System

11 on the hood.

12         MR. NICK:  Your Honor, can I just point to the hoods

13 on the photograph to the jury?

14         THE COURT:  Sure.

15 BY MR. NICK:

16 Q.   These would be the hoods, correct, right here

17 (indicating)?

18 A.   Yes.

19 Q.   And the ballasts, which you were trying to find before, is

20 a more square object and you see some of them hanging right

21 here behind the hood (indicating)?

22 A.   Yes.

23 Q.   Now, did you seize every single one of the hoods that were

24 there?

25 A.   No, we did not.

1  Q.   Some of them were left behind, correct?

2  A.   Yes.

3  Q.   And some were taken?

4  A.   Yes.

5  Q.   And that's, again, part of the space problem that you

6  talked about?

7  A.   Yes.

8  Q.   Now, to your knowledge, as of the day that you were there

9  collecting evidence, it was basically an investigation of the

10 Mendocino County Sheriff's Department?

11 A.   Yes.

12 Q.   Now, in the course of your collection of evidence, there

13 were certain objects which were taken for the purposes of

14 fingerprint analysis, correct?

15 A.   Correct.

16 Q.   All right.  Do you know, to your knowledge, if an analysis

17 was ever performed on the objects taken?

18 A.   I personally did not request anything to be done.  I don't

19 know if anything happened after the evidence left my custody.

20 Q.   And just so the jury understands the police procedure,

21 it's basically that folks as yourself that have this job of

22 going out and processing a scene will take it and somebody in

23 charge of the investigation will then request another division

24 of the police department or Justice Department or whomever it

25 is that does fingerprinting to process it for that purpose?

1  **A.**    Correct.

2  **Q.**    And there is usually some sort of a form you fill out to

3  make that request?

4  **A.**    Yes.

5  **Q.**    And that was never done, correct, sir?

6  **A.**    I did not do one, no.

7  **Q.**    Now, do you recall whether the black bags filled with

8  shake that we saw in the photographs before, those were some of

9  the items which were taken for that purpose?

10 **A.**    They were primarily taken because of the content inside,

11 but they can also be conducive to fingerprints.

12 **Q.**    And there was also a -- some drink cans that were taken

13 for that purpose, correct?

14 **A.**    I don't specifically recall any drinking cans.  I think

15 there were some other can, maybe like a spray and a flashlight,

16 but I don't remember drinking cans themself.

17 **Q.**    Now, you have the basic knowledge to know the type of

18 objects which are likely to have human fingerprints on it,

19 correct?

20 **A.**    Yes.  There are certain items that are more conducive to

21 having fingerprints on them.

22 **Q.**    And it's generally an item with a smooth surface?

23 **A.**    Yes.

24 **Q.**    Non-porous?

25 **A.**    Yes.

1   Q.   For example, a smooth surface plastic is more conducive

2   than, let's say, wood?

3   A.   Yes.

4   Q.   I just kind of wanted to go through a set of photographs

5   that have been marked as Defense A?

6   A.   Okay.

7   Q.   And see if we can do it.

8          MS. AULT:   Excuse me, Mr. Nick.

9          (Whereupon document was tendered

10           to counsel.)

11  BY MR. NICK:

12  Q.   I wanted to go through a series of objects here and just

13  kind of ask you if, based on your training and experience, it

14  looked like items that would be conducive for fingerprint?

15  A.   Okay.

16         MS. AULT:   Objection, your Honor.   This is not in

17  this witness's area of expertise, nor has he been established

18  to be a fingerprint expert.

19         THE COURT:   But he has already testified about

20  objects that are and are not conducive to taking fingerprints.

21  He did that a minute ago without objection.

22         Overruled.   You can ask him.

23         What are these photos, Mr. Nick?

24         MR. NICK:   Yes, your Honor.   These are a series of

25  photos of various items that were at the Piercy grow.   For

1  example, the metal electrical panel on one.  There is a plastic

2  bag containing beef jerky on another one.

3          **THE COURT:**  Well, you don't need to testify for me.

4  Maybe -- will the witness know what these are photographs of?

5          **MR. NICK:**  I believe so, your Honor.  Let me just

6  show them to him.

7  **BY MR. NICK:**

8  **Q.**   Showing you Defense A.  The first one is an electrical

9  panel, correct?

10 **A.**   Yes.

11 **Q.**   And has a lot of metal on it?

12 **A.**   Correct.

13 **Q.**   And people need to turn those switches on and off

14 regularly, correct?

15 **A.**   I don't know how often, but they would have to turn them

16 on and off I would assume.

17 **Q.**   And no fingerprinting was done of that electrical panel,

18 correct, sir?

19 **A.**   Correct.

20 **Q.**   The next photograph is a beef jerky bag, is that it?

21 **A.**   Yes.

22 **Q.**   And I realize -- I saw in your search warrant return that

23 was search warrant item number one, Old Trapper jerky bag.  Is

24 that the Old Trapper jerky bag there?

25 **A.**   No.  This is the Pemmican Premium Cut jerky bag.

1 Q.   And those were photographed and seized for fingerprint

2 purposes, at least the other one, correct?

3 A.   Yes.

4 Q.   Next photo.  Is a series of plastic type of tubs, cans,

5 containers, let's just say, correct?

6 A.   Yes.

7 Q.   And those would be conducive for fingerprinting as well,

8 correct?

9 A.   They can be, yes.

10 Q.   And these are items regularly used in this marijuana

11 operation, based on your training and experience, correct, sir?

12 A.   Yes.

13 Q.   The next photograph, sir, is what appears to be a box of

14 donuts?

15 A.   Yes.

16 Q.   Is that Dolly Madison, the brand on it?

17 A.   Hostess.

18 Q.   Hostess, okay.  And they are, like, sitting on a soil bed

19 of some sort, correct?

20 A.   Yes, they are in one of the grow beds.

21 Q.   And from your experience, this is a cardboard.  It has a

22 very smooth, kind of a wax surface, correct?

23 A.   Yes.

24 Q.   And that would be conducive for fingerprinting, correct?

25 A.   It can be, yes.

1  Q.   Next item sir or next photograph is -- you follow all

2  those yellow wires you get to a portion of the electrical

3  panel, correct?

4  A.   It looks like the top of one, yes.

5  Q.   And that electrical panel would be conducive for

6  fingerprints as well, correct?

7  A.   Yes, it can be.

8  Q.   Next object -- or next photograph would be, again, just a

9  plastic container, white in color with the word Aggrene on it,

10 A-G-G-R-E-N-E.  And that is also conducive for fingerprinting?

11 A.   The plastic surface can be, yes.

12 Q.   And the next photograph, sir, is another tub, correct?

13 A.   Yes.

14 Q.   And that one actually has handwriting on it, correct?

15 A.   Yes.

16 Q.   And that tub is no different than any other -- or plastic

17 tub conducive for fingerprinting, in other words, correct?

18 A.   Yes, it can be.

19 Q.   Next object or photograph?  Same thing, another plastic

20 tub.  I believe there is a glass container on the lower

21 left-hand corner or a can?

22 A.   Yeah.  It looks like it's covered in paper, but, yes.

23 Q.   Has glass on the top portion of the paper, correct?

24 A.   Yes.

25 Q.   And so the glass that is exposed and, also, the plastic

1  tubs that are there in the photograph would be conducive for

2  fingerprinting, correct?

3  A.   It can be, yes.

4  Q.   And the next photograph, again, more plastic containers,

5  also conducive for fingerprinting?

6  A.   It can be, yes.

7  Q.   If we can take a look at some of those right there, some

8  of these are like Vitamin Water drinks, I believe, they are

9  called, correct?

10  A.   Yes.

11  Q.   And one of them appears to have a little bit of vitamin

12  drink still left in it, true?

13  A.   It appears to have some liquid in it, yes, one of them.

14  Q.   And those would be items that would be conducive of

15  fingerprints, as well, correct?

16  A.   They can be, yes.

17  Q.   Next photograph.  That's the other beef jerky bag, is that

18  correct, sir?

19  A.   Yes.

20  Q.   And that was a photograph and taken for fingerprinting as

21  well?

22  A.   Yes.

23  Q.   And the next item is -- none.  None of these items were

24  seized for fingerprinting other than the beef jerky bag, is

25  that correct?

1  A.    Yeah.   I believe in these photos that was the only thing

2  that was seized, yes.

3          THE COURT:   Would you ask the witness what he's

4  looking at?

5          MR. NICK:   Yes, your Honor.   I'm sorry.

6  BY MR. NICK:

7  Q.    Do you recognize these as photographs of items that were

8  collected at the Piercy location?

9  A.    Yes.   In that were.

10 Q.    And that would be all of the photos that you saw, is that

11 correct?

12 A.    Yes.

13         MR. NICK:   I move them into evidence, your Honor.

14         MS. AULT:   No objection, your Honor.

15         THE COURT:   Thank you.   They will be received.

16         (Trial Exhibit A received

17          in evidence)

18 BY MR. NICK:

19 Q.    Now, let me ask you about the accounting of -- actually,

20 before I get to that, show you what was previously marked as

21 9-k, and it was received into evidence.   I show you this

22 photograph right here.

23         (Photograph tendered to the witness.)

24 Q.    And, really, what I was focusing on was the rubber gloves

25 that are in the hand.

1  A.    All right.

2  Q.    Could you tell me, Deputy Alvarado, what is the purpose of

3  wearing those rubber gloves?

4  A.    To prevent the transfer of our fingerprints onto items at

5  the scene.

6  Q.    Thank you, sir.

7          With respect to the counting of the plants, let me

8  ask you how many times prior to this occasion had you been

9  specifically requested to try to determine if there was roots

10  on the plants?

11  A.    I believe this would be the first case.

12  Q.    And your understanding is that that has some sort legal

13  significance, whether there are roots or not, correct?

14  A.    Yes.

15  Q.    And do you know what a tap root is?  Do you know that

16  term?

17  A.    Not itself, no.

18  Q.    And would you be able to tell us if there was a tap root

19  on -- I believe it was 40 that you counted?

20  A.    No.  I may have counted more than that.  Just -- I would

21  go up to that amount, report that and then --

22  Q.    And then start on 41 and so on and so forth?

23  A.    Yes.

24  Q.    What I wanted to know is, did you photograph the root

25  system of every individual plant that you counted?

1  **A.**   No, I did not.

2  **Q.**   And showing you what's been previously marked as 9-j,

3  which was shown previously, are you able to tell me that you

4  can see a root system in every single one of these in the

5  photograph?

6              (Whereupon, photograph was tendered

7               to the witness.)

8  **A.**   No, not in every single plant.

9  **Q.**   With respect to the -- I will just call them oven bags,

10  and then there is the turkey one.  I believe there is a large

11  one as well, is that correct?

12  **A.**   Yes, different sizes it appears.

13  **Q.**   All right.  These are bags that you run into commonly in

14  these marijuana growing operations, correct?

15  **A.**   You see them fairly frequently, yes.

16  **Q.**   It wasn't something you ran into for the first time at

17  this site?

18  **A.**   No.

19  **Q.**   I wanted to show you one other photograph -- two others

20  that I omitted to show you regarding the fingerprint line of

21  questioning?

22  **A.**   Okay.

23  **Q.**   Let me first show 9-ee, which is the photograph of the

24  generator.

25              **THE COURT:**  Is it in evidence already?

1          **THE CLERK:**  It is not.  Double e is not.

2          **MR. NICK:**  Okay.

3  BY MR. NICK:

4  **Q.**   Then let me show you this photograph that's marked as 9-e.

5          (Whereupon, photograph was tendered

6          to the witness.)

7  **Q.**   Do you recognize this as the generator that you saw at the

8  Piercy site?

9  **A.**   You know, I did not see the generator up close.  I saw it

10 from the hillside, so I couldn't specifically say from this

11 vantage point that it is or isn't.

12 **Q.**   Deputy Alvarado, let me ask you this.  Assume for a second

13 that this were the generator.  You would agree that there is a

14 substantial amount of oil film all over the generator that is

15 an excellent source of fingerprints?

16         **MS. AULT:**  Objection, your Honor.

17         **THE COURT:**  Sustained.

18         **MR. NICK:**  I will rephrase the question.

19 BY MR. NICK:

20 **Q.**   You would agree that the oil provides a source of

21 fingerprint?

22         **THE COURT:**  Not the oil, because you can't show him

23 the picture because he can't identify it, but you can ask him

24 more generally that question.

25         **MR. NICK:**  Yes, your Honor.

1  BY MR. NICK:

2  Q.    Oil on metal followed by touching it by a human hand will

3  provide a fingerprint?

4  A.    Sometimes.  Oil actually may make it a little more

5  difficult because it smudges very easily and it doesn't leave a

6  clean identifiable print.

7  Q.    Thank you, sir.  Then 9-w, that is the photo of the scale.

8          (Whereupon, photograph was tendered

9           to the witness.)

10         THE CLERK:  I think that that -- I think that's in,

11 but let me just...

12         THE COURT:  W is in.

13         THE CLERK:  Okay, yeah.

14 BY MR. NICK:

15 Q.    With respect to 9-w, the water bottle would be a source of

16 fingerprints, correct?

17 A.    Yes, it can be.

18 Q.    And even the stainless steel top portion of the scale,

19 correct?

20 A.    Yes, it can be.

21 Q.    Is there anybody in particular who has had custody of

22 whatever items were taken since the day that they were taken on

23 May 12, 2005?

24 A.    Basically from the scene they went to our office and were

25 secured in the detective office in Ukiah.  Within the following

1  day or two the marijuana investigators returned from their

2  training out of state and the items were turned over to them

3  for proper storage and safekeeping, and from there I don't know

4  what has happened to them.

5  **Q.**  Would you have any knowledge as to whether at any time

6  since May 12, 2005 any agent of the federal government had

7  checked out any of the items of evidence for any fingerprint

8  processing purpose?

9  **A.**  I would not have knowledge.

10        **MR. NICK:**  Your Honor, I believe that's all I have.

11  If I could just check my notes a moment?

12        **THE COURT:**  Fine.

13        (Brief pause.)

14        **MR. NICK:**  One last question I had -- I have nothing

15  further.

16        **THE COURT:**  Thank you.  Do you have any redirect?

17        **MS. AULT:**  I do, your Honor, just very quickly.

18        **THE COURT:**  Okay.

19                  **REDIRECT EXAMINATION**

20  BY MS. AULT:

21  **Q.**  Deputy Alvarado, so in the detective bureau is it a

22  standard practice when you go to a crime scene to collect items

23  that you think might have fingerprints on them?

24  **A.**  Sometimes, yes.

25  **Q.**  Now, do you always submit those items for fingerprint

1   analysis?

2   **A.**   Not always, no.

3   **Q.**   What are some of the circumstances why you wouldn't submit

4   those for analysis?

5   **A.**   Again, if there is some type of other evidence that points

6   to or shows that a person was involved, then we may not do it.

7   There could be -- there could be other reasons, but that would

8   be the main reason; that there was other evidence to show

9   that -- the persons responsible for the crimes.

10  **Q.**   And have you ever been involved in an investigation where

11  you actually did do fingerprint analysis, but the fingerprints

12  that were found at the scene weren't the fingerprints of the

13  person who committed the crime, they were somebody else's

14  prints?

15          **MR. NICK:**   Your Honor, I'm -- that's irrelevant here.

16  I object on that basis.  I would object.  Irrelevant.

17          **THE COURT:**   Sustained.

18  **BY MS. AULT:**

19  **Q.**   Have you ever been involved in an investigation where you

20  determined that someone committed a crime, but their

21  fingerprints were not found at the scene?

22          **MR. NICK:**   Objection.  Relevancy.

23          **THE COURT:**   Overruled.  You may answer.

24  **A.**   Yes.  Where the fingerprints, somebody was involved and

25  their fingerprints weren't there, yes.

1  BY MS. AULT:

2  Q.   Now, if a surface is dirty, is that something that

3  interferes with the ability to get a fingerprint off of that?

4  A.   Yes, it can.

5  Q.   And a grow site, such as the grow site at Piercy, is that

6  a very dirty environment?

7  A.   There is a lot of loose soil, dirt, chemicals, fluids at

8  the scene.

9  Q.   So another thing that might -- well, when you went to

10  count the plants in the buildings, were all the plants in each

11  building -- were all the plants in one building essentially the

12  same size?

13  A.   Yes.  Each building, like Building 3 all the plants were

14  of a similar size.  In Building 2, they were of their own

15  similar size, et cetera, down to Building 1.

16  Q.   So the plants in Building 2 might have been a different

17  size from the plants in Building 3, but all the plants in

18  Building 3 were the same size?

19  A.   Yes.

20  Q.   And I believe that defense counsel showed you Exhibit 9-j,

21  and he asked you if you could see roots on every plant and you

22  said no.

23        Is that just because of the way the photograph is

24  taken?

25

1          (Whereupon, photograph was tendered

2           to the witness.)

3  **A.**   Yes.  The picture, the way it's taken, it makes it

4  difficult to see the root system for every plant.

5  **Q.**   I apologize.  It might not be displaying to the jury.

6          **THE CLERK:**  Oh, wait.  Hold on.  I'm sorry.  I took

7  it down.  Here we go.

8          (Photograph displayed.)

9  **Q.**   I'm sorry.  Can you answer the question again?

10 **A.**   The way the picture is taken, it's not possible to see the

11 roots off of every plant in that picture, no.

12 **Q.**   So your answer "no" to that question was not because the

13 plants don't have roots, you just couldn't see them in that

14 picture?

15 **A.**   Yes, that's correct.

16 **Q.**   Okay.  Those are all the questions I have for you.  Thank

17 you.

18          **THE COURT:**  Anything further, Mr. Nick?

19          **MR. NICK:**  Nothing further.  Thank you.

20          **THE COURT:**  All right.  Thank you very much, sir.

21 You may be excused.

22          (Witness excused.)

23          All right.  The government may call its next witness.

24          **MS. JERICH:**  Your Honor, the government is going to

25 call Steven Alvarado.

1                          **STEVE ALVARADO**,

2  called as a witness for the Plaintiff herein, having been first

3  duly sworn, was examined and testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  State your full name for the record,

6  please?

7              **THE WITNESS:**  Steve Alvarado.

8              **THE CLERK:**  Just Steve?  A-L-V-A-R-A-D-O?

9              **THE WITNESS:**  Correct.

10             **MS. JERICH:**  May I proceed, your Honor?

11             **THE COURT:**  You may.

12                     **DIRECT EXAMINATION**

13 BY MS. AULT:

14 Q.   Good afternoon, sir.

15 A.   Good afternoon.

16 Q.   Sir, how are you employed?

17 A.   I'm employed with the Mendocino County Sheriff's Office.

18 Q.   And what do you do with the Mendocino County Sheriff's

19 Department?

20 A.   I'm a public safety dispatcher.

21 Q.   Could you describe for the Court what your duties are as

22 such?

23 A.   I process all calls for service for the Sheriff's

24 Department.  We deal with 911 calls exclusively for the county.

25 Q.   And how long have you been employed as a dispatcher?

1   **A.**    Almost 14 years.

2   **Q.**    Since approximately 1994?

3   **A.**    Correct.

4   **Q.**    Is that a full-time position for you?

5   **A.**    Yes, it is.

6   **Q.**    Do you also serve as a reserve deputy with that same

7   Sheriff's Department?

8   **A.**    Yes, I do.

9   **Q.**    How long have you been a reserve deputy with the Sheriff's

10  Department in Mendocino?

11  **A.**    I was sworn in in November of 1995.

12  **Q.**    So approximately 12, 13 years?

13  **A.**    That's correct.

14  **Q.**    How many days a week do you serve as a reserve officer?

15  **A.**    Three days a week.

16  **Q.**    What does that mean to be a reserve officer?

17  **A.**    I assist the full-time peace officers in their duties.

18  **Q.**    Do you work a 9:00 to 5:00 shift or --

19  **A.**    Not necessarily.  I work with the marijuana supression

20  unit, so the hours are very flexible in that sense.  Summertime

21  it's nighttime.  Sometimes it's date time.

22  **Q.**    And as a peace officer or reserve officer, is that a paid

23  position?

24  **A.**    No, it's not.

25  **Q.**    But it's three times a week and you have done that for 12

1  years?

2  **A.**    Correct.

3  **Q.**    And then for the remainder of the week, if I understand

4  you correctly, you are a dispatcher, is that correct?

5  **A.**    Correct.

6  **Q.**    And that is a paid position?

7  **A.**    That is.

8  **Q.**    And as a reserve officer, while you are on duty do you

9  carry a firearm?

10  **A.**    Yes, I do.

11  **Q.**    Do you have the ability to arrest people?

12  **A.**    Yes, I do.

13  **Q.**    And I think you mentioned that you assist mainline

14  officers --

15  **A.**    Correct.

16  **Q.**    -- is that correct?

17          And how is it that you assist them?

18  **A.**    In the situation with the marijuana supression unit, I

19  assist them in their investigations, whether it's collection of

20  evidence or surveillance, whatever the case maybe.

21  **Q.**    And is there a particular name for that marijuana

22  supression or eradication unit?

23  **A.**    In Mendocino County it's called COMMET.  It's C-O-M-M-E-T,

24  which is an acronym County of Mendocino Marijuana Eradication

25  Team.

1 **Q.**   Thank you.  In order to serve as a reserve officer and

2 support a unit like COMMET, have you received specific

3 training?

4 **A.**   Yes, I have.

5 **Q.**   Could you describe for us what that is?

6 **A.**   Specific training with reference to the marijuana

7 supression unit, I have attended the DEA's Marijuana

8 Investigator School.  I have also attended the DEA Overflight

9 School which deals with aerial observation for the detection of

10 marijuana.

11 **Q.**   Is it a fair statement that you received regular training

12 with respect to your duties as a member of COMMET?

13 **A.**   Yes, earlier, earlier.

14 **Q.**   Thank you.  Now, you referenced the DEA Aerial Overflight

15 School.  Could you describe for us in a little greater detail

16 what that entails, involves?

17 **A.**   The overflight school is conducted in Mendocino County.

18 What it does is it provides law enforcement officers throughout

19 the State of California and the other 49 states with the

20 ability to detect marijuana grows from air platforms, whether

21 it's a helicopter or fixed wing, and it's on-the-job training.

22 **Q.**   When did you first beginning training for overflight

23 detection?

24 **A.**   1996.

25 **Q.**   And, in fact, now are you, yourself, a trainer?

1  A.   Yes, I am.

2  Q.   Well, could you describe for the Court what types of grows

3  are you hoping to detect from an aircraft, such as a helicopter

4  or an airplane?

5  A.   We are looking for outdoor grows that are either on

6  corporate or private or national forests, properties.

7  Q.   And how is it that you detect these grows?

8  A.   By visual.  Strictly by the eye, naked eye.

9  Q.   And how often per year do you do this?

10  A.   Roughly from the first of April through the end of June.

11  Q.   And after you have identified a grow or grow sites, what

12  do you do?

13  A.   We record those locations of gardens by using GPS and then

14  when it becomes time to eradicate, we are able to go back to

15  those locations and take care of that task.

16  Q.   And could you describe for us what you mean by GPS?

17  A.   GPS is global positioning system and the devices we use

18  are hand held.  They receive satellite signals from satellites

19  orbiting the earth.

20        When we locate a garden from the air, we have the

21  aircraft, the helicopter is the one we use the most, hover the

22  site so that we get a GPS position or latitude/longitude of the

23  position where the garden is at.

24  Q.   How many of these grows per year on average, if you can

25  give us an estimate, would you say you identify and to use your

1    words eradicate?

2    **A.**    I would say approximately 350 to 400 different grow sites

3    a year.

4    **Q.**    Is that times the 12 years you have been doing this?

5    **A.**    It varies a little bit, but yes.

6    **Q.**    In the course of 12 years, how many such outdoor grows

7    have you identified and eradicated?

8    **A.**    Comfortably, probably over a thousand.

9    **Q.**    And when we you "eradicate," what does that mean?

10   **A.**    Eradication in the sense of what we do in our county is to

11   go into the garden site and we basically cut them down.

12   **Q.**    How are they cut down?

13   **A.**    Using either pruning shears or cutting device, loppers.

14   **Q.**    Sometimes if they are more major grows or larger plants,

15   do you have to resort to bigger instruments than cutting

16   shears?

17   **A.**    Like chain saws, yes.

18   **Q.**    And after the marijuana grows are cut down, what do you do

19   with them?

20   **A.**    Once the plants have been cut down, they are transported

21   to a disposal site where they are buried.

22   **Q.**    Are they buried in some sort of bag or casing?

23   **A.**    No.  They are buried in their natural state in the ground

24   and covered with soil.

25   **Q.**    Now, could you be a little more specific with respect to

1  what your general duties are as a member, as a volunteer member

2  basically with COMMET, the marijuana eradication team?

3  **A.**    What I primarily do, beyond the scope of just general

4  assistance to the officers, is I prepare maps, whatnot, of the

5  sites that we have acquired through using GPS.  When we do the

6  search warrants, I do most of the photography.  I assist in the

7  eradication of the plants.

8  **Q.**    Do your duties sometimes involve photographing crime

9  scenes?

10  **A.**    Correct.

11  **Q.**    You mentioned search warrants.  Do you assist in the

12  execution of the search warrants?

13  **A.**    Yes, I do.

14  **Q.**    Evidence collection?

15  **A.**    Uh-huh.

16  **Q.**    Now, you mentioned -- we have only talked about outdoor

17  marijuana grows.  There is also another type of marijuana grow,

18  correct?

19  **A.**    Correct.

20  **Q.**    What is that?

21  **A.**    It would be the indoor grows.

22  **Q.**    And with respect to the search warrants that you have

23  executed during the course of your 12 years, do those pertain

24  exclusively to indoor marijuana grows?

25  **A.**    Yes.

1  Q.   Could you describe for the Court, in the course of your 12

2  years as a member of the COMMET team, how many marijuana

3  investigations have you been involved in?

4  A.   Probably more than 100.

5  Q.   And how many marijuana grows have you examined or

6  investigated?

7  A.   Every bit of that.

8  Q.   And how about the same question for number of search

9  warrants you have participated in?

10  A.   I would say again, being conservative, every bit of 100.

11  Q.   Have you participated in both state and federal search

12  warrants?

13  A.   Yes, I have.

14  Q.   So you work in conjunction with federal and state, local

15  agencies?

16  A.   Yes, I do.

17  Q.   Have these search warrants been related exclusively to

18  indoor grows?

19  A.   Yes.

20  Q.   And could you describe the difference for the Court, if

21  there is any, between the assistance you are required to

22  deliver in the execution of a state or local search warrant

23  versus the execution of a federal search warrant?

24  A.   The primary difference, as far as what I'm assigned to do,

25  is in the collection of samples.

1          At the state level it only requires five subsamples

2    in a 10-pound.  Collection of the plants in the federal

3    government collects 10 samples and the entire plant.

4    **Q.**  We will discuss that in detail in a little bit.  Thank

5    you.

6          Now, how many marijuana arrests have you made in the

7    course of your 12 years with the COMMET team?

8    **A.**  Personally, just about a dozen.

9    **Q.**  Now, have all of these arrests involved the cultivation or

10   growing of marijuana?

11   **A.**  Yes, they have.

12   **Q.**  And each time you investigate a marijuana grow site, is it

13   also true that you make an arrest?

14   **A.**  Sometimes.

15   **Q.**  Regarding the other times where you don't, why is that in

16   your experience?

17   **A.**  There is no one at the search warrant site.

18   **Q.**  So when there is somebody at the search warrant site, you

19   arrest them?

20   **A.**  They are detained.

21   **Q.**  They are detained, okay.

22         In those cases when you find a person at a search

23   warrant site and you arrest them or detain them, is it common

24   in your experience to also dust the entire structure, any

25   structures that might be included on that property for latent

1  fingerprints?

2  **A.**   At the state level, no.  We usually submit the evidence

3  for fingerprinting to a criminal laboratory that deals with

4  that.

5          If it's a federal search warrant, the federal

6  government usually provides their own fingerprint specialists.

7  **Q.**   And why isn't that commonly done, if you know, at the

8  state level?

9  **A.**   I think only because its funding and expertise in doing

10  fingerprint.

11  **Q.**   There is a cost associated with --

12  **A.**   Very much so.

13  **Q.**   -- dusting for latent fingerprints and analyzing them?

14  **A.**   Correct.

15  **Q.**   Thank you.  Now, let's turn to May 12, 2005.  Were you

16  dispatched to 750 Bear Pen Canyon Road in Mendocino County?

17  **A.**   Yes I was.

18  **Q.**   Why were you dispatched there?

19  **A.**   I was advised that there was an indoor operation and a

20  search warrant was being prepared and my assistance was

21  required with some other deputies to process the scene for

22  eradication.

23  **Q.**   Where were you, sir, when you received this call for

24  assistance?

25  **A.**   I was in Ukiah.

1  Q.   How far is Ukiah from 750 Bear Pen Canyon Road, if you

2  know?

3  A.   Approximately 75, 80 miles.

4  Q.   And by car, how long a drive was that for you?

5  A.   I believe it took us about an hour and a half to get to

6  that location.

7  Q.   And the purpose of your responding to 75 year Bear Pen

8  Canyon Road on that date was what?

9  A.   To do the eradication and collect evidence.

10 Q.   When you arrived at 750 Bear Pen Canyon, were you acting

11 by yourself or were other persons present?

12 A.   There were others.

13 Q.   Who were some of these other people?

14 A.   There was Detective Alvarado.  There was a Detective

15 Kline.  There was Sergeant Poma.  There was Patrol Deputy

16 Davis.  There was two Fish and Game officers there that I

17 recall.

18 Q.   And is this standard procedure to work in a team like

19 this?

20 A.   Very much so.

21 Q.   And why is that?

22 A.   It's more efficient.

23 Q.   Now, you mentioned Deputy Alvarado.

24 A.   Uh-huh.

25 Q.   Is that Andy Alvarado?

1   A.   It is.

2   Q.   Are you related to Deputy Alvarado?

3   A.   Yes, I am.  He's my son.

4   Q.   All right.  Thank you.

5        Now, approximately what time was it that you arrived

6   at Bear Pen Canyon Road on May 12?

7   A.   Approximately 6:00 p.m., give or take.

8   Q.   Was the sun still shining?

9   A.   It was in the lower -- it was on its way down, yes.

10  Q.   So almost twilight time?

11  A.   Approaching.

12  Q.   Now, prior to this occasion, had you ever heard the name

13  Cody Dobbs?

14  A.   No, I had not.

15  Q.   Never met any individual in Mendocino County named Cody

16  Dobbs?

17  A.   No, ma'am.

18  Q.   When you arrived at this location, were any suspects

19  present?

20  A.   No, they were not.

21  Q.   After you arrived, what were your duties?

22  A.   We waited to be advised that the search warrant had been

23  signed before we executed it.  Once the search warrant was

24  signed and we were advised to that, we started processing the

25  scene.

1   Q.   Did there come a point in time when you were advised that

2   the search warrant had, indeed, been authorized?

3   A.   Yes, we were.

4   Q.   And what did the search warrant authorize you to do?

5   A.   To collect evidence that was specific to marijuana

6   cultivation.

7   Q.   And pursuant to receiving word that the warrant had been

8   authorized, did you go about searching any buildings on that

9   property?

10  A.   I did not.

11  Q.   You did not, okay.  Did others that you were working with

12  search buildings on that property?

13  A.   Not to my knowledge.

14  Q.   How about grow structures?

15  A.   Other than seeing the placement of the buildings, no.

16  Q.   So let me refer you, sir, to what's previously been marked

17  and entered as Government's Exhibit No. 11, which -- you see

18  the diagram?

19  A.   Yes, I do.

20  Q.   I'm motioning to Exhibit 11.

21        Looking at Exhibit 11 do you recognize that diagram?

22  A.   Yes, I do.

23  Q.   And how do you recognize that?

24  A.   I constructed that diagram on the second day.

25  Q.   I'm sorry.  You said you constructed that diagram?

1  **A.**    Or drew that diagram.

2  **Q.**    Pardon me.  For the record, that is Exhibit 11-a.

3            When you arrived -- by the way, is that to scale?

4  **A.**    No, it's not.

5  **Q.**    What is the purpose of constructing a diagram of that

6  nature?

7  **A.**    To give a better perspective of the relationship to -- in

8  this situation the grow structures, to the residence, and to

9  the power source.

10 **Q.**    Again, that's part of your job duties when you respond to

11 a scene like this?

12 **A.**    Yes, it is.

13 **Q.**    Photographs and diagram drafting?

14 **A.**    Right.

15 **Q.**    On the first day, on May 12, 2005, how many, we will call

16 them grow buildings did you discover?

17 **A.**    I was advised of three grow buildings.

18 **Q.**    But, in fact, we see four in that diagram?

19 **A.**    Correct.

20 **Q.**    Which of the three buildings reflected on the diagram you

21 drafted were discovered on May 12th, that first day?

22 **A.**    To the best of my knowledge, they were the ones that are

23 located in the right side of that diagram.  I believe they are

24 marked "Grow Room."

25 **Q.**    So on the right-hand side, Exhibit 11-a?

1    **A.**    Of the diagram.

2    **Q.**    There were three rectangular structures marked "Grow

3    Room"?

4    **A.**    Right.

5    **Q.**    And those are the buildings that you are referring to?

6    **A.**    Yes, ma'am.

7    **Q.**    Now, one to the extreme right appears to be drawn by hand.

8    It appears to be much larger than the other two.

9    **A.**    It -- again, not being to scale, I tried to represent the

10   size of these buildings.

11   **Q.**    All right.  Thank you.

12           And the grow houses discovered, the three on

13   May 12th, these were indoor grow houses?

14   **A.**    Yes, ma'am.

15           **MS. JERICH:**  Agent Bilek, would you mind putting up,

16   please, what's been previously entered Exhibit 9-g?

17           (Photograph displayed.)

18   **BY MS. JERICH:**

19   **Q.**    Do you recognize that, sir?

20   **A.**    I do.

21   **Q.**    What is that a picture of?

22   **A.**    Of an indoor grow.

23   **Q.**    Does it appear to be an accurate depiction of an indoor

24   grow from the grow site at 750 Bear Pen Canyon Road?

25   **A.**    Yes, it does.

1    Q.    And who would have been taken that picture?

2    A.    I believe it would have been Detective Kline.

3    Q.    Thank you.

4          MS. JERICH:  Would you please put up 9-h?

5          (Photograph displayed)

6    BY MS. JERICH:

7    Q.    Again, this is also an exhibit previously admitted into

8    evidence.  What does that appear to depict?

9    A.    Same building, just a different viewpoint.

10   Q.    Thank you.

11          I believe you mentioned earlier that one of your

12   roles on May 12th or just in general is to count plants?

13   A.    Yes, ma'am.

14   Q.    Would you describe for the Court what plant counting --

15   what that means?  What it is?

16   A.    Plant counting is -- part of our procedure is to pull the

17   plant up from the soil and count each one individually.

18   Q.    And on May 12th at 750 Bear Pen Canyon did you count

19   plants by yourself or were you doing this with others?

20   A.    I was doing it with others.

21   Q.    How many other persons?

22   A.    I believe there was two other deputies that were involved.

23   Q.    And you said you pull the plants up, is that correct?

24   A.    Yes.

25          MS. JERICH:  Agent Bilek, would you put on 9-j?

1        And again, your Honor, for the Court's information

2    this has previously been admitted into evidence.

3        (Photograph displayed)

4    **BY MS. JERICH:**

5    **Q.**   What are we looking at there, sir?

6    **A.**   These were the plants that were pulled up from that

7    particular grow room to do two things.  One, to show that they

8    were clones; and, two, that they were rooted.

9    **Q.**   Now, why is it important to show that the plants are

10   clones?

11   **A.**   The purpose of the cloning is -- in this situation is if

12   there are no roots to the stem, it is not classified as a plant

13   so it does not get counted.  It must be a rooted plant or item

14   to be considered as such.

15   **Q.**   So on May 12th all the plants that you pulled up, turned

16   over and saw the roots, visible roots, were counted?

17   **A.**   That's correct.

18   **Q.**   You included that in the plant totals that you -- what did

19   you do with your plant totals?

20   **A.**   As there was three of us that were doing the eradication,

21   one deputy was assigned as the sketch artist and, also, the

22   collector of the plant counts.

23        So the plants I pulled I gave that information to the

24   deputy who tabulated it for that particular area.

25   **Q.**   And so you turned the plants over.  You count the rooted

1  plant and you provide the information as soon thereafter to

2  this deputy you are referring to?

3  **A.**   Yes, ma'am.

4  **Q.**   Okay.  And do you recall who that might have been on

5  May 12th?

6  **A.**   Deputy Davis.

7  **Q.**   Thank you.  We have also heard some discussion about the

8  taking of subsamples.  Could you just describe for the Court

9  what a subsample is?

10  **A.**   A subsample is a portion of the plant that's coming from

11  the area in question, like an indoor grow, that is submitted to

12  the Department of Justice to ascertain whether or not it is a

13  marijuana plant.

14  **Q.**   Thank you, sir.

15          **MS. JERICH:**  May I approach the witness, your Honor?

16          **THE COURT:**  You may.

17          (Whereupon, exhibit was tendered

18            to the witness.)

19  **BY MS. JERICH:**

20  **Q.**   So you took a subsample or subsamples on May 12, 2005, is

21  that correct?

22  **A.**   Yes, ma'am.

23  **Q.**   And I believe you just explained why.  I have placed an

24  exhibit before you labeled United States Exhibit 87.  Do you

25  have that in front of you?

1  A.    Uh-huh.

2  Q.    Inspect it.  Do you recognize it?

3  A.    It looks consistent with evidence that would be used for

4  sampling.

5  Q.    Is that representative of the subsample or samples that

6  you took on May 12, 2005?

7  A.    Not knowing the bags, to be able to examine the paper

8  bags, I could not say that definitively.

9  Q.    If we were to open up that envelope, could you give us a

10  more definitive answer?

11  A.    Yes.

12  Q.    All right.

13        MS. JERICH:  Tracy, do you have some scissors I might

14  use?  Thank you.

15  BY MS. JERICH:

16  Q.    May I ask you, sir, to open the bag for us?

17        MS. JERICH:  May I approach the witness?

18        THE COURT:  You may.

19  BY MS. JERICH:

20  Q.    Just for the record, you have pulled out what appears to

21  be a Ziploc-type bag containing within it a green leafy product

22  with brown paper packaging.

23  A.    That's right.

24  Q.    All right.  Seeing that as you do now, do you recognize

25  it?

1   **A.**   Yes, I do.

2   **Q.**   What can you tell us about that?

3   **A.**   The paper bags have my signature on them.  They signify

4   the number of the plant, in the sense of subsample one in this

5   example and what building it came from.

6   **Q.**   And seeing that, is that an accurate -- or is that

7   representative of the subsamples you would have taken on

8   May 12, 2005?

9   **A.**   Yes, ma'am.

10          **MS. JERICH:**  I would like to move, your Honor,

11  Exhibit 87 into evidence at this time.

12          **THE COURT:**  Any objection?

13          **MR. NICK:**  No objection.

14          **THE COURT:**  Thank you.  It will be received.

15          (Trial Exhibit 87 received in evidence)

16          **MS. JERICH:**  Thank you very much.

17  **BY MS. JERICH:**

18  **Q.**   Now, after you took those particular subsamples, what did

19  you do with that evidence?

20  **A.**   This was turned over again to, I believe, Deputy Alvarado,

21  who was the collector of this -- of the evidence, he and Deputy

22  Kline.

23  **Q.**   Thank you.

24          On May 12, 2005 did you locate generator initially on

25  that property?

**A.**    I was advised of a generator when I had arrived there.

**Q.**    All right.  So he advised you about the generator

initially?

**A.**    I don't remember specifically, but I did receive

information that there was a generator on the property.

**Q.**    And why were you advised regarding the generator?

**A.**    I have some expertise and once they are determined that

they are part of the crime scene, having them removed for

evidence.

**Q.**    So once you received that information what, if anything,

on May 12th did you do with it?

**A.**    Ultimately I went down to the generator and examined it.

It was going to be a logistics problem removing it.  Determined

that it was the power source for the grow.

**Q.**    Thank you, sir.

        Was -- where was the generator located on the

property in relation to the three original grow houses?

**A.**    Do you wish me to refer to the diagram?

**Q.**    That's fine.  Exhibit 11-a?

**A.**    Yes, ma'am.  In the center of the diagram where it says

"Residence," the generator was located approximately north of

that and downhill.

**Q.**    And was the generator connected in any fashion to the

three grow houses discovered on May 12, 2005?

**A.**    Yes, it was.

1  Q.   And how was that?

2  A.   It was connected by the power lines that led up to each of

3  the structures.

4  Q.   And when you --

5  A.   Ultimately --

6  Q.   I'm sorry.  Please.

7  A.   I was just going to add that ultimately when the power was

8  turned -- or the generator was turned off, all the lighting

9  that was in the upper grows ceased to exist.

10 Q.   And now you just indicated at some point the generator was

11 turned off?

12 A.   Correct.

13 Q.   Whose job was it to turn the generator off?

14 A.   Once we had completed the operation of the buildings up

15 above, I turned it off.

16 Q.   What time, approximately, would that have occurred?

17 A.   I would approximate probably around 10:30, 11:00 o'clock

18 at night.

19 Q.   So the reason for the generator having been left on for a

20 time period was what?

21 A.   So we could see what we could do inside of these

22 structures.  It provided us a light source.

23 Q.   Okay.  I understand.  Thank you.

24       Is it significant when you discover a grow site to

25 also discover a generator?

1    **A.**    Very much so.

2    **Q.**    And why is that in your experience?

3    **A.**    Either commercial power is not available to the area in

4    question or, two, to go undetected if commercial power is

5    available.

6    **Q.**    Was the generator discovered at this particular grow site,

7    in your experience, average size, large?  How would you

8    describe it?

9    **A.**    It was a large -- larger than what we normally would

10   encounter.

11   **Q.**    Did that impact your investigation in this case?

12   **A.**    Yes, it did.

13   **Q.**    And how?

14   **A.**    In the sense that it was providing a tremendous amount of

15   power to the three grows.  It had more than enough capability

16   of supplying that power, so there was some concern that there

17   may have been something else which we could not find that

18   night.

19   **Q.**    And I believe you mentioned that the generator was

20   ultimately removed from the property, is that correct?

21   **A.**    I'm sorry.  I didn't hear that.

22   **Q.**    I believe you stated that the generator was removed, shut

23   down and removed, is that right?

24   **A.**    You are correct.

25   **Q.**    Could you tell us how that occurred?

1  A.   I obtained the services of a tow company with a large

2  flatbed, and we spent a fair amount of time after it was

3  disconnected from its power and -- or the feed lines and the

4  fuel source, it was loaded on the back of a large flatbed tow

5  truck.

6  Q.   Thank you, sir.

7         MS. JERICH:  May I approach the witness, your Honor?

8         THE COURT:  You may.

9         MS. JERICH:  Thank you.

10         (Whereupon, photograph was tendered

11          to the witness.)

12  BY MS. JERICH:

13  Q.   I have placed before you two photographs.  They have been

14  marked as Government's 9-bb and 9-ee.  Have you examined them,

15  sir?

16  A.   Yes, ma'am.

17  Q.   What is depicted in 9-bb?

18  A.   They are metal drums that were located on the north side

19  of the fourth grow shed that was located on the second day.

20  Q.   And what are those indicative of, if anything?

21  A.   Water storage.

22  Q.   And how is that related, if it is, to marijuana grow

23  sites?

24  A.   To water the plants so that they would grow.

25  Q.   And did you take that photograph?

1  **A.**    Yes, I did.

2  **Q.**    And why was that?

3  **A.**    To show that that's how they were watering the plants, or

4  as a source, a containment source.

5  **Q.**    And how about the second photograph, 9-ee I believe.

6  **A.**    The second one is the operational end of the generator

7  that was found on the scene.

8  **Q.**    And is that an accurate depiction of how it appeared on

9  the date you took the photographs?

10  **A.**    Yes, it is.

11           **MS. JERICH:**  Your Honor, I would like to move both

12  exhibits into evidence.

13           **MR. NICK:**  No objection.

14           **THE COURT:**  They will be received, if they are not

15  already in.  I thought they were.

16           **THE CLERK:**  I think they are not.

17           (Trial Exhibits 9-bb and 9-ee received in evidence)

18           **MS. JERICH:**  Thank you.

19           **THE CLERK:**  Bb and ee?

20           **MS. JERICH:**  Bb and ee.

21           Would you please publish -- I see you are doing it

22  already.

23           (Photograph displayed.)

24  **BY MS. JERICH:**

25  **Q.**    Do you see on your screen, is that ee?

1   **A.**   Yes, ma'am.

2   **Q.**   Again, could you just describe for us what that is?

3   **A.**   It's the control panel for the generator.

4   **Q.**   And that's the generator that you ultimately disconnected

5   and removed from the property?

6   **A.**   Yes, ma'am.

7   **Q.**   Okay.  I would like to approach you as well, Deputy, with

8   Exhibit 9-cc, if I may?

9              **THE COURT:**  All right.

10             (Whereupon, photograph was tendered

11               to the witness.)

12  **BY MS. JERICH:**

13  **Q.**   Sir you have before you an exhibit.  Do you recognize

14  what's depicted in that exhibit?

15  **A.**   Yes, I do.

16  **Q.**   What is that?

17  **A.**   It's a photograph of the grow bed inside the fourth

18  building that was found on the second day, as it was being

19  prepared to take it as a subsample.

20  **Q.**   I'm going to reserve my questioning for you on that in

21  just a minute.  I'm getting ahead of myself.

22             Other than the grow buildings you discovered on the

23  first day, were there any other structures you located on the

24  property in addition to the residence?

25  **A.**   Yes, ma'am.

1  **Q.**   And could you describe those for the Court?

2  **A.**   There was a shed to the south of the house that had mostly

3  storage, wasn't associated with anything that we were concerned

4  with, as far as the cultivation was concerned, and a processing

5  shed.

6  **Q.**   And when you say "processing shed," what is that?

7  **A.**   Processing shed is where, once the plant has reached its

8  maturity, it is cut down.  It is put into an area where it is

9  dried and then when it reaches a predetermined dryness that is

10 preferred by the cultivator, they prune or trim off all the

11 leaves and all the stems and keep only the flower or the bud.

12 **Q.**   Referring you again, sir, to Exhibit 11-a.  On the diagram

13 drawn by your hand there appears to be three -- well, two

14 rectangles marked "Shed," and one it appears to be in the lower

15 left-hand corner marked "Process Shed."

16 **A.**   Yes, ma'am.

17 **Q.**   Are those the types of processing areas that you have just

18 described for us?

19 **A.**   Yes, ma'am.

20 **Q.**   All right.  So if I understand your testimony -- well, let

21 me backup.

22       What is the grow cycle for a marijuana plant from

23 seedling or clone to maturity?

24 **A.**   Approximately 90 days.

25 **Q.**   90 days.  So three months?

1   A.   Yes, ma'am.

2   Q.   In your training and experience, is marijuana grown in one

3   way?  Is there more than one way?  Is it just with a seed or

4   clone?  How does it get started?

5   A.   In an indoor grow operation, predominantly they are grown

6   from clones.

7   Q.   Clones, which you previously described to us, I believe,

8   is that correct?

9   A.   Correct.

10  Q.   All right.  And when you inspected the structures on

11  May 12 and overturned those plants and looked at the roots,

12  those were clones in your opinion?

13  A.   Yes, ma'am.

14  Q.   Okay.  So the clones are placed into grow beds, is that

15  right?

16  A.   Into a small grow cube.  It's a variety of different

17  materials.  Some of it's wool.

18  Q.   And then what happens to them for the 90-day cycle?

19  A.   They place them into a tray and add grow enhancements to

20  stimulate it to root and grow.

21  Q.   And are they kept under certain lighting conditions?

22  A.   Yes, ma'am.

23  Q.   Okay.  And what are those, if you know?

24  A.   Most of the ones that I have encountered are usually

25  fluorescent bulbs.

1  Q.    And are they watered on a regular basis?

2  A.    Yes.  They have to be tended.

3  Q.    So somebody has to be present to do that?

4  A.    Yes, ma'am.

5  Q.    Are they managed in any other ways, such as fertilized or

6  something like that?

7  A.    That would be correct.

8  Q.    And is this the process that's necessary to grow them into

9  their mature level for a 90-day time period?

10 A.    Yes, ma'am.

11 Q.    So after they have reached maturity, and I believe you've

12 indicated they bud, then what happens to those plants in the

13 grow beds we have been looking at?

14 A.    Once they've reached maturity, then the plants are cut, or

15 eradicated depending on your terminology.  They were placed

16 into a drying position so that they will dry up.  And then the

17 process that I talked about earlier, about trimming off all of

18 the leaves and stems is where they go from there.

19 Q.    And so, again, this requires some person or persons to cut

20 these plants?

21 A.    Yes, ma'am.

22 Q.    And then are they hung in a separate structure in your

23 experience?

24 A.    Usually.

25 Q.    And so when you refer to a processing shed or shed, is a

1    purpose of such a structure to dry the marijuana plants?

2    **A.**    Yes, ma'am.

3    **Q.**    Okay.  And in your experience, for how long a time period

4    is required to dry the plants?

5    **A.**    I could not provide you with a definitive time frame.  I

6    think it depends on the outside conditions -- whether it's cold

7    or hot, whether it's humid or dry -- how fast the plant dries.

8    **Q.**    Thank you.  After the plants are dried, they are then, if

9    I understand your testimony, submitted to the trimming process,

10   is that right?

11   **A.**    Yes, ma'am.

12   **Q.**    And in your experience does that usually occur within the

13   same type of processing shed?

14   **A.**    Usually.

15   **Q.**    And, again, that requires a person or persons to perform

16   that task?

17   **A.**    Yes, ma'am.

18   **Q.**    Okay.  And could you describe for us how a person would go

19   about trimming the marijuana?

20   **A.**    They use a special little scissor, manicuring scissor,

21   something that you could buy at the hardware store, that allows

22   them to sit there and trim off all the extra leaves and the

23   stem work.

24   **Q.**    And they are trying to save or collect what part of that

25   marijuana plant?

**A.**    The flower of the plant or the bud.

**Q.**    Because that is the part that is put on the market, so to speak?

**A.**    Correct.

**Q.**    And what happens with the stuff that's not kept or collected?  What is that?

**A.**    Leaves and stems are usually discarded.

**Q.**    Thank you very much.  Now, when you left the property, the Bear Pen Canyon Road grow on May 12, 2005, were your duties as far, as you understood them, finished with respect to that grow site?

**A.**    Yes, ma'am.

**Q.**    Did you have any intention of returning to 750 Bear Pen Canyon?

**A.**    No.

**Q.**    You are nodding in the negative, okay.  Now, what, in fact, did happen on May 13, 2005?

**A.**    I was notified during the next day that a second grow shed had been discovered by the Fish and Game officers.

**Q.**    And, again, where were you at that time?

**A.**    I was in dispatch.

**Q.**    So were you back home, two hours away in the car?

**A.**    Yes, ma'am.

**Q.**    Okay.  So did you, in fact, respond again to 750 Bear Pen Canyon?

1  A.   Yes.  I was advised that a search warrant had been

2  obtained and I went back up to that address.

3  Q.   Again, were you with other officers?

4  A.   There was two others.

5  Q.   And who were they, if you recall?

6  A.   Then Deputy Davis and Deputy Kline.

7  Q.   And when you responded on the second day, May 13th, did

8  your duties also include taking photographs?

9  A.   Yes, ma'am.

10        MS. JERICH:  I'm going to if I may, your Honor,

11 approach the witness with some photographs?

12        THE COURT:  All right.

13        MS. JERICH:  Excuse me.

14        (Whereupon, photograph was tendered

15         to the witness.)

16        MS. JERICH:  For the record, I have placed

17 government's exhibits which have not yet been admitted into

18 evidence, 9-x through 9-aa before the witness.

19 BY MS. JERICH:

20 Q.   Sir, do you recognize those photographs?

21 A.   Yes, I do.

22        THE CLERK:  Did you want to move 9-cc?

23        MS. JERICH:  Not yet.  Thank you though.

24        THE CLERK:  I'm sorry.  What's the number?

25        MS. JERICH:  For the record, 9-x through 9-11.

BY MS. JERICH:

Q.   And you recognize those photographs, sir?

A.   Yes, ma'am.

Q.   And do they accurately depict the exterior and interior of
the fourth grow house discovered at Bear Pen Canyon on
May 13th?

A.   Yes, they do.

          MS. JERICH:  Your Honor, I would like to at this time
admit those items into evidence.

          MR. NICK:  No objection, your Honor.

          THE COURT:  Did you say no?

          MR. NICK:  No objection, your Honor.  I'm sorry.

          THE COURT:  All right.  They will be received.

          (Trial Exhibits 9-x through 9-aa received in evidence)

          MS. JERICH:  Agent Bilek, would you please put up 9-x
so the jury can see?

          (Photograph displayed.)

BY MS. JERICH:

Q.   What is that, sir?

A.   The picture of 9-x is the exterior on the south side of
the fourth grow shed.

Q.   And you mentioned earlier that that grow shed was not
discovered on May 12, is that right?

A.   That is correct.

Q.   And why is that?

1   A.   Because of its location and, also, due to the darkness of

2   the evening.

3   Q.   Now, directing you again to Exhibit 11-a, which we have

4   all been looking at, where on that diagram is this fourth grow

5   shed?

6   A.   It will be in the lower left-hand corner that's marked as

7   "Grow Shed."  And it would be to the west or left of the

8   "Processing Shed."

9   Q.   And is that some distance between the fourth grow shed on

10  the lower left-hand corner of 11-a and the three grow sheds

11  discovered on May 12?

12  A.   Yes, ma'am.

13  Q.   How great a distance would you say that is, if you know?

14  A.   As the crow flies, I would say approximately 80 yards.

15  Q.   Did you in some way determine the connection between the

16  generator that was discovered --

17  A.   Yes, ma'am.

18  Q.   All right.  And what was that connection to the fourth

19  grow shed?

20  A.   One of the pictures that I'm sure might be shown, it will

21  show power lines coming down to it.  Basically walked back up

22  and traced the power lines back to where the generator was.

23  Q.   So before the generator was detached, there were power

24  lines discovered, if I understand your testimony, running both

25  to the three grow houses that you found the first day and then

1  later to the fourth grow house on the southwest portion of that

2  property?

3  A.    Yes, ma'am.

4  Q.    Okay.

5         MS. JERICH:  Could you please put up the next

6  exhibit, Agent Bilek?

7         (Photograph displayed.)

8  BY MS. JERICH:

9  Q.    And what are we looking at there, sir?

10 A.    The interior of the fourth grow shed, and a marijuana bed.

11 Q.    And that's reflected in, I believe, 9-y?

12 A.    Correct.

13 Q.    Again, was that photograph taken by you?

14 A.    Yes, ma'am.

15        MS. JERICH:  Next exhibit, please, 9-x?

16        (Photograph displayed.)

17        MS. JERICH:  Pardon me.  9-z for the record.

18 BY MS. JERICH:

19 Q.    Do you recognize that?

20 A.    Yes, I do.

21 Q.    What is that?

22 A.    It would be the opposite side of the same room that the

23 other photograph was taken.  That's inside the fourth grow

24 building.

25        MS. JERICH:  Then the final photograph, please, which

1   I believe is 9-aa?

2          (Photograph displayed.)

3   **BY MS. JERICH:**

4   **Q.**   What are we looking at there, sir?

5   **A.**   Looking from the furthest end of the room outward in the

6   fourth grow shed.

7   **Q.**   Now, did your duties searching at Bear Pen Canyon the

8   second day also include counting plants?

9   **A.**   Yes, ma'am.

10  **Q.**   Again, was this done by yourself or with other people?

11  **A.**   I did probably the largest percentage of the eradication

12  in this room.

13  **Q.**   And, again, did you only count plants with marijuana

14  roots?

15  **A.**   Yes, ma'am.

16  **Q.**   And on this day, did you give the information again to --

17  was it Deputy Davis or some other person?

18  **A.**   Deputy Davis again.

19  **Q.**   Did you also take a subsample on May 13th?

20  **A.**   Yes, ma'am.

21          **MS. JERICH:**  May I approach the witness, your Honor?

22          **THE COURT:**  Pardon me?

23          **MS. JERICH:**  May I approach the witness?

24          **THE COURT:**  You may.

25          **MS. JERICH:**  Thanks.

1          I'm going to, with the Court's permission, remove
2    9-cc at this time.

3          **THE COURT:**  Any objection?

4          **MR. NICK:**  No, your Honor.

5          **THE COURT:**  Thank you.  It will be received.

6          **MS. JERICH:**  It has not been marked.

7          **THE CLERK:**  9-cc.

8          **MS. JERICH:**  Not yet.

9          **THE CLERK:**  What did we just admit?

10         **THE COURT:**  Just right this second we did 9-cc.

11         **MS. JERICH:**  I just took it back.  I have not --

12         **THE CLERK:**  Oh, she doesn't want to put it in.

13         **MS. JERICH:**  I will in a moment.  I was first going
14   to ask the witness about Exhibit 88.

15         **THE COURT:**  So we have not put it in.

16         **MS. JERICH:**  We have not admitted anything.

17         **THE COURT:**  Premature admission.

18   **BY MS. JERICH:**

19   **Q.**   We were talking about subsamples, all right, and you have
20   already explained to us the purpose in taking subsamples.  It's
21   to test for the presence of, is it TCH?

22   **A.**   THC.

23   **Q.**   THC, excuse me.  And when we say THC, what does that mean
24   in marijuana investigator parlance?

25   **A.**   That is the substance that is what causes the high.

1   Q.   The high?

2   A.   Right.

3   Q.   Which makes it illegal, I guess.

4         Now, you see before you I have placed Exhibit 88.

5   Do you recognize the contents that exhibit, sir?

6   A.   Again, as in the first ones, the paper bags in there are

7   consistent with what I would use, but it would also have my

8   signature on them or my handwriting on them.  And I don't see

9   that from where I'm at at this point.

10  Q.   After you collect the subsample, which is basically part

11  of the plant, is that correct?

12  A.   Yes, ma'am.

13  Q.   You do something with wrapping in it a bag, is that

14  correct?

15  A.   Right.  The subsample goes into a paper bag.  It's marked

16  as to which subsample it is and its location.

17  Q.   And who marks it?

18  A.   In this situation it was me.

19  Q.   Do you have the scissors still up there, sir?

20  A.   Yes, I do.

21  Q.   Would you mind opening the bag and identifying for us the

22  contents that bag?

23  A.   Yes, I will.

24  Q.   Thank you.

25  A.   I don't want to pull them out because I will get debris on

1  the countertop, but I do recognize my signatures on these.

2  **Q.**   There are some -- if you pull that out again, that's fine.

3  You can leave it intact.

4        You have opened what is Exhibit 88 and you have

5  removed what appears to be a smaller size Ziploc baggie and you

6  have examined the bags, is that correct?

7  **A.**   That's right.

8  **Q.**   And are those, in fact, the subsamples you took from the

9  Bear Pen Canyon grow on May 13?

10  **A.**   Yes, ma'am.

11  **Q.**   How do you recognize them to be such?

12  **A.**   My signature and it's consistent with the photograph that

13  I took, also.

14  **Q.**   Thank you.

15        **MS. JERICH:**   Your Honor, I would like to ask that

16  this exhibit also be admitted into evidence.

17        **THE COURT:**   Any objection?

18        **MR. NICK:**   No objection.

19        **THE COURT:**   It will be received.

20        **MS. JERICH:**   Thank you.

21        **THE CLERK:**   Which number was this?

22        **MS. JERICH:**   Exhibit 88.

23        (Trial Exhibit 88 received in evidence)

24  **BY MS. JERICH:**

25  **Q.**   Now I would like to return for just a moment, if I

1  could --

2         MS. JERICH:  And for the Court's information I

3  probably have about 10 minutes maximum.

4         THE COURT:  Are you able to stay 10 more minutes,

5  ladies and gentlemen?  No?  No?  Is that a no or yes.

6         JUROR TAMAYO:  It's a yes.

7         THE COURT:  Why don't you try to finish up?

8         MS. JERICH:  I will, your Honor.  Thank you.

9  BY MS. JERICH:

10 Q.   Approaching you again, sir, with Exhibit 9-cc.

11         (Whereupon, photograph was tendered

12          to the witness.)

13 BY MS. JERICH:

14 Q.   Could you just identify, again, for us what is depicted in

15 that photograph?

16 A.   What it says on here, SW-2 and then No. 1 one.  SW-2

17 stands for search warrant No. 2, and the No. 1 is the first

18 subsample from this building on that second day.

19 Q.   And search warrant number two, because as we have

20 discussed there were two days and two searches at this grow

21 site, is that correct?

22 A.   Correct.

23         MS. JERICH:  Okay.  Your Honor --

24 BY MS. JERICH:

25 Q.   And that's a photograph taken by whom?

1  **A.**    Myself.

2  **Q.**    Okay.

3          **MS. JERICH:**  I would like to ask that 9-cc also be

4  moved into evidence at this time.

5          **MR. NICK:**  No objection.

6          **THE COURT:**  Thank you.  It will be received.

7          (Trial Exhibit 9-cc received in evidence)

8          **MS. JERICH:**  Thank you.  Thank you very much.

9          **MS. JERICH:**  Would you please put that up?  Thank

10  you.

11          (Photograph displayed.)

12  **BY MS. JERICH:**

13  **Q.**  Just for the jury's information, what we are looking at

14  is -- what's that green leafy product?

15  **A.**    In my experience and training it's marijuana.

16  **Q.**  And is that marijuana photographed within that fourth

17  structure discovered on May 13th?

18  **A.**    Yes, ma'am.

19  **Q.**  And that brown bag, in whose hand is that done?

20  **A.**    The handwriting is mine.

21  **Q.**  Okay.  And you said, I believe, that stands for -- SW-2

22  stands for search warrant number two?

23  **A.**    Uh-huh.

24  **Q.**  And the No. 1 stands for first subsample?

25  **A.**    No. 1.

1  Q.   Okay.  Taken from that particular grow bed?

2  A.   Yes.

3  Q.   Okay.  How many subsamples, if you recall, did you take in

4  that fourth grow house on that day?

5  A.   I believe I only took three samples that day.

6  Q.   And, again, after you have taken your subsample, you do

7  what with that?

8  A.   I surrendered that to Deputy Davis.

9  Q.   Thank you.  And with respect to when you finished counting

10 the plants, you also submitted that information on May 13th to

11 Deputy Davis?

12 A.   Correct.

13 Q.   Did you also on the second day locate a trim room on that

14 property?

15 A.   It would have been the same one that we discovered on the

16 first day.  We had to walk by it to get to this one.

17 Q.   All right.  Thank you.

18       MS. JERICH:  May I approach the witness with my last

19 set of photographs, your Honor?

20       THE COURT:  You may.

21       MS. JERICH:  Thank you.

22       (Whereupon, photographs were tendered

23        to the witness.)

24 BY MS. JERICH:

25 Q.   I have approached you with a series of photographs labeled

1    Exhibits 9-jj through 9-nn.

2          Do those pictures accurately depict the trim room and

3    the processing shack found in the additional grow house on

4    May 13th?

5    A.    Yes, they do.

6    Q.    And did you, in fact, take those pictures?

7    A.    Yes, I did.

8    Q.    Okay.  Thank you.

9          MS. JERICH:  All right.  Your Honor, at this point I

10   would like to ask that these photographs as well be admitted

11   into evidence.

12          THE COURT:  Any objection?

13          MR. NICK:  No objection.

14          THE COURT:  Thank you.  They will be received.

15          (Trial Exhibits 9-jj through 9-nn received in

16           evidence)

17          MS. JERICH:  Thank you very much.  Would you please

18   put up, I believe it's Exhibit MM.

19          (Photograph displayed.)

20   BY MS. JERICH:

21   Q.    Sir, what is that that we are looking at in MM?

22   A.    This is the area where the plants were processed or

23   manicured.

24   Q.    Is an area like that also known as a trim room?

25   A.    Yes, they are.

1  Q.   Can it also be called a processing shack?

2  A.   Yes.

3  Q.   And what is on that center table?

4  A.   I'm going to look at a different photograph because it's a

5  little clearer, but there are some water bottles.  There's leaf

6  and stem from marijuana plants.  Looks like some potato chips,

7  some alcohol, some beef jerky, some paper towels.

8  Q.   Okay.  Thank you, sir.

9            And in those black plastic bags found around that

10  small table what did you find?

11  A.   It was leaf structure and stem structures.

12  Q.   Were those buds that were going to market?

13  A.   No.

14  Q.   What was contained in those bags?

15  A.   What was left, the cuttings from the plant.

16  Q.   And is that what we heard another witness refer to as

17  shake?

18  A.   Yes, ma'am.

19  Q.   Now, is that basically trash?

20  A.   Pretty much so.

21  Q.   Not usable?

22  A.   (Witness shaking head.)

23  Q.   Okay.  Thank you.

24        MS. JERICH:  Agent Bilek, would you go to NN, please?

25        (Photograph displayed.)

1  **BY MS. JERICH:**

2  **Q.**   And is that just another view of that same exhibit

3  photographed by you in 9-mm?

4  **A.**   Yes, ma'am.

5  **Q.**   And is this a scene that you have in your 12 years with

6  the COMMET team seen before?

7  **A.**   Yes, ma'am.

8  **Q.**   Okay.  So is this commonly how you would expect to find a

9  trim room?

10  **A.**   Pretty much so.

11          **MS. JERICH:**  Would you please put up JJ?

12          (Photograph displayed.)

13  **BY MS. JERICH:**

14  **Q.**   And what is that we are looking at, sir?

15  **A.**   That is the east side or easterly side of the processing

16  or trim shed.

17  **Q.**   And, again, referring to the trim shed discovered on

18  May 13th?

19  **A.**   It would have been discovered on the 12th.

20  **Q.**   I'm sorry, on the 12th.

21          **MR. NICK:**  Exhibit KK?

22          (Photograph displayed.)

23  **BY MS. JERICH:**

24  **Q.**   What are we looking at there, if you know?

25  **A.**   It would be the first room that you would enter going into

1  the processing or trim shed, and the bags are full of marijuana

2  leaves and stems or shake.

3  **Q.**  Called shake, all right.

4          **MS. JERICH:**  LL, please.

5          (Photograph displayed.)

6  **BY MS. JERICH:**

7  **Q.**  And, again, is that --

8  **A.**  I'm sorry.  LL shows basically the same thing, garbage

9  bags full of marijuana leaves and stem.  This would have been

10 to the right, I believe, of the door as you come into this

11 building.

12 **Q.**  Thank you very much.

13         **MS. JERICH:**  Your Honor, I have no further questions

14 for this witness.

15         **THE COURT:**  All right.  Thank you.

16         Will you have cross-examination, Mr. Nick?

17         **MR. NICK:**  Yes, your Honor.

18         **THE COURT:**  All right.  We will break at this time

19 then.  And if you would come back, please, ladies and

20 gentlemen, at 8:30 tomorrow morning.

21         In the meantime, please do not speak with each other

22 or anyone else about this case.  Don't let anybody talk to you.

23 Don't make up your minds, you have not heard all the evidence

24 yet.

25         Have a great evening.

1              (Jury out at 3:12 p.m.)

2              **THE COURT:**  And you, sir, I'm sorry to say, have to

3 come back tomorrow morning.

4              (Witness stands down.)

5              **THE COURT:**  What's up for tomorrow?

6              **MS. AULT:**  Just waiting for the door to close, your

7 Honor.

8              Tomorrow we anticipate finishing up with

9 Mr. Alvarado, Deputy Alvarado.  We will call Brian Thomas,

10 Timbrye Petrell, Rusty Noe, Mark Peterson, and perhaps Trevor

11 Trabue.

12             **THE COURT:**  We will need to discuss the question of

13 Wednesday at some point with the jury.  I'm content to go all

14 day Wednesday.  I'm content to break at, say, 1:00 o'clock on

15 Wednesday to give people a little jump on the holiday.  If the

16 jury -- I had mentioned being off on Wednesday in order to get

17 a jury.  If somebody tells us they have got concrete plans for

18 Wednesday, I would respect that; but I think my preference to

19 be to go until about 1:00 o'clock on Wednesday if that works

20 for people.

21             **MR. NICK:**  Yes, your Honor.  I just -- can I just

22 make a suggestion?  I would go with either one.  Like 8:00 in

23 the morning until, like, noon without a break and that way

24 people can get out of here a little bit earlier?  Maybe just

25 think about it.

1        THE COURT:  I can think about it.  I thought really

2   fast.

3        MR. NICK:  I forget about your judicial capacity.

4        THE COURT:  That's an easy one.  My colleagues down

5   the hall start at 6:00, but I don't want to start earlier than

6   8:30, but I am willing to break early.  So think about that and

7   we will talk about it tomorrow.  And then I would like to tell

8   them before we break tomorrow what to expect for next week.

9        MS. AULT:  We would appreciate that, your Honor.  All

10  of my witnesses are from out of town, so getting them out of

11  here before the holiday rush would be, I think, good for them.

12       THE COURT:  If you feel like we are making really

13  good progress, then we can break at 12:00 or 12:30.  I just

14  don't have a sense of how you feel about that.

15       MS. AULT:  I think we are going a little bit slower

16  than I was originally anticipating, but I think tomorrow I

17  think things will pick up a little bit.  I think part of it is

18  just the process of getting used to the courtroom and equipment

19  and everything.

20       THE COURT:  All right.  So I will forget, so please

21  remind me tomorrow we shall discuss this.

22       The last thing I wanted to mention to you is that we

23  have to start late on Monday morning.  I think 9:30 we will

24  have to start Monday.

25       THE CLERK:  On Monday the 19th?

1           THE COURT:  Yes, next Monday.  Because what I was

2    thinking is --

3           THE CLERK:  Did you say 9:30?

4           THE COURT:  9:30, and you can talk to the jury about

5    it.  Maybe we can go till, say, 4:00 on Monday to try to make

6    up the time.

7           MS. JERICH:  That that would be fine, your Honor.

8           THE COURT:  So if that works for you.

9           MR. NICK:  Yes, your Honor.  That's fine.

10          THE COURT:  Also, remind me I should tell them that,

11   too.

12          MR. NICK:  Your Honor, I just had one inquiry.  I had

13   filed a petition for writ of habeas corpus --

14          THE CLERK:  Oh, did you?  Do I have it?

15          THE COURT:  I gave it to you.

16          THE CLERK:  Oh, God.  It's buried in here.

17          THE COURT:  Check with Tracy.  She should have it.

18          MR. NICK:  Thank you, your Honor.

19          MS. AULT:  Your Honor, just to advise the Court, we

20   will want to have a discussion outside of the presence of the

21   jury about that witness before she is called.

22          THE COURT:  Okay.  I did sign the writ.

23          MS. AULT:  That's fine.  Some of the items in the

24   writ we don't think are the proper subject.  They are

25   collateral impeachment matters that we don't think are

1  important.

2          **THE COURT:**  We will talk about that.

3          Anything else for now or can I let the court reporter

4  go?

5          **MS. AULT:**  That's all, your Honor.  Thank you.

6          (Whereupon at 3:17 p.m. further proceedings

7           in the above-entitled cause was adjourned

8           until Thursday, November 15, 2007 at 8:30 a.m.)

9

10                              -   -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

|                                    | **PAGE** | **VOL.** |
|------------------------------------|----------|----------|
| Preliminary Jury Instructions      | 260      | 2        |
| Opening Argument by Ms. Ault       | 262      | 2        |
| Opening Argument by Mr. Nick       | 278      | 2        |

| **PLAINTIFF'S WITNESSES**          | **PAGE** | **VOL.** |
|------------------------------------|----------|----------|
| **BRUCKENSTEIN, LARRY**            |          |          |
| (SWORN)                            | 301      | 2        |
| Direct Examination by Ms. Ault     | 302      | 2        |
| Cross Examination by Mr. Nick      | 342      | 2        |
| Redirect Examination by Ms. Ault   | 356      | 2        |
| **VAN PATTEN, GREGORY**            |          |          |
| (SWORN)                            | 364      | 2        |
| Direct Examination by Ms. Ault     | 365      | 2        |
| Cross Examination by Mr. Nick      | 373      | 2        |
| Redirect Examination by Ms. Ault   | 380      | 2        |
| **ALVARADO, ANDREW**               |          |          |
| (SWORN)                            | 380      | 2        |
| Direct Examination by Ms. Ault     | 381      | 2        |
| Cross Examination by Mr. Nick      | 404      | 2        |
| Redirect Examination by Ms. Ault   | 420      | 2        |
| **ALVARADO, STEVE**                |          |          |
| (SWORN)                            | 424      | 2        |
| Direct Examination by Ms. Jerich   | 424      | 2        |

— — — —

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1 | | | 307 | 2 |
| 84-a | | | 313 | 2 |
| 84-d | | | 315 | 2 |
| 84-e | | | 318 | 2 |
| 84-c | | | 320 | 2 |
| 9-dd | | | 320 | 2 |
| 9-c | | | 322 | 2 |
| 9-b | | | 324 | 2 |
| 11 | | | 326 | 2 |
| 11-a | | | 326 | 2 |
| 9-h | | | 330 | 2 |
| 10-a | | | 333 | 2 |
| 9-A | | | 336 | 2 |
| 84-f | | | 339 | 2 |
| 9-ff through 9-ii | | | 340 | 2 |
| 36-a | | | 346 | 2 |
| 36-b | | | 370 | 2 |
| 36-c | | | 372 | 2 |
| 9-b through 9-w | | | 386 | 2 |
| 40 | | | 395 | 2 |
| 38 | | | 401 | 2 |
| 39 | | | 402 | 2 |
| 37 | | | 403 | 2 |
| A | | | 415 | 2 |
| 87 | | | 443 | 2 |
| 9-bb and 9-ee | | | 448 | 2 |
| 9-x through 9-aa | | | 456 | 2 |
| 88 | | | 462 | 2 |
| 9-cc | | | 464 | 2 |
| 9-jj through 9-nn | | | 466 | 2 |

–  –  –  –

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR 06-0711 SI, UNITED STATES OF AMERICA vs CODY DOBBS were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____
/s/ Debra L. Pas

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, September 3, 2008